## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| ADISSEO ESPANA S.A. AND ADISSEO USA INC. | ) ) ) |
| Plaintiffs, | ) |
| v. | ) |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant, | ) |
| and | ) |
| | ) |
| NOVUS INTERNATIONAL INC., | ) |
| | ) |
| Defendant-Intervenor. | ) |

Court No. 21-00562

## <u>ORDER</u>

Upon consideration of Plaintiffs Adisseo Espana S.A. and Adisseo USA Inc. (collectively "Adisseo"), Motion for Judgment on the Agency Record pursuant to Rule 56.2 of the Rules of the United States Court of International Trade, and all other papers and proceedings herein, it is hereby:

ORDERED that Plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record is granted; and it is further

ORDERED that the U.S. International Trade Commission's final

determination Methionine from Spain and Japan, 86 Fed Reg. 50743

(Sept. 10, 2021), is remanded for disposition in a manner consistent

with the judgment of this Court.

SO ORDERED

Dated:_____, 2022

New York, New York                          _____

                                                              JUDGE

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE**

| | |
|---|---|
| ADISSEO ESPANA S.A. AND ADISSEO USA INC. ) ) ) Plaintiffs, ) v. ) ) UNITED STATES, ) ) Defendant, ) and ) ) NOVUS INTERNATIONAL INC., ) ) Defendant-Intervenor. ) | Court No. 21-00562 |

**PLAINTIFFS' RULE 56.2 MOTION FOR JUDGMENT ON THE**

**AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade. Plaintiffs Adisseo Espana S.A. and Adisseo USA Inc. (collectively "Adisseo"), hereby move for judgment on the agency record in the above-referenced action.  This action challenges the United States International Trade Commission's ("the Commission") final determination in the antidumping investigation covering subject methionine from Spain and Japan.  The final determination was styled

and published as <u>Methionine from Spain and Japan</u>, 86 Fed Reg. 50743

(Sept. 10, 2021) and accompanying views of the Commission contained

in USITC Publication 5230 (Sept. 2021), entitled <u>Methionine from</u>

<u>Japan and Spain</u>: Investigation Nos. 731-TA-1535-1536.

    The legal and factual support for Plaintiffs' motion is fully set

forth in its Memorandum of Points of Authority in Support of their

Motion for Judgment on the Agency record.  Plaintiffs respectfully ask

this Court to hold that the Commission's final determination is

unsupported by substantial evidence on the administrative record and

otherwise not in accordance with law, and that the Court therefore

remand this final determination to the Commission for disposition in a

manner consistent with the judgment of the Court.

Respectfully submitted,


    /s/ Eric C. Emerson
Eric C. Emerson
Christopher
Forsgren
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 429-8076

*Counsel for Adisseo Espana S.A.*
*and Adisseo USA, Inc.*

Dated: March 31, 2022

<u>**PUBLIC VERSION**</u>

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE**

|  |  |
|---|---|
| ———————————————— ) | |
| **ADISSEO ESPANA S.A. AND** ) | |
| **ADISSEO USA INC.** ) | |
| **Plaintiffs,** ) | **Court No. 21-00562** |
| **v.** ) | |
| ) | **Business Proprietary** |
| **UNITED STATES,** ) | **Information Deleted from** |
| ) | **Pages 15, 16, 18 – 25, 27 – 31,** |
| **Defendant,** ) | **33 – 35, 43, 51 – 53, and 56 – 64** |
| **and** ) | |
| ) | |
| **NOVUS INTERNATIONAL INC.,** ) | |
| ) | |
| **Defendant-Intervenor.** ) | |
| ———————————————— ) | |

<u>**PLAINTIFFS' MEMORANDUM IN SUPPORT OF RULE 56.2
MOTION FOR JUDGMENT ON THE AGENCY RECORD**</u>

# Table of Contents

**Page**

I.   STATEMENT PURSUANT TO RULE 56.2 ........................................ 1

   A.   Administrative Determination Under Review .............................. 1

   B.   Issues Presented for Review and Summary of Argument ............. 2

II.   STATEMENT OF THE FACTS .................................................... 5

III.   STANDARD OF REIVEW ...................................................... 9

IV.   ARGUMENT ................................................................ 10

   A.   The Commission's Determination that Subject Imports Adversely
   Affected the Price for the Domestic Like Product Was Not in
   Accordance with Law and Was Not Supported by Substantial
   Evidence ................................................................ 10

      1.   The Commission's Price Effects Determination Was Predicated
      on an Incorrect Assessment of the Importance of Price in the
      Purchasing Decision ................................................... 11

      2.   The Commission's Finding that Subject Imports Caused Price
      Depression Was Not Supported by Substantial Evidence ............... 14

      3.   The Commission's Findings Regarding Lost Sales Were Not
      Substantiated by Record Evidence and in Any Case Cannot Alone
      Support a Finding of Adverse Price Effects ........................... 32

      4.   The Commission Failed to Make a Finding of Underselling .... 39

   B.   The Commission's Determination of Adverse Volume Effects Was
   Not Supported by Substantial Evidence ................................. 49

i

1.    The Commission Failed to Consider the Importance of Supply Diversity When Assessing the Significance of the Increase in Subject Imports During the POI.........................................................50

2.    The Commission Failed to Consider the Lack of Substitutability Between Different Chemical Compositions of Methionine When Considering the Increase in Import Volumes ....53

3.    The Commission's Finding that Subject Imports Caused a Loss in the Domestic Industry's Market Share is Unsupported by Substantial Evidence. ........................................................59

C.    The Commission's Determination that Subject Imports Adversely Impacted the Condition of the Domestic Industry Was Not in Accordance with Law and Was Not Supported by Substantial Evidence .................................................................................62

V.  CONCLUSION ......................................................................64

## Table of Authorities

**Pages**

## Cases

AK Steel Corp. v. United States, 36 C.I.T. 1466 (2012) .................... 25, 26

Altx, Inc. v. United States, 167 F. Supp. 2d 1353 (Ct. Int'l Trade 2001)
.......................................................................... 13, 32, 37, 62

Altx, Inc. v. United States, 370 F.3d 1108 (Fed. Cir. 2004) ............. 13, 32

Associacion Colombiana de Exportadores de Flores v. United States, 12
C.I.T. 1174 (1988) .................................................................. 36

Atlantic Sugar, Ltd. v. United States, 744 F.2d 1556 (Fed. Cir. 1984).. 46

Bando Chem. Indus. v. United States, 16 C.I.T. 133 (1992) ................. 36

British Steel PLC v. United States, 127 F.3d 1471 (Fed. Cir. 1997) ..... 47

Celanese Chems. Ltd. v. United States, 31 C.I.T. 279 (2007) .......... 38, 46

Coal. of Gulf Shrimp Indus. v. United States, 71 F. Supp. 3d 1356 (Ct.
Int'l Trade 2015) ................................................................. 47

Comm. for Fair Beam Imps. v. United States, 27 C.I.T. 932 (2003) 38, 47

Copperweld Corp. v. United States, 682 F. Supp. 552 (Ct. Int'l Trade
1988) ................................................................................. 37

CS Wind Vietnam Co. v. United States, 832 F.3d 1367 (Fed. Cir. 2016)
.................................................................................... 10, 46

Dak Ams. LLC v. United States, 456 F. Supp. 3d 1340 (Ct. Int'l Trade
2020) ................................................................................. 45

DAK Ams. LLC v. United States, 517 F. Supp. 3d 1349 (Ct. Int'l Trade
2021) ................................................................................. 44

Hynix Semiconductor, Inc. v. United States, 431 F. Supp. 2d 1302 (Ct.
Int'l Trade 2006) ................................................................. 45

Iwatsu Elec. Co. v. United States, 15 C.I.T. 44 (1991) ............................ 38

Lone Star Steel Co. v. United States, 10 C.I.T. 731 (1986) .................... 38

Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins.
    Co., 463 U.S. 29 (1983) ........................................................................ 10

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S.
    29 (1983)................................................................................................ 46

Nippon Steel Corp. v. United States, 337 F.3d 1373 (Fed. Cir. 2003) ... 46

Nippon Steel Corp. v. United States, 458 F.3d 1345 (Fed. Cir. 2006) ... 10

Nucor Corp. v. United States, 414 F.3d 1331 (Fed. Cir. 2005)......... 40, 41

Sec'y of Agriculture v. United States, 347 U.S. 645 (1954) .................... 47

Shake & Shingle All. v. United States, 415 F. Supp. 3d 1249 (Ct. Int'l
    Trade 2019) .................................................................................... 58, 62

Shanghai Foreign Trade Enters. Co. v. United States, 318 F.Supp.2d
    1339 (Ct. Int'l Trade 2004) ................................................................ 10

Yantai Oriental Juice Co. v. United States, 26 C.I.T. 605 (2002) .......... 10

## Statutes

19 U.S.C. § 1516a(b)(l)(B)(i) .................................................................. 10

19 U.S.C. § 1677(7)(C)(i)......................................................................... 49

19 U.S.C. § 1677(7)(C)(ii) ................................................................. 11, 40

## Administrative Determinations

Acetone from Singapore and Spain, Inv. Nos. 731-TA-1438 and 1440,
    USITC Pub 4997 (Dec. 2019) .............................................................. 34

Bottom Mount Combination Refrigerator-Freezers from Korea and
    Mexico, Investigation Nos. 701-TA-477 and 731-TA-1180-1181 (Final),
    USITC Pub. 4318 (May 2012) ............................................................. 44

Certain Ceramic Station Post Insulators from Japan, Inv. No. 731-TA-1023 (Final), USITC Pub. 3655 (Dec. 2003) .........................................47

Low Enriched Uranium From France, Germany, the Netherlands, and the United Kingdom, Investigations Nos. 701-TA-409-412 (Final) and 731-TA-909 (Final), USITC Pub. 3486 (Feb. 2002)..............................47

Polyethylene Terephthalate (PET) Resin From India, Indonesia, & Thailand, Investigations Nos. 701-TA-439 and 731-TA-1077; 1078 and 1080 (Final), USITC Pub. 3769 (May 2005) .........................................43

Sodium Metal from France, Investigation No. 731-TA-1135 (Final), USITC Pub. 4045 (Nov. 2008)..............................................................43

Utility Scale Wind Towers, Inv. Nos. 701-TA-486 and 731-TA-1195-1196 (Final), USITC Pub. 4372 (Feb. 2013) .................................................47

Wooden Bedroom Furniture from China, Investigation No. 731-TA-1058 (Final), USITC Pub. 3743 (Dec. 2004) .................................................44

## Glossary

| Abbreviation | Term |
| --- | --- |
| Tr. | Transcript |
| STEAW | Short Ton 100-percent Equivalent Activity Weight[1] |
| MHA | Methionine Hydroxy Analog |
| DLM | DL-Methionine |
| ITC/Commission | United States International Trade Commission |
| Adisseo | Adisseo Espana S.A. and Adisseo USA Inc. |
| Sumitomo | Sumitomo Chemical Company, Ltd. and Sumitomo Chemical America, Inc. |

[1] This unit of measure was used by the Commission to facilitate meaningful comparison between methionine types. See Appx01715-01716.

# I.   STATEMENT PURSUANT TO RULE 56.2

Pursuant to Rule 56.2 of the Rules of this Court, Plaintiffs Adisseo Espana S.A. and Adisseo USA Inc. (collectively "Adisseo"), hereby submit this memorandum of points and authorities in support of their motion for judgment on the agency record. For the reasons set forth below, Plaintiffs respectfully request that the Court grant their motion.

## A.   Administrative Determination Under Review

Adisseo challenges the United States International Trade Commission's ("the Commission") final determination in the antidumping investigation covering subject methionine from Spain and Japan. The final determination was styled and published as Methionine from Spain and Japan, 86 Fed Reg. 50743 (Sept. 10, 2021) ("Spain and Japan Final Determination") and accompanying views of the Commission contained in USITC Publication 5230 (Sept. 2021), entitled Methionine from Japan and Spain: Investigation Nos. 731-TA-1535-1536. These views explicitly incorporated the reasoning of the Commission contained in Methionine from France, Inv. No. 731-TA-1534, contained in USITC Publication 5206 (June 2021), entitled Methionine from France: Investigation No. 731-TA-1534 ("Views").

1

The Commission's preliminary determination in the challenged investigation was published as <u>Methionine From France, Japan, and Spain; Determinations</u>, 85 Fed. Reg. 58385 (Sept. 18, 2020) and accompanying views of the Commission contained in USITC Publication 5121 (September 2020), entitled <u>Methionine from France, Japan, and Spain</u>, Inv. Nos. 731-TA-1534-1536 (Preliminary), USITC Pub. 5121 (Sept. 2020).

### B.   Issues Presented for Review and Summary of Argument

*1. Whether the Commission's determination that subject imports caused adverse price effects was supported by substantial evidence on the record, or otherwise in accordance with law.*

**Adisseo's Position:** No.  The Commission erroneously concluded that subject imports caused adverse price effects – specifically, that they depressed the price for the domestic like product.  The Commission supported this conclusion on the basis of email correspondence that purported to show subject merchandise was being offered at below market prices, evidence which was wholly contradicted by consistent and pervasive *overselling* by subject imports.  Not only was the

2

Commission's decision to rely on this anecdotal information contrary to its normal practice, these communications do not in fact support the Commission's conclusion.  In reaching this conclusion, the Commission ignored evidence demonstrating that any U.S. price declines were caused not by subject imports, but instead by global downward price trends which were transmitted into the U.S. market by means other than subject imports.  The Commission's reliance on lost sales allegations equally promoted anecdotal data over the quarterly price comparison data the Commission has consistently found to be more probative.  Finally, the Commission failed to make a finding on the question of whether there was significant price underselling as required by statute and applicable case law.

2. *Whether the Commission's determination that subject imports caused adverse volume effects was supported by substantial evidence on the record, or otherwise in accordance with law.*

**Adisseo's Position:** No.  The Commission's finding of adverse volume effects ignored key evidence that any increase in subject import volume was not significant in light of the nature of the U.S. methionine market.  Specifically, the Commission improperly ignored

or disregarded substantial record evidence that U.S. purchasers do not regard subject imports and domestic like product as fully substitutable because of the importance they place on diversity of supply, and the limited interchangeability of different types of methionine.  Additionally, the Commission's finding that the domestic industry lost substantial market share to subject imports similarly ignored important context such as increased demand in the U.S. methionine market and changes in market share for different types of methionine.

3. *Whether the Commission's determination that subject imports adversely impacted the condition of the domestic industry was supported by substantial evidence on the record, or otherwise in accordance with law.*

**Adisseo's Position:** No.  The Commission's determination that subject imports adversely impacted the condition of the domestic industry was predicated on its findings of adverse volume and price effects.  Because those findings are unsupported by substantial evidence and otherwise not in accordance with law, the Commission's finding of adverse impact must also necessarily fail.

4

## II.   STATEMENT OF THE FACTS

On July 29, 2020, the Commission, pursuant to Section 735(b) of the Tariff Act of 1930 ("the Act") (19 U.S.C. § 1673d(b)), instituted antidumping duty investigations, following the receipt of petitions filed with the Commission and the United States Department of Commerce ("Commerce") by Novus International Inc. ("Petitioner"), a domestic producer of methionine.  Methionine From France, Japan, and Spain; Institution of Anti-Dumping Duty Investigation and Scheduling of Preliminary Phase Investigations, 85 Fed. Reg. 47243 (Aug. 4, 2020).

On September 18, 2020, the Commission published its affirmative preliminary determination.  Methionine From France, Japan, and Spain; Determinations, 85 Fed. Reg. 58385 (Sept. 18, 2020); Methionine from France, Japan, and Spain, Inv. Nos. 731-TA-1534-1536 (Preliminary), USITC Pub. 5121 (Sept. 2021).  The Commission determined that there was a reasonable indication that an industry in the United States was materially injured by reason of imports of methionine from France, Japan, and Spain, that were alleged to be sold in the United States at less than fair value ("LTFV").

5

On February 24, 2021, the Commission published its Notice of
Institution of the final phase of its injury investigation. <u>Methionine
From France, Japan, and Spain; Scheduling of the Final Phase of
Antidumping Duty Investigations</u>, 86 Fed. Reg. 13585 (Mar. 9, 2021).
The deadlines for the Commission to issue its final determinations in
these investigations became staggered when Commerce postponed the
final determinations for its antidumping duty investigations regarding
methionine from Japan and Spain, but did not postpone the final
determination in the investigation of methionine from France.
<u>Methionine From Japan: Preliminary Affirmative Determination of
Sales at Less Than Fair Value, Preliminary Affirmative Determination
of Critical Circumstances and Postponement of Final Determination
and Extension of Provisional Measures</u>, 86 Fed. Reg. 12627 (Mar. 4,
2021); <u>Methionine From Spain: Preliminary Affirmative Determination
of Sales at Less Than Fair Value, Preliminary Negative Determination
of Critical Circumstances, Postponement of Final Determination, and
Extension of Provisional Measures</u>, 86 Fed. Reg. 12614 (Mar. 4, 2021);
<u>Methionine From France: Final Determination of Sales at Less Than</u>

<u>Fair Value and Final Partial Determination of Critical Circumstances</u>, 86 Fed. Reg. 26697 (May 17, 2021).

On May 5, 2021, Adisseo filed its pre-hearing brief, in which it argued that: (1) the domestic industry suffered no adverse volume effects by reason of subject imports; (2) the domestic industry suffered no adverse price effects by reason of subject imports; (3) the domestic industry suffered no adverse impact by reason of subject imports; and (4) subject imports did not threaten to cause material injury to the domestic industry.

On May 11, 2021 the Commission conducted its public hearing by video conference, in which Adisseo participated.

On May 18, 2021, Adisseo filed its post-hearing brief, in which it argued that: (1) the domestic industry's decline in market share did not support a material injury determination; and (2) the declining price for methionine in the U.S. market during the period of investigation was not caused by subject imports.

On June 9, 2021, Adisseo submitted its final comments to the Commission in the methionine from France investigation, which also referenced imports of methionine from Japan and Spain.  In its

comments, Adisseo demonstrated that the information provided with the Petitioner's post-hearing brief did not support petitioner's theory of underselling.  Specifically, Adisseo showed that the customer-specific examples of underselling provided by Petitioner were not probative and that Petitioner's theory of underselling was conceptually unsound.

The Commission reached a final affirmative determination in the investigation of methionine from France in June 2021.  Methionine from France, Inv. No. 731-TA-1534 (Final), USITC Pub. 5206 (June 2021); Methionine From France, 86 Fed. Reg. 35826 (Jul. 7, 2021). Notwithstanding the facts set out by Adisseo in its pre- and post-hearing briefs and final comments, the Commission found that an industry in the United States was materially injured by reason of cumulated imports of methionine from France, Japan and Spain.

On August 6, 2021, Adisseo submitted its supplemental final comments to the Commission in the methionine from Japan and Spain investigation.  In its comments, Adisseo again demonstrated that the Petitioner's theory of underselling was flawed and that subject imports did not materially injure the domestic industry.

Commerce published its final affirmative determinations regarding LTFV imports of methionine from Japan and Spain on July 23, 2021.  Methionine From Japan: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances, 86 Fed. Reg. 38983 (Jul. 23, 2021); Methionine From Spain: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, 86 Fed. Reg. 38985 (Jul. 23, 2021).

On September 10, 2021, the Commission published its final determination regarding subject imports from Japan and Spain, in which it made an affirmative determination.  Methionine from Spain and Japan, 86 Fed Reg. 50743 (Sept. 10, 2021) and Methionine from Japan and Spain, Investigation Nos. 731-TA-1535-1536 (Final) USITC Pub. 5230 (Sept. 2021).  In reaching its determination, the Commission explicitly adopted and incorporated the finding and analysis regarding material injury from its Methionine from France determination and Views.

## III.   STANDARD OF REIVEW

The Court holds unlawful any determination that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(l)(B)(i).  The standard of review requires the agency to fully consider "whatever in the record fairly detracts" from the evidence adduced in support of the agency's conclusion, CS Wind Vietnam Co. v. United States, 832 F.3d 1367, 1373 (Fed. Cir. 2016), and to analyze all "important aspect{s} of the problem" before it.  Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  Additionally, an agency must do more than offer conclusory statements of its findings.  See, e.g., Shanghai Foreign Trade Enters. Co. v. United States, 318 F.Supp.2d 1339, 1346 (Ct. Int'l Trade 2004); Yantai Oriental Juice Co. v. United States, 26 C.I.T. 605, 611 (2002).  Furthermore, an agency's decision is only supported by substantial record evidence if it is reasonable.  See Nippon Steel Corp. v. United States, 458 F.3d 1345, 1351 (Fed. Cir. 2006).

## IV.   ARGUMENT

A.   **The Commission's Determination that Subject Imports Adversely Affected the Price for the Domestic Like Product Was Not in Accordance with Law and Was Not Supported by Substantial Evidence**

10

Under the Act, the Commission is directed to consider whether:

> (I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and

> (II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

19 U.S.C. § 1677(7)(C)(ii).

> 1.   The Commission's Price Effects Determination Was Predicated on an Incorrect Assessment of the Importance of Price in the Purchasing Decision

Three times in the Views the Commission states that "price is an important factor" in purchasing decisions regarding methionine.  See Views at Appx02101, Appx02103, Appx02106 n.147.  This statement is critical, since the Commission's analysis of price effects fundamentally depends on the characterization of methionine purchasers as driven principally if not exclusively by price.

But this assumption that price is the driving force behind U.S. purchasers' buying decisions is contradicted by the factual record. While price is of course considered, U.S. purchasers reported that numerous other non-price factors are more important in their

11

purchasing decision.  In response to the Commission's questionnaires, U.S. purchasers ranked the importance of their top purchasing factors as follows:

| Factor | Very Important | Somewhat Important | Not Important |
|---|---|---|---|
| Reliability of supply | 28 | 0 | 0 |
| Availability | 27 | 0 | 1 |
| Quality meeting industry standards | 27 | 1 | 0 |
| Product consistency | 25 | 3 | 0 |
| Price | 23 | 5 | 0 |

<u>Investigation Nos. 731-TA-1534-1536 (Final): Methionine from France, Japan, and Spain – Staff Report</u> (June 1, 2021) ("Final Staff Report") at Appx01672 (Table II-7).  The Final Staff Report also notes that "{q}uality/consistency and availability/supply continuity were the most frequently cited first-most important factor (cited by 10 firms each), followed by price/cost ({6} firms) . . ."[2]  Final Staff Report at Appx01671 and Table II-6.  Furthermore, of 28 responding purchasers, *only two*

---

[2] The Final Staff Report erroneously states that seven purchasers ranked price/cost as the most important factor. <u>See</u> Final Staff Report at Appx01671 (Table II-6).

said that they always purchase the lowest-priced product.[3]  Final Staff

Report at Appx01671.  Responses to the Commission's U.S. Purchasers'

Questionnaires were supported by purchaser testimony at the hearing

(uncited by the Commission in its Views) that price is not the most

significant factor in their purchasing decision.  <u>Methionine from France,</u>

<u>Japan and Spain, Inv. Nos. 731-TA-1534-1536 (Final), Hearing</u>

<u>Transcript</u> (May 11, 2021) ("Tr.") at Appx11106-11108 (Batal),

Appx11115-11117 (Cross).  The Commission's failure to acknowledge

the lesser importance of price relative to these other non-price factors

thus unfairly overstates the importance of price in the purchasing

decision.

     This mischaracterization is critical.  In addition to the many other

failings in the Commission's price effects analysis as detailed below, the

Court should bear in mind that the Commission's analysis is based on

---

[3] Adisseo repeatedly brought to the Commission's attention the fact that price was a less important factor in purchasing decisions than other non-price factors.  <u>See, e.g.</u>, Adisseo's Pre-Hearing Case Brief (May 4, 2021) ("Adisseo Pre-Hearing Brief") at Appx07027-07028; Adisseo's Post-Hearing Case Brief (May 17, 2021) ("Adisseo Post-Hearing Brief") at Appx07650-07652.  The Court has held that the Commission "may not through its silence simply ignore a Staff Report analysis that contradicts the Commission's own conclusions where an interested party has specifically brought the possibly conflicting evidence to the agency's attention."  <u>Altx, Inc. v. United States</u>, 167 F. Supp. 2d 1353, 1359-60 (Ct. Int'l Trade 2001) (citations omitted), <u>aff'd</u> <u>Altx, Inc. v. United States</u>, 370 F.3d 1108 (Fed. Cir. 2004).

the presumption that purchasers will always buy the lowest priced product. If that assumption is not correct – and it is not – then the soundness of the Commission's analysis and the correctness of its decision is severely undermined.

2.   The Commission's Finding that Subject Imports Caused Price Depression Was Not Supported by Substantial Evidence

a.   The Commission Relied on a Nonsensical Theory of "Phantom Underselling" to Reach Its Price Depression Conclusion

The Commission's holding of price depression rests heavily on a theory that Petitioner developed for the first time during the hearing, namely, that Respondents made low-priced *offers* that the domestic industry was required to meet, which thus drove down prices for the domestic like product, while at the same time were making *actual sales* at higher prices, thus largely overselling the domestic like product. This theory of "phantom underselling," which rests almost entirely on hearing testimony and anecdotal data, is inconsistent with the facts of the case and is, frankly, nonsensical.

(1)   The "Phantom Underselling" Theory Is Logically Unsound

14

Petitioner's theory of "phantom underselling" is inconsistent with the undisputed evidence that subject imports consistently and overwhelmingly oversold the domestic like product.[4]  The quarterly price comparison data showed that cumulated subject imports oversold the domestic like product in [        ] quarterly comparisons, which equated to [            ] overselling by volume.  See Final Staff Report at Appx01724 (Table V-7).  The Commission attempts to explain away the importance of this contrary overselling data by stating that overselling occurred because domestic producers reduced their prices to meet lower-priced offers for the subject merchandise.  See Views at Appx02109.  But for the theory of "phantom underselling" to work, the Commission must have concluded that Respondents were making low-priced *bids*, while at the same time and in the same market and to the same group of customers, Respondents were also making *actual sales* at substantially higher prices.  Moreover, since the margins of overselling [                ] over the period of investigation ("POI"), see Final

---

[4] The fundamental accuracy of the price comparison data was undisputed.  See Tr. at Appx11033 (Drake) ("{W}e are not raising any serious concerns with the quality or the accuracy of the pricing product data.")  Furthermore, the Views makes no mention of any inadequacies in the price comparison data.

Staff Report at Appx01717 (Table V-4) and Appx01718 (Table V-5), the difference between the (lower) price at which subject producers were allegedly offering their goods for sale and the (higher) price at which they were actually selling those goods [                    ].  This simply makes no sense.  If respondents were able to make sales at higher prices, why were they making these low-priced bids?  Similarly, if purchasers were aware that subject producers were offering low-priced bids in the market, why were they buying from the same subject producers at consistently higher prices?   While Plaintiffs raised these points in their post-hearing brief, see Adisseo Post-Hearing Brief at Appx07647- Appx07652, Appx07681- 07689, the Commission failed to address this logical inconsistency in its Views.

> (2)    Key Record Evidence to Support the
>        "Phantom Underselling" Theory Is Absent
>        from the Record

In addition to its logical failings, Petitioner's "phantom underselling" theory is unsupported by facts.  For example, if Petitioner's theory were true, the record should be full of instances of lost revenues, i.e., instances where a purchaser reported that a U.S. producer was required to reduce its prices in order to maintain a sale.

16

It is not.[5]  A trivial number of U.S. purchasers reported that U.S.

producers reduced their prices in response to import competition, while

the vast majority of U.S. purchasers reported either that U.S. producers

did not reduce their prices, or that they had no knowledge of any price

reduction by U.S. producers.[6]

|  | Yes – U.S. Producers Reduced Price | No Knowledge | No – U.S. Producers Did Not Reduce Price |
|---|---|---|---|
| Purchases from France | 1 | 15 | 10 |
| Purchases from Japan | 2 | 14 | 11 |
| Purchases from Spain | 0 | 18 | 8 |

Importantly, under the specific circumstances described by Petitioner,

those U.S. purchasers reporting "no knowledge" should not be

---

[5]  Petitioner's counsel was asked directly at the hearing why the record contained so little evidence of lost revenues, and responded that "{i}t's a little hard to understand why there are so few confirmed lost revenue examples. . ."  Tr.  at Appx11065 (Drake).

[6] Final Staff Report at Appx01732.  On this point, the Commission presents a distorted picture of the factual record in its Views.  While the Views correctly note the number of U.S. purchasers reporting that the domestic industry was required to reduce its price to meet subject import competition, the Views fail to note the far larger number of purchasers who reported that the domestic industry was not required to do so.  Compare Views at Appx02109, n.154 with Final Staff Report at Appx01732.

considered neutral responses.  A "no knowledge" response actually undermines Petitioner's argument, since if the domestic industry were required to meet or underbid the subject imports in order to win or maintain a sale, the purchaser would surely know that the domestic industry had reduced its price.  The fact that nearly all purchasers reported "no" or "no knowledge" in response to this question is inconsistent with the Commission's conclusion.

Additionally, Petitioner's inability to back up its allegations that it lost sales volume under "meet-or-release" clauses in long-term contracts further undermines its "phantom underselling" argument.  The U.S. industry reported that [                    ] of its sales are made under annual or long-term contracts, some of which have meet-or-release clauses.  See Views at Appx02108.  These meet-or-release clauses "allow purchasers to inform suppliers of a lower-priced offer and purchase the lower-priced product from another supplier if the supplier it is negotiating with is unable or unwilling to offer a lower price."  Id.  But these clauses can only be exercised where a purchaser provides the seller with

[                              ] (emphasis added) of a lower offered price. See Petitioner's Post-Hearing Case Brief (May 17, 2021) ("Petitioner's

Post-Hearing Brief") at Appx07856-07861 (Attachment A, sample contract with [            ]).  During the hearing, Petitioner confirmed that it had the right to see "the actual competing offer," Tr. at Appx11019 (Galo), and Petitioner further agreed to submit evidence of these bids in its post-hearing brief.  <u>Id.</u> (Drake).  If the Petitioner's theory of "phantom underselling" were true, Petitioner should have been able to submit substantial evidence of these allegedly rampant lower-priced offers for subject imports since these meet-or-release clauses come with strict documentary requirements.

In its post-hearing brief, Petitioner failed to live up to its promise, and submitted *precisely zero* evidence that it was forced to lower its prices or forced to lose volume under "meet or release" clauses in its existing long-term contracts.  Petitioner's failure to make good on its promise was acknowledged by the Commission itself, which was forced to state that there was no "direct" evidence of lower-priced offers being formally made under these "meet or release" clauses.  Views at Appx02108.  The total absence of any such proof – which would necessarily be readily available to Petitioner, if indeed it existed – further undermines Petitioner's theory of "phantom underselling."

19

(3)   The Record Evidence Cited by the
Commission in Support of the "Phantom
Underselling" Theory Does Not in Fact
Support the Commission's Conclusion

Ultimately, the best that Petitioner could muster was to submit informal, anecdotal email correspondence, either internal or with its customers, which purported to show that Petitioner was forced to lower its prices to meet import competition. <u>See</u> Petitioner's Post-Hearing Brief at Appx07862-07929, Appx07936-07966 (Exhibit 2, Attachments B-G, J-K). However, this correspondence does not establish that subject imports consistently underbid the domestic product.

First, as a general matter, none of the examples provided by Petitioner include written documentation from the subject producers themselves showing the price being offered. Without such written documentation, there is no way to verify that the prices mentioned in the emails were indeed the prices that were being offered by subject producers in competing bids. And, as noted above, given Petitioner's emphasis on having lost sales volumes to lower-priced subject imports under "meet or release" clauses [

], such evidence should have been easy to come by.

20

Second, the particular pieces of email correspondence cited to by the Commission are missing key information needed to establish what the Commission alleges that they show.  In footnote 153 of its Views, the Commission discusses some of the specific conclusions it drew from certain of the email correspondence submitted by Petitioner, in support of its general conclusion that this correspondence "demonstrate{s} instances where customers notified Novus of offers of lower prices for subject imports and either [

                                                        ]." Views at Appx02108.

However, when examined more closely, it is clear that the cited correspondence does not actually support this conclusion.

    To start, the Commission claimed that "[


                                                        ].

Novus Posthearing Brief at Exh. 2, Att. B."  Views at Appx02108, n. 153 (citation in original).  However, none of the correspondence involving [                    ] cited to by the Commission mentions Adisseo (or any other specific producer) as the source of the alleged competing offers. See Petitioner's Post-Hearing Brief at Appx07862-07895 (Exhibit 2,

Attachment B).  While it is possible that [



].

Furthermore, [


[



]  <u>Id.</u> at Appx07890 [

].  This hardly establishes that [



], as

reported by the Commission.

Next, the Commission claimed that "[



].

Novus Posthearing Brief at Exh. 2, Att. C."  Views at Appx02108, n. 153

(citation in original).  However, [

     ] Moreover, [                                                          ]

Rather, [

                                                    ] See Id. at Appx07900-

07902.

     Finally, the Commission asserted that

"Novus's internal communications indicate that it [

     ]. See Novus Posthearing Brief at Exh. 2, Att. D ([

])."

Views at Appx 02108, n. 153 (citations in original).  As a threshold

matter, whether or not Novus [

] does little *per se* to support the

Commission's assertion that Novus's customers "either [

]." Id. at Appx02108.  An awareness of price competition does

not necessarily demonstrate that the alleged price competition actually

led domestic producers to reduce their prices.  Moreover, [

]8  See Petitioner's

---

7 [

                        ] Petitioner's Post-Hearing Brief at Appx07918 (Exhibit 2,
Attachment D, [                                                        ]).
8 Notably, [




            ] Petitioner's Post-Hearing Brief at Appx07910-07911 (Exhibit 2,
Attachment D, [                                                        ]).  This does not

PUBLIC VERSION

Post-Hearing Brief at Appx07906-07921 (Exhibit 2, Attachment D).

Without establishing whether Novus ultimately lowered its prices or

lost sales to competing bids, this evidence cannot possibly support the

Commission's conclusion that Novus's customers "either [



].">[9]  Views at Appx02108.  Consequently, the anecdotal email

correspondence relied on by the Commission cannot constitute

substantial evidence that the "phantom underselling" upon which the

Commission's price depression finding is predicated actually took place.

But even if the email correspondence submitted by Petitioner

actually demonstrated what the Commission and Petitioner purported

it to show, the Commission and the Court have generally regarded this

kind of anecdotal evidence as probative only insofar as it corroborates

other more empirically sound record evidence.  For example, in <u>AK</u>

<u>Steel Corp. v. United States</u>, 36 C.I.T. 1466 (2012), the domestic

industry challenged, *inter alia*, the Commission's determination that

---

provide any support for the proposition for which the Commission cites to it – i.e.,
"[

].">

[9] [

]

there was not likely to be significant underselling if the antidumping duty order that was in effect were to be revoked.  Id. at 1480.  As part of its challenge to the Commission's underselling finding, the domestic industry cited to a report prepared by one of the plaintiffs and parties to the investigation containing anecdotal evidence of offers for subject product made by one of the subject foreign producers from Mexico.  Id.

In rejecting this anecdotal evidence in its determination, the Commission noted that the price offers contained in the report were "contradicted by the pricing data on the record," which showed "that imports from Mexico oversold the domestic like product in 46 of 70 quarterly comparisons."  Id. at 1481.  Furthermore, the anecdotal evidence did "'not indicate the product at issue or the source of the information' on some pages, and 'did not indicate the time frame' on others."  Id. (citations omitted).  The Court upheld the Commission's price effects determination, explaining that "the Commission acted reasonably in deciding to weigh verifiable transaction prices from the period of review more heavily than evidence of offer prices with limited source citations compiled by an interested party."  Id.  The Commission should have reached a similar outcome in this case, but instead

26

inexplicably rejected its traditional price comparison data showing

consistent and pervasive overselling in favor of this unverified, spotty

and anecdotal data.

> b.     The Record Contained Ample Information
>         Regarding Alternative Causes of Price Depression
>         That Was Improperly Ignored by the Commission

Plaintiffs conceded that U.S. methionine prices declined during

the POI, but also submitted evidence on several alternative causes for

this price decline.  While Respondents submitted substantial

documentation demonstrating a number of reasons why U.S. prices

declined,[10] the most well-documented explanation – global price

depression caused by global overcapacity – was unreasonably ignored

by the Commission.

Plaintiffs established that while U.S. prices for methionine

declined during the POI, so too did methionine prices globally.  An

---

[10] During the investigation, Plaintiffs presented substantial evidence showing that
declines in soybean meal prices contributed to the decline in global methionine
prices.  See Adisseo Pre-Hearing Brief at Appx07046-Appx07049; Adisseo Post-
Hearing Brief, Annex III at Appx07679-07681.  Record evidence also shows that
input costs for methionine decreased during the POI.  See Final Staff Report at
Appx01737 (Table VI-1) (showing that U.S. producers' unit cost of goods sold
declined by [     ] percent over the POI, from [      ] per ton in 2018 to [      ] per
ton in 2020).  See also Final Staff Report at Appx01710.

increase in methionine production capacity around the world temporarily upset the supply/demand balance, and as a result, global prices for methionine fell, which thus put downward pressure on the U.S. methionine market.  See Adisseo Pre-Hearing Brief at Appx07015-07017; Adisseo Post-Hearing Brief at Appx07683-07684; Adisseo's Final Comments (June 8, 2021) ("Adisseo Final Comments") at Appx08956-08957.  The Commission acknowledged the decline in global prices, see Final Staff Report at Appx01723, but dismissed this explanation as an alternative cause of the declines in U.S. prices.  The Commission held that "to the extent that global excess production capacity were to affect pricing in the U.S. market, it *necessarily* would do so via import competition," and in particular, through subject import competition. Views at Appx02109 (emphasis added).  This conclusion is demonstrably incorrect.

Record evidence demonstrates that U.S. purchasers are aware of and actively consider global prices when making U.S. purchases of methionine.  See Adisseo Pre-Hearing Brief, Appx07015-07017 and Appx07044-07046.  The purchaser questionnaire responses show that out of [   ] responding purchasers, [   ] indicated that they were aware

28

of non-U.S. prices for methionine, and [         ] responding purchasers

indicated that non-U.S. prices were referenced in their negotiations

with methionine suppliers.  See Adisseo Post-Hearing Brief at

Appx07748-49 (Exhibit 1, U.S. Purchasers' Questionnaire, Table III-18).

As Adisseo's Mr. Harari aptly put it in his hearing testimony: "the

United States is the second largest market in the world.  It is not an

island.  The U.S. belongs to the global market, and prices in the U.S.

will follow global prices.  A lot of the buyers are global buyers as well."

Tr. at Appx11146 (Harari).

    While the survey figures cited above demonstrate that U.S.

purchasers are aware of non-U.S. prices, these figures understate the

importance of non-U.S. prices in the market, because it is some of the

largest purchasers who rely on global prices in their purchasing

decisions.  [

    ] See Final Staff Report at Appx01728 (Table V-8).  In the

preliminary phase of this proceeding, [

29

]  Adisseo Pre-Hearing Brief at

Appx07046-07047 (citing Lost Sales and Lost Revenue Questionnaire

Response of [                                        ]).  Similarly, [

], Final Staff Report at Appx01728

(Table V-8), reported that it was familiar with non-U.S. prices of

methionine and that it referenced those non-U.S. prices in negotiations

with U.S. suppliers.  See Appx05581 ([                          ] U.S. Purchasers'

Questionnaire Response, Questions III-18 (a) & (b)).  It stated that

[

] Id.

(Question III-18(b)).

Almost as if to prove this point, Petitioner submitted its bids [

].  These bids started out [

30

].  See Petitioner's Post-

Hearing Brief at Appx07850 (Exhibit 2, [                    ]).  Clearly

[                    ] expected to receive the same price at all of its mills,

and was able to force Petitioner [

].  In 2020, having learned its lesson,

[

].  Id. ([                    ]).  Petitioner's own

documentation thus demonstrates that its U.S. prices to [

] were influenced by the downturn in global prices for methionine,

wholly apart from any subject import competition.

Thus, the Commission's conclusion that non-U.S. prices must

"necessarily" be transmitted into the U.S. market through subject

imports is not only not supported by the evidence on the record, it is

directly contradicted by evidence not acknowledged by the Commission

in its Views.  The Court has held that "the {Commission} is required to

include in a final determination of injury an explanation of the basis for

its determination that addresses relevant arguments that are made by

interested parties who are parties to the investigation… Thorough

31

consideration of such arguments and analyses is also an integral

element of the commission's responsibility to examine the relevant data

and articulate a satisfactory explanation for its action."  <u>Altx, Inc. v.

United States</u>, 167 F. Supp. 2d 1353, 1357 (2001), <u>aff'd</u> <u>Altx, Inc. v.

United States</u>, 370 F.3d 1108 (Fed. Cir. 2004).  The Commission's

conclusion regarding the transmission of global prices to the U.S.

market fails to meet this legal standard.

      3.    The Commission's Findings Regarding Lost Sales Were
Not Substantiated by Record Evidence and in Any
Case Cannot Alone Support a Finding of Adverse Price
Effects

          a.    The Commission's Finding that "the Domestic
Industry Lost a Substantial Volume of Sales to
Subject Imports Due to Price" Is Unsupported by
Substantial Evidence and Not in Accordance with
Law

The Commission relied heavily on evidence of purported lost sales

to support its determination of adverse price effects.  Specifically, the

Commission relied on the purchasers' questionnaire responses to

conclude that "the record indicates that purchasers were offered lower-

priced subject imports in particular transactions and cumulated subject

imports were able to take substantial quantities of sales from the

domestic industry due to their pricing."[11]  Views at Appx02105-02106.

To support this conclusion, the Commission states that the purchasers'

questionnaire responses showed that purchasers "collectively purchased

[      ] STEAW of subject imports in lieu of domestically produced

methionine primarily due to price", which represented "[      ] percent of

the increase in subject import volume over the POI."[12]  Views at

Appx02105.

---

[11] The first part of this statement – regarding offers of lower-priced subject imports – is apparently based on the email correspondence submitted by Petitioner (although the Commission did not cite to this evidence in support of this statement). See Petitioner's Post-Hearing Brief at Appx07862-07929, Appx07936-07966 (Exhibit 2, Attachments B-G, J-K).

[12] The vast majority of the [      ] STEAW of lost sales cited by the Commission was reported by a single purchaser.  [

                                                                                                                    ]
See Appx08705 ([      ] U.S. Purchasers' Questionnaires at III-38(c)); Adisseo Post-Hearing Brief, Annex VII at Appx07715-07716.  These [      ] STEAW represent the entire quantity of MHA that [      ] purchased from Spain during the POI.  Adisseo Pre-Hearing Brief at Appx07054.  In other words, the Commission treated *all* of [      ] MHA purchases from Spain as lost sales.  As Plaintiffs explained during the investigation, inconsistencies in [      ] purchasers' questionnaire responses, as well as other record evidence, call into question whether the [      ] STEAW of lost sales reported by [      ] should be considered as lost sales at all.  Specifically, Plaintiffs pointed out that [



                                                                                                      ]  See Adisseo Post-Hearing Brief, Annex VII at Appx07716.  In response to these arguments, the Commission noted in footnote 146 of its Views that "{i}t is not inconsistent for [      ] to report concerns about the availability of the U.S.-produced product, that it had not changed suppliers during the POI, or that maintaining multiple sources of supply

PUBLIC VERSION

This calculation is misleading and grossly overstates the significance of the purported lost sales.  See Adisseo's Post-Hearing Brief, Annex VII at Appx07714-07715.  The Commission's calculation is misleading because it is not appropriate to compare a *total amount* of lost sales over the POI to a *change* (e.g., increase) in annual subject import volume.  A more appropriate comparison would be to compare the volume of lost sales to U.S. purchasers' total purchases and imports over the POI, or to U.S. apparent consumption over the same period, which the Commission has done in prior cases.[13]

---

was very important, but to also purchase lower priced subject imports for price reasons." Views at Appx 02106, n. 146.

While Plaintiffs do not concede that these responses from [      ] are not inconsistent, the Commission entirely failed to respond to the other line of argument on this point advanced by Plaintiffs in their post-hearing brief.  Namely, the Commission apparently did not consider that [      ] increased its share of purchases from domestic suppliers during the POI – from [      ] percent in 2018 to [      ] percent in 2020 – and, therefore, did not "shift" to subject imports.  See Adisseo Post-Hearing Brief, Annex VII at Appx07718.  Additionally, in absolute terms, [      ] purchases from U.S. sources increased by [      ] percent between 2018 and 2020, while its purchases from subject sources decreased by [      ] percent.  See Adisseo Post-Hearing Brief, Annex VII at Appx07716-07717.  These trends belie the Commission's conclusion that the domestic industry "lost" this volume of sales to subject imports during the POI.

[13] See Acetone from Singapore and Spain, Inv. Nos. 731-TA-1438 and 1440, USITC Pub 4997, at 34 (Dec. 2019) (the Commission stated that purchasers purchased "69,270 short tons of subject imports instead of domestic product because of lower subject import prices.  These purchases were equivalent to 15.3 percent of the 451,344 short tons of subject imports reported purchased during the POI.").

To illustrate the distortive effect of the Commission's methodology, consider the following hypothetical:

| Widget Volumes in U.S. Market (2018-2020) | |
|---|---|
| Total Purchases + Imports (2018) | 1625 units |
| Total Purchases + Imports (2019) | 1650 units |
| Total Purchases + Imports (2020) | 1725 units |
| Total Purchases + Imports (2018 – 2020) | 5000 units |
| Increase in Annual Subject Imports (from 2018 to 2020) | 100 units |
| Total Lost Sales Volume (2018 – 2020) | 75 units |

In this scenario, using the approach taken by the Commission in the Views, the 75 units of lost sales represents 75 percent of the *increase* in annual subject import volume from 2018 to 2020 (i.e., 75 / 100). However, under the more appropriate "apples to apples" methodology discussed above, lost sales represent only 1.5 percent of the total volume of purchases and imports over the period (i.e., 75 / 5,000).

When recalculated on this more appropriate basis, the volume of lost sales in this investigation represents only [     ] percent of total purchases and imports of methionine[14] during the POI, and only [     ]

---

[14] Total U.S. purchases and imports can be found at Final Staff Report at Appx01725, Appx01726-01728 (Table V-8).

percent of total apparent U.S. consumption of methionine[15] over the

same period – clearly a far lower amount than identified by the

Commission, and one that can hardly be considered "significant."

Plaintiffs raised this issue in its post-hearing brief, but the Commission

failed to consider this distortion in its Views.  See Adisseo Post-Hearing

Brief, Annex VII at Appx07714-07715.

The Court has held that "'{i}n order to ascertain whether {an}

action is arbitrary, or otherwise not in accordance with law, reasons for

the choices made among various potentially acceptable alternatives

usually need to be explained.'"  Bando Chem. Indus. v. United States,

16 C.I.T. 133, 136-37 (1992) (quoting Associacion Colombiana de

Exportadores de Flores v. United States, 12 C.I.T. 1174, 1177 (1988)).

Therefore, at a minimum, the Commission had an obligation to explain

why comparing the volume of lost sales to the *increase* in subject import

volume was an appropriate basis to conclude that the volume of lost

sales was "substantial," and why it chose this comparison over one of

the more appropriate comparisons raised by Plaintiffs during the

---

[15] Total U.S. apparent consumption can be found at Final Staff Report at
Appx01706 (Table IV-11)

investigation.  See also Altx, Inc. v. United States, 167 F. Supp. 2d

1353, 1373-74 (2001) (the Commission must explain "the basis for its

determination that addresses relevant arguments that are made by

interested parties who are parties to the investigation.").  Thus, the

Commission's finding that "subject imports were able to take

substantial quantities of sales from the domestic industry due to their

pricing" is not supported by substantial evidence and not in accordance

with law.

                  b.     The Commission Improperly Relied on Evidence
                         of Lost Sales as a Basis for Its Finding of Adverse
                         Price Effects

Even taking the Commission's finding of "substantial" volumes of

lost sales at face value, this evidence is insufficient to establish that

low-priced subject imports caused adverse price effects.  While lost sales

may corroborate other evidence of adverse price effects, the Commission

and its reviewing court have repeatedly stressed that anecdotal lost

sales allegations are insufficient to undermine other more empirical

price effects information, such as evidence from the Commission's

traditional price comparison analysis.  See, e.g., Copperweld Corp. v.

United States, 682 F. Supp. 552, 572 (Ct. Int'l Trade 1988) ("We note

that the presence or absence of confirmed lost sales is rarely determinative or persuasive on the question of a {causal} link between {less than fair value} imports and material injury to the domestic industry."); <u>Celanese Chems. Ltd. v. United States</u>, 31 C.I.T. 279, 300 (2007) ("Here, the Commission discounts lost sales and revenue allegations as non-dispositive anecdotal evidence."); <u>Comm. for Fair Beam Imps. v. United States</u>, 27 C.I.T. 932, 955 (2003) ("Moreover, the ITC stressed that the lost sales and revenue data was 'anecdotal' and could not 'outweigh the patterns' contained in 'the pricing data overall.' The court finds the ITC's reasons to be sound and consistent with the underlying record.") (citations omitted); <u>Iwatsu Elec. Co. v. United States</u>, 15 C.I.T. 44, 53, n. 15 (1991) ("Both commissioners and the court have not always been satisfied that anecdotal lost sales data is highly probative, but neither has it been rejected outright, particularly *if it is used corroboratively*.") (emphasis added); <u>Lone Star Steel Co. v. United States</u>, 10 C.I.T. 731, 733-34 (1986) ("Anecdotal evidence of lost sales and revenue rarely adds distinct information to a record of this type but rather confirms what is already substantially demonstrated by {other relevant evidence such as}... underselling by imports.").

38

By contrast, here the Commission did not use this lost sales evidence in conjunction with other record evidence of underselling to show that subject imports caused adverse price effects.  Rather, without any explanation, it rejected overwhelming record evidence of overselling and instead made a finding of price depression based largely on anecdotal data, of which lost sales played a large part.  <u>See</u> Views at Appx02105-02106, Appx02111-02112.

As the caselaw cited above makes clear, this is an improper use of this kind of evidence.  In the absence of other record evidence of underselling, the existence of lost sales is insufficient *per se* to establish that subject imports caused adverse price effects, and for that reason, the Commission's Final Determination is not in accordance with law.

    4.    The Commission Failed to Make a Finding of Underselling

        a.    The Act Requires the Commission to Make a Finding of Price Underselling, Which the Commission Failed To Do

Under the Act, the Commission is directed to consider whether:

> (I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, **<u>and</u>**

> (II) the effect of imports of such merchandise
> otherwise depresses prices to a significant degree
> or prevents price increases, which otherwise
> would have occurred, to a significant degree.

19 U.S.C. § 1677(7)(C)(ii).  The Federal Circuit has interpreted this

statutory provision to mean that the Commission must make two

separate legal findings: significant price underselling and significant

price suppression or depression.  "In Altx, Inc. v. United States, 167 F.

Supp. 2d 1353, 1365 (Ct. Int'l Trade 2001), aff'd, 370 F.3d 1108 (Fed.

Cir. 2004), the {CIT} held that the Commission was required to make

two distinct determinations, one for each prong of {19 U.S.C. §}

1677(7)(C)(ii)".  Nucor Corp. v. United States, 414 F.3d 1331, 1340 (Fed.

Cir. 2005).

In the instant case, however, the Commission failed to meet this

requirement because a majority of Commissioners did not reach a

conclusion on whether there was significant underselling.  See Views at

Appx02104-02106.  The Commission discusses the overselling data

(without finding any fault), then moves on to a discussion of the lost

sales information without making a determination as to price

underselling.  Views at Appx02104.  Moreover, not only did the

Commission not make this required statutory determination explicitly,

40

the Commission's conclusion on underselling is not clear by implication as it discusses both evidence in favor of and against a finding of overselling.  Thus, it is not clear from the Commission's discussion of the relevant record evidence what finding on significant underselling it intended to make.[16]  The Commission's failure to make a statutorily required finding of price underselling thus renders the Commission's Final Determination not in accordance with law.

        b.      The Commission Minority's Analysis Does Not Establish Underselling and Its Conclusions Are Not Supported by Substantial Evidence

In footnote 147 of the Views, Chair Kearns and Commissioner Karpel, a minority of the Commissioners voting in this investigation, made a finding of significant underselling.  See Views at Appx02106-02107, n. 147.  While views of a minority of the Commissioners voting in this investigation cannot constitute the views of the Commission, an

---

[16] Compare Nucor Corp. v. United States, 414 F.3d 1331, 1339 (Fed. Cir. 2005) ("It is true, as Nucor contends, that the Commission did not state in so many words that the volume of underselling was an insignificant factor in evaluating whether the effect of imports on prices had led to present material injury to the domestic industry.  Nonetheless, the trial court found that to be the plain import of the Commission's analysis, and we agree.").

analysis of their reasoning is nevertheless useful as it demonstrates the errors in the Commission's price effects analysis.

Chair Kearns and Commissioner Karpel's finding implicitly rejected the uncontested evidence of overselling, and instead was predicated on the following five bases: (1) the "moderately high degree of substitutability between the domestic like product and cumulated subject imports of the same type and form"; (2) the importance of price in the purchasing decisions of U.S. customers; (3) the evidence of lost sales; (4) loss of market share by the domestic industry; and (5) the Petitioner's theory of phantom underselling. Id. The issues related to price as a purchasing factor, lost sales evidence, and Petitioner's theory of phantom underselling have been addressed above in Sections IV.A(1), (2), and (3). The claims of substitutability and loss of market share are refuted in Section IV.B below. As such, this section focuses on the Commissioners' unreasonable decision to reject the record evidence of overselling – especially the quarterly price comparison data – in reaching a decision that "significant underselling" had occurred.

As mentioned above, the quarterly price comparison data demonstrated that there was predominant overselling during the POI,

with overselling occurring in [      ] percent of comparisons, equating to

[      ] percent overselling by volume.  See Views at Appx 02104; Final

Staff Report at Appx01724 (Table V-7).  This would ordinarily lead to

the conclusion that price underselling had not occurred, since the

pricing data unequivocally show that subject imports were higher-

priced than the domestic like product.

     Indeed, the Commission has typically considered this price

comparison data the most probative evidence of whether subject

imports are lower-priced than the domestic like product.  See, e.g.,

Sodium Metal from France, Investigation No. 731-TA-1135 (Final),

USITC Pub. 4045, at 18 (Nov. 2008) ("The Commission typically relies

upon quarterly pricing data in analyzing price effects, and we do not

find any compelling reason to depart from our normal procedure in this

investigation."); Polyethylene Terephthalate (PET) Resin From India,

Indonesia, & Thailand, Investigations Nos. 701-TA-439 and 731-TA-

1077; 1078 and 1080 (Final), USITC Pub. 3769, at 22 (May 2005),  ("We

rarely depart from our standard practice of comparing U.S. producer

and import prices to unrelated customers of the same or similar

products sold to unrelated purchasers at the same level of trade.");

43

<u>Bottom Mount Combination Refrigerator-Freezers from Korea and</u>

<u>Mexico</u>, Investigation Nos. 701-TA-477 and 731-TA-1180-1181 (Final),

USITC Pub. 4318, at 31 (May 2012) ("Consistent with the statute, our

normal methodology compares the weighted average import price with

the weighted average price of the domestic like product{.}"); <u>Wooden</u>

<u>Bedroom Furniture from China</u>, Investigation No. 731-TA-1058 (Final),

USITC Pub. 3743, at 22 (Dec. 2004) ("Although it is true that the

Commission has the discretion to utilize any reasonable price

comparison methodology in its analysis, the quarterly weighted-average

price comparison methodology used in this proceeding is the standard

methodology the Commission uses to assess whether subject imports

are underselling domestic merchandise and having adverse price effects

in the market.  We generally rely on weighted-average pricing because

it allows us to assess, in a meaningful fashion, whether general pricing

trends across a number of domestic producers indicate that the subject

imports are having an adverse impact on domestic prices overall.");

<u>DAK Ams. LLC v. United States</u>, 517 F. Supp. 3d 1349, 1357, n. 5 (Ct.

Int'l Trade 2021) ("The Commission also explained that it considered

the direct import data in its underselling analysis, but ultimately

44

concluded that the quarterly price data was 'paramount and the most probative price information.'"); Hynix Semiconductor, Inc. v. United States, 431 F. Supp. 2d 1302, 1311 (Ct. Int'l Trade 2006) ("{T}he ITC has similarly applied its weighted-average pricing analysis in other cases involving commodity-like products, and the ITC has never found that the price-sensitive nature of those markets invalidates or negates the results of a weighted-average pricing methodology.").

Chair Kearns and Commissioner Karpel effectively rejected this probative record evidence in its entirety, stating only that "probative evidence of underselling may include pricing data, purchaser responses, and other record evidence{.}"  Views at Appx02106, n.147.  This statement may be true, but it fails to acknowledge the weight traditionally given to price comparison data.  Although the Commission is afforded discretion to weigh the evidence as appropriate in each case, it did not adequately address why the quarterly price comparison data were not probative here.  "An agency must 'examine the relevant data and articulate a satisfactory explanation for its action.'" Dak Ams. LLC v. United States, 456 F. Supp. 3d 1340, 1358 (Ct. Int'l Trade 2020) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,

463 U.S. 29, 43 (1983)).  Furthermore, "{t}he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." <u>CS Wind Vietnam Co. v. United States</u>, 832 F.3d 1367, 1373 (Fed. Cir. 2016).  The record as a whole must be examined, including evidence that "fairly detracts from the substantiality of the evidence." <u>Nippon Steel Corp. v. United States</u>, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (quoting <u>Atlantic Sugar, Ltd. v. United States</u>, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).

Moreover, these Commissioners provided virtually no explanation for why they rejected the quarterly price comparison evidence – to which the Commission typically affords significant weight for such a finding – other than noting "that price offers that do not result in a sale are not reflected in the Commission's quarterly price comparisons." Views at Appx02106-02107, n. 147.  This explanation is inadequate to explain the wholesale rejection of the quarterly pricing data.[17]

---

[17] Additionally, the Commissioners' minority determination of significant underselling is not in accordance with law because rejecting the quarterly price comparison evidence in this context represents a deviation from consistent agency practice without adequate explanation.  "An action by the Commission 'becomes 'agency practice' when a uniform and established procedure exists that would lead a party, in the absence of notification of change, reasonably to expect adherence to the established practice or procedure.'" <u>Celanese Chems. Ltd. v. United States</u>, 31 C.I.T. 279, 300 (2007) (citations omitted).  "Should the agency choose to deviate from a

46

practice it consistently employed in the past for the evaluation and testing of a set of facts, it must delineate and give reasons for its subsequent change of policy as to provide adequate guidance to parties affected by its actions and to present the reviewing court with a discernable basis to judge the discrepancy." Comm. for Fair Beam Imps. v. United States, 27 Ct. Int'l Trade 932, 944 (2003) (citing Sec'y of Agriculture v. United States, 347 U.S. 645, 652-53 (1954); British Steel PLC v. United States, 127 F.3d 1471, 1475 (Fed. Cir. 1997)).

As the numerous citations above to prior Commission determinations and cases demonstrate, both the Commission and this Court have repeatedly acknowledged that the Commission's "normal practice" in analyzing price effects is to rely on quarterly price comparison data. Although the Commission has occasionally chosen to depart from this practice by discounting or dismissing the quarterly price comparison data, it has usually done so on the grounds that the data itself was not probative because it was somehow inaccurate or unrepresentative, and thoroughly explained such shortcomings in these instances. See, e.g., Low Enriched Uranium From France, Germany, the Netherlands, and the United Kingdom, Investigations Nos. 701-TA-409-412 (Final) and 731-TA-909 (Final), USITC Pub. 3486, at 16, n. 88 (Feb. 2002) ("We have given less weight to annual weighted-average pricing and unit value data for price comparisons because they may include sales not subject to head-to-head competition between domestic and subject imported {low enriched uranium}."); Utility Scale Wind Towers, Inv. Nos. 701-TA-486 and 731-TA-1195-1196 (Final), USITC Pub. 4372, at 43 (Feb. 2013) (exemplifying Commission's practice to collect bid data where prices are not comparable due to the unique nature of a product); Certain Ceramic Station Post Insulators from Japan, Inv. No. 731-TA-1023 (Final), USITC Pub. 3655, at 15, n. 104 (Dec. 2003) (refusing to assess bid information raised "late in the investigation" and "{a}fter their suggested pricing articles do not produce much data"); Coal. of Gulf Shrimp Indus. v. United States, 71 F. Supp. 3d 1356, 1365 (Ct. Int'l Trade 2015) ("The Commission stated that when it 'has reliable, comprehensive pricing data obtained from its questionnaire responses, as it did in the underlying investigations,' it has 'consistently relied on that data, rather than rely on alternative public source data series.'"). As previously noted, the accuracy of the quarterly price comparison data in this case is unquestioned. See Tr. at Appx11033 (Drake) ("{W}e are not raising any serious concerns with the quality or the accuracy of the pricing product data.") Moreover, the Views make no mention of any inadequacies in the price comparison data. Therefore, the Commissioners were obligated to adequately explain why they departed from the Commission's "normal practice" of relying on quarterly price comparison data in analyzing price effects in circumstances such as those present in this case.

47

Although it may be true that price offers which do not result in a sale would not show up in the quarterly price comparisons, this is true of price offers for both imported methionine *and* for domestic methionine. Moreover, the Commissioners' explanation fails to address the fact that, because subject import sales were made at near-universally higher prices, the subject price offers that *did* result in a sale were at higher prices than domestic producers' prices.  The Commissioners' explanation seems to operate from a presumption that offers for subject import prices are always lower than domestic prices, meaning that domestic producers must offer prices that are lower still to make any sales.  The record evidence to support that presumption is slim at best.[18]

Thus, because these Commissioners failed to articulate a satisfactory explanation for why they rejected the quarterly price comparison data, which seriously detracts from the record evidence cited by the Commission to support its finding, the Commission's price

---

[18] As discussed above in Section IV.A(2)(a)(3), the anecdotal email evidence submitted by Petitioner – upon which the Commissioners rely for their finding of significant underselling – does not establish the existence of widespread underbidding by subject importers.

48

effects finding was unsupported by substantial evidence and not in accordance with law.  To the extent that the Court remands the Commission's determination with an instruction to make a price underselling determination, that remand should be accompanied by a further instruction to consider the points raised above.

For all the foregoing reasons, the Commission's conclusions regarding the adverse price effects of subject imports were not in accordance with law and not supported by substantial evidence.

## B.   The Commission's Determination of Adverse Volume Effects Was Not Supported by Substantial Evidence

The Commission is required to determine "whether the volume of the imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant."  19 U.S.C. § 1677(7)(C)(i).

In its Views, the Commission found that "the volume of cumulated subject imports and the increase in the volume of cumulated subject imports is significant in both absolute terms and relative to apparent U.S. consumption."  Views at Appx02103.  Although subject import volume did increase both absolutely and relatively over the POI, this increase was not significant in light of the decline of non-subject

49

imports over the same period and the attenuated competition in the

U.S. methionine market.  For the following reasons, the Commission's

conclusions regarding the volume effects of subject imports were not in

accordance with law and not supported by substantial evidence.

      1.     The Commission Failed to Consider the Importance of
Supply Diversity When Assessing the Significance of
the Increase in Subject Imports During the POI

A substantial portion of the increase in subject imports during the

POI reflected a ton-for-ton replacement of non-subject imports.

Plaintiffs explained, and the Commission acknowledged, that after the

imposition of Section 301 duties on imports of methionine from China,

Plaintiffs largely abandoned their exports of methionine hydroxy analog

("MHA") from its facility in China in favor of exports of MHA from its

facility in Spain.  <u>See</u> <u>Investigation Nos. 731-TA-1534-1536 (Final):</u>

<u>Methionine from France, Japan, and Spain – Prehearing Report</u> (April

27, 2021) at Appx06314, n. 3.  More than half of the increase in subject

merchandise import volume between 2018 and 2020 was thus

attributable to a one-for-one replacement of imports from China with imports from Spain.[19]

In its discussion of potential non-subject causes of injury, the Commission acknowledged the decrease in Chinese imports but stated, without support, that "{d}omestic producers could reasonably have expected to gain market share following the exit of these {Chinese} imports from the U.S. market . . ." Views at Appx02117. This assumption is undercut by the record, and in particular, by the importance that purchasers place on maintaining a diversity of supply.

Record evidence overwhelmingly demonstrates the importance U.S. purchasers place on maintaining a diverse source of supply. Supply disruptions in the methionine industry are not uncommon, and with so few producers of methionine worldwide, and with evidence that the Petitioner refused to supply certain customers during the POI, U.S. purchasers expressed a need to purchase from multiple suppliers. Adisseo Pre-Hearing Brief at Appx07021- 07027.  U.S. purchasers accounting for [          ] of total POI imports and purchases reported

---

[19] Chinese imports were 25,280 short tons in 2018.  Final Staff Report at Appx01691 (Table IV-2); the increase in total import volume from subject sources from 2018 to 2020 was 46,335 short tons.  Id.

PUBLIC VERSION

that having multiple suppliers was "very important," and those representing [        ] of total POI imports and purchases reported it was either "very important" or "important."  <u>See</u> U.S. Purchasers' Questionnaire Responses at Question III-25[20] and Final Staff Report at Appx01671, Appx01728 (Table V-8).  Purchasers testifying at the hearing emphasized that they valued supply diversity, and were even willing to pay a higher price to achieve that diversity.  Adisseo Post-Hearing Brief at Appx07650-07651; <u>see also</u> Adisseo Pre-Hearing Brief at Appx07026-07027 (recounting U.S. purchasers' responses to the same effect).  Indeed, U.S. purchasers' desire to maintain multiple sources of supply, including import sources, was even acknowledged by Petitioner. <u>See</u> Tr. at Appx11053 (Galo); Tr. at Appx11041 (Drake).

This desire to maintain a diversity of supply thus undermines the Commission's assumption that "{d}omestic producers could reasonably have expected to gain market share following the exit of these {Chinese} imports from the U.S. market . . ."  Views at Appx02117.  Here the

---

[20] The relevant purchasers' questionnaire responses can be found at Appx08281, Appx08449, Appx08464, Appx08479, Appx08494, Appx08509, Appx08524, Appx08539, Appx08554, Appx08569, Appx08584, Appx08599, Appx08614, Appx08629, Appx08644, Appx08659, Appx08674, Appx08689, Appx08704, Appx08719, Appx08734, Appx08749, Appx08764, Appx08779, Appx08794, Appx08809, Appx08824, Appx08839, Appx08854.

Commission assumes that a U.S. purchaser of Chinese methionine naturally would have turned to a domestic source as a replacement. But this ignores the fact that the majority of imports from China were of MHA, and that Petitioner – the sole supplier of MHA – maintained a greater than [          ] market share of MHA throughout the POI. Final Staff Report, at Appx01821 (Table F-2).  It is therefore **un**reasonable to expect that purchasers, desiring a diversity of supply, would have turned to a domestic source to replace this lost Chinese volume.  Indeed, Petitioner itself admitted as much at the hearing: "We have no objection to somebody's preference on having two suppliers of {MHA}, *one of them needing to be imported*."  Tr. at Appx11053 (Galo) (emphasis added).

Because the Commission's conclusion regarding the rise in subject imports failed to recognize U.S. purchasers' need to maintain a diversity of supply, the Commission's conclusion regarding the volume effects of subject imports is not supported by substantial evidence.

      2.    The Commission Failed to Consider the Lack of Substitutability Between Different Chemical Compositions of Methionine When Considering the Increase in Import Volumes

53

In assessing the increase in overall import volume during the POI, the Commission failed to consider this increase on a disaggregated bases, as urged by Plaintiffs. Had it done so, the Commission necessarily would have concluded that this increase in subject import volume was not significant or injurious.

While the investigation consists of a single like product, methionine is produced and sold with two distinctly different chemical configurations: DL-methionine ("DLM") and MHA. DLM is sold only in a dry form; MHA is predominantly sold in a liquid form, but can also be sold in a dry form. Producers typically specialize in one configuration or the other. Novus and Adisseo Espana produce only MHA; Evonik and Adisseo France produce only DLM. Of the companies involved in the investigation, only Sumitomo Chemical Company, Ltd. ("Sumitomo") produces both configurations.

Just as producers tend to specialize in one configuration or the other, so too do purchasers tend to purchase only one configuration or the other, or at a minimum, have a strong preference for one configuration. Purchasers' questionnaire responses show that 41

54

percent of purchasers (i.e., 9 out of 22 purchasers)[21] cannot switch

between MHA and DLM, Views at Appx02100 (citing Final Staff Report

at Appx01669)), and even for those customers who could theoretically

switch, "substitutability may be limited by availability, application, the

cost of shifting between methionine types, and customer preference."

Views at Appx02100 (citing Final Staff Report at Appx01668).  Thus,

because these chemical configurations are not fully interchangeable, an

increase in supply of one configuration has a more attenuated effect on

producers of the other.

This difference in chemical configuration should have had an

impact on the manner in which the Commission assessed the increase

in subject import volume during the POI.  As explained above, the

increase in imports of MHA from Spain was substantially offset by the

virtual elimination in imports from China, which were largely of MHA.

Any increase in the import volume of MHA overall was likely then

---

[21] <u>See</u> U.S. Purchasers' Questionnaire Responses to Question III-36 and Final Staff
Report at Appx01728 (Table V-8).  Relevant purchasers' questionnaire responses
can be found at Appx08282, Appx08450, Appx08465, Appx08480, Appx08495,
Appx08510, Appx08525, Appx08540, Appx08555, Appx08570, Appx08585,
Appx08600, Appx08615, Appx08630, Appx08645, Appx08660, Appx08675,
Appx08690, Appx08705, Appx08720, Appx08735, Appx08750, Appx08765,
Appx08780, Appx08795, Appx08810, Appx08825, Appx08840, Appx08855.

attributable to U.S. purchasers requiring or preferring a diversity of supply, a fact unmentioned by the Commission in its examination of volume effects.

A similar situation occurred with respect to imports of DLM. Total imports of subject DLM increased from 15,537 short tons in 2018 to 30,112 short tons in 2020, for a net increase of 14,575 short tons. Final Staff Report at Appx01816 (Table F-1). This increase in imports of DLM represents roughly a third of the increase in total subject imports over the same period, and imports of DLM in 2020 represented 37.6 percent of total subject imports in 2020.[22] But this volume of subject imports equally could not have been injurious to the domestic industry since the only U.S. producer of DLM, Evonik, [

] over the POI: [

]. Final Staff Report at Appx01683 (Table III-4). Operating at

[

---

[22] In 2020, DLM imports were 30,112 short tons; total subject imports were 80,057 short tons in the same year. Compare Final Staff Report at Appx01816 (Table F-1) with id. at Appx01706 (Table IV-11).

], requiring customers to

meet their growing demand for DLM with imports.

While acknowledging Evonik's [                                          ],

the Commission's principal response to this argument was that

"relatively few purchasers reported that they could not obtain supply

from domestic producers during the POI."  Views at Appx02118.  While

"relatively few" is obviously a subjective description, the Court should

be aware that "{h}alf of responding purchasers (10 of 20) reported

supply constraints."  Final Staff Report at Appx01665.  Furthermore,

the footnote accompanying the Commission's statement in the Views

indicates that 5 of 20 – or 25 percent – of U.S. purchasers reported

being placed on allocation from U.S. importers and producers.[23]  Views

at Appx02118, n. 188.  It appears that this is a compilation of responses

to Question III-13 of the U.S. Purchasers' Questionnaire regarding

"Supply Constraints," but this simple tally ignores other record

evidence demonstrating concerns by U.S. purchasers about their ability

to obtain adequate supply from the domestic industry.  The Commission

---

[23] The footnote accompanying this statement (i.e., footnote 188) also cites to Table III-4 of the Final Staff Report, but this appears to be in error.

notes that Novus [                                                    ], Views at Appx02118,

but as explained above, the substitutability between DLM and MHA is

limited, meaning that [                                                    ] is irrelevant

to those U.S. purchasers needing to obtain more DLM from a [

                                    ].  The Commission's failure to put the increase in

subject import volume in the appropriate context thus undermines its

conclusion that the volume of subject imports, and the increase in

subject imports, was "significant."

      In sum, the above record evidence shows that the Commission's

determination that the volume of subject imports increased significantly

was erroneous because it failed to account for these crucial contextual

factors.  Its failure to consider this important contrary record evidence

renders the Commission's determination unsupported by substantial

evidence.  See Shake & Shingle All. v. United States, 415 F. Supp. 3d

1249, 1254-55 (Ct. Int'l Trade 2019) ("If {the Commission} fails to

consider or discuss record evidence which, on its face, provides

significant support for an alternative conclusion, then {the

Commission's} determination is unsupported by substantial evidence.").

3.    The Commission's Finding that Subject Imports
Caused a Loss in the Domestic Industry's Market
Share is Unsupported by Substantial Evidence.

The Commission found that "{t}he domestic industry also lost

sales to subject imports due to price and subject imports gained [    ]

percentage points of market share from the domestic industry." Views

at Appx02116. While the Commission's statement is mathematically

correct, it distorts the impact of subject imports in the market.

It is first important to understand that the domestic industry's

"loss" in market share came at a time of rapidly increasing demand

growth in the U.S. market. From 2018 to 2020, total apparent

consumption increased by [                    ]. Final Staff Report at

Appx01706 (Table IV-11). Over the same period, U.S. producers' U.S.

shipments also grew, by [    ] percent. Id. This indicates that the

domestic industry's "loss" of market share was not a reflection of subject

imports taking market share from the domestic industry as the

Commission implies. Rather, it shows that there were additional sales

– stemming from additional growth in U.S. market demand – which the

domestic industry did not also make.

PUBLIC VERSION

Second, as demonstrated by the quarterly price comparison data, these additional sales made by subject imports occurred at *higher prices*.  While Plaintiffs dispute the theory of "phantom underselling" (as described above), even if that did occur, the price comparison data unquestionably demonstrate that U.S. customers were paying more for subject imports than the domestic like product, and were doing so [

] over the POI.  Plaintiffs have explained above why there was no basis for the Commission to claim that the domestic industry "could reasonably have expected to gain market share following the exit of {imports from China} from the U.S. market."  Views at Appx02117.  Indeed, these factors make clear why the Commission should *not* have expected the domestic industry to gain market share.

Finally, as was true for the purported increases in subject import volume, the domestic industry's [              ] "loss" of market share to subject imports is less than meets the eye when understood on a disaggregated basis.  As previously noted, the limited substitutability of DLM and MHA in some applications segments the U.S. methionine market to a meaningful degree.  During the POI, domestic producers' market share declined by [                    ] in the DLM segment of

60

the market and [                        ] in the MHA segment of the

market.  Final Staff Report at Appx01817 (Table F-1), Appx01821

(Table F-2).

Because of the [

                                  ], the loss of market share in the DLM

segment could not have been injurious to the domestic industry because

Evonik was [

                    ].  As for the MHA segment, record evidence shows that

Novus could not have made all of the additional sales necessary to

capture this extra [            ] of market share, regardless of the status

of subject imports.[24]  Consequently, the [            ] loss of market share

in the MHA segment overstates the extent of any real injury to Novus

from subject imports.  Even assuming this were not the case, the

domestic industry's [            ] market share loss in the MHA segment

– the only market share loss where injury to the domestic industry

could have theoretically occurred – is considerably lower than the [

            ] market share loss that the Commission relies on to support its

---

[24] The record contained consistent evidence of [
                    ]. See Adisseo Pre-Hearing Brief at Appx07024-07025.

finding that subject imports injured the domestic industry.  Thus, the

domestic industry's aggregated [                    ] market share loss to

subject imports, repeatedly cited to by the Commission, overstates the

significance of any injury to the domestic industry from subject imports.

The Commission did not address *any* of the significant contrary

evidence discussed above, or the associated arguments made by

Plaintiffs during the investigation, in its Views.  The Commission's

failure to do so constitutes a breach of its well-established obligation to

"consider or discuss record evidence which, on its face, provides

significant support for an alternative conclusion," Shake & Shingle All.

v. United States, 415 F. Supp. 3d 1249, 1254-55 (Ct. Int'l Trade 2019),

and to provide "an explanation of the basis for its determination that

addresses relevant arguments that are made by interested parties who

are parties to the investigation." Altx, Inc. v. United States, 167 F.

Supp. 2d 1353, 1357 (2001).  Thus, the Commission's determination is

unsupported by substantial evidence and not in accordance with law.

    C.    **The Commission's Determination that Subject Imports Adversely Impacted the Condition of the Domestic Industry Was Not in Accordance with Law and Was Not Supported by Substantial Evidence**

The Commission determined that "cumulated subject imports had a significant impact on the domestic industry." Views at Appx02119. The Commission explained that

> "the significant volume of low-priced subject imports exerted downward pressure on prices for the domestic like product, depressing prices to a significant degree. The domestic industry also lost sales to subject imports due to price and subject imports gained [   ] percentage points of market share from the domestic industry. Consequently, the domestic industry's output and revenues were lower than they otherwise would have been, and the domestic industry's financial performance declined over the POI."

Views at Appx02116 (footnotes omitted). In other words, according to the Commission the domestic industry's deteriorating financial performance is predicated on its previous findings that subject imports caused adverse volume and price effects: namely, price depression, lost sales and lost market share.[25]

---

[25] The Commission also dismissed record evidence that declining average unit values ("AUVs") on domestic industry exports were the primary driver of the deterioration of the domestic industry's financial performance. See Views at Appx 02118. The Commission attempted to rebut this evidence by asserting that since "{d}omestic shipments constituted [        ] of the domestic industry's total shipments during the POI . . . the lower prices the domestic industry received for these U.S. shipments due to price competition from the cumulated subject imports played a material role in its overall declines in financial performance." Id.

Record evidence, however, does not support this assertion. The AUV of the domestic industry's export shipments declined by [      ] between 2018 and 2020, a decline that was [                    ] than the decline of [      ] in the industry's U.S. commercial shipments AUV between 2018 and 2020. See Sumitomo's Pre-

As discussed thoroughly in Sections IV.A and IV.B, subject imports were not responsible for these adverse volume and price effects. Because those findings of adverse volume and price effects were unsupported by substantial evidence and not in accordance with law, the Commission's determination of adverse financial impact on the domestic industry – which relies solely on those findings – also cannot be sustained.

## V.   CONCLUSION

For these reasons, Plaintiffs respectfully request that the Court hold that the Commission's affirmative finding of material injury was

---

Hearing Case Brief (May 4, 2021) at Appx06670.  The AUV for the domestic industry's U.S. commercial shipments is the only relevant metric for assessing the impact on subject imports on the domestic industry's financial condition, since this is the only price that could theoretically be affected by subject imports' presence in the U.S. market.  Had the domestic industry's overall net sales AUV declined by [      ] between 2018 and 2020 (i.e., the decline in its U.S. commercial shipments AUV) rather than by [      ] (i.e., the decline in its total shipments AUV, including both U.S. and export sales), the result would have been an [

                                                                                              ].  This result is [                                                                 ] operating income in 2018, and actually represents an improvement in percentage terms ([

                     ].  <u>Id</u>. at Appx06670-06671.  Thus, when viewed on a disaggregated basis it is clear that, even if subject imports caused U.S. methionine prices to decline, these price declines did not actually "play a material role" in the deterioration of the domestic industry's financial condition as the Commission claims.

unsupported by substantial evidence and otherwise not in accordance

with law.

                              Respectfully submitted,


                              ___/s/ Eric C. Emerson_____
                              Eric C. Emerson
                              Christopher Forsgren
                              Steptoe & Johnson LLP
                              1330 Connecticut Avenue, N.W.
                              Washington, D.C. 20036
                              (202) 429-8076

                              *Counsel for Adisseo Espana S.A.*
                              *and Adisseo USA, Inc.*

Dated: April 1, 2022

## CERTIFICATION PURSUANT TO STANDARD CHAMBER PROCEDURES

Pursuant to Standard Chamber Procedure 2(B)(2), I, Eric C. Emerson, certify the foregoing Brief in Support of Rule 56.2 Motion for Judgment on the Agency Record, filed by Plaintiffs Adisseo Espana S.A. and Adisseo USA Inc., complies with the word count limitations of Standard Chamber Procedure 2(B)(1). This brief was prepared in Century Schoolbook 14-point type, and contains 13,142 words in the confidential version, excluding the parts of the brief exempted by Standard Chamber Procedure 2(B)(1). In making this certification I have relied on the word count feature of the word-processing software used to prepare the brief.

                                                                 /s/ Eric C. Emerson
                                              Eric C. Emerson
                                              Steptoe & Johnson LLP
                                              1330 Connecticut Avenue, N.W.
                                              Washington, D.C. 20036
                                              (202) 429-8076

                                              *Counsel for Adisseo Espana S.A. and Adisseo USA, Inc.*

Dated: April 1, 2022