*PUBLIC VERSION*

---

## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE:  THE HONORABLE M. MILLER BAKER

---

Court No. 21-00562

---

**ADISSEO ESPANA S.A. and
ADISSEO USA INC.,**

*Plaintiffs,*

v.

**UNITED STATES,**

*Defendant,*

and

**NOVUS INTERNATIONAL INC.,**

*Defendant-Intervenor.*

---

## DEFENDANT UNITED STATES INTERNATIONAL TRADE COMMISSION'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD

---

NOAH A. MEYER
Attorney for Defendant
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC  20436
Telephone (202) 708-1521
Fax: (202) 205-3111

ANDREA C. CASSON
  Assistant General
  Counsel for Litigation
  (202) 205-3105
KARL VON SCHRILTZ
  Assistant General
  Counsel for Import Injury
  (202) 205-3096

**DATED:  June 30, 2022**

# TABLE OF CONTENTS

TABLE OF CONTENTS ...........................................................ii

TABLE OF AUTHORITIES .....................................................iv

GLOSSARY ..........................................................................viii

I.    STATEMENT PURSUANT TO RULE 56.2 ..............................1

      A.    Administrative Determination Under Review ......................1

      B.    Question Presented and Summary of Argument ...................2

            1.    Was the Commission's Finding that the
                  Volume and the Increase in the Volume of
                  Subject Imports was Significant Supported
                  by Substantial Evidence and in Accordance
                  with Law? ..........................................................2

            2.    Was the Commission's Finding that Subject
                  Imports Caused Significant Price Effects
                  Supported by Substantial Evidence and in
                  Accordance with Law? ........................................3

            3.    Was the Commission's Finding that Subject
                  Imports Had a Significant Impact on the
                  Domestic Industry Supported by
                  Substantial Evidence? ........................................6

II.   STATEMENT OF FACTS ......................................................8

III.  ARGUMENT .......................................................................17

      A.    Standard of Review ...............................................17

      B.    The Commission's Volume Finding is Supported
            by Substantial Evidence and in Accordance with
            Law ...................................................................19

            1.    The Commission's Volume Finding is in
                  Accordance with Law ..........................................19

            2.    The Commission's Volume Finding is
                  Supported by Substantial Evidence ......................21

## TABLE OF CONTENTS (cont'd)

C.  The Commission's Price Effects Finding is Supported by Substantial Evidence and in Accordance with Law .............................................. 23

    1.  The Commission Considered Underselling in Accordance with the Statute ................................ 23

    2.  The Commission Reasonably Found that Price Was an Important Factor in Purchasing Decisions .................................... 24

    3.  The Commission Reasonably Found that the Domestic Industry Lost a Substantial Volume of Sales to Subject Imports Due to Price .......................................................... 27

    4.  The Commission Reasonably Found Price Depression by Reason of Subject Imports ................... 33

    5.  The Commission Reasonably Found that Price Depression Was Not Explained by "Global Overcapacity" ................................. 46

D.  The Commission's Impact Finding is Supported by Substantial Evidence and is in Accordance with Law ................................................. 50

    1.  The Commission's Impact Finding Should be Sustained ................................................ 50

    2.  The Commission Reasonably Considered the Importance of Supplier Diversity ..................... 53

    3.  The Commission Reasonably Considered the Impact of All Cumulated Subject Imports ................................................... 56

    4.  The Commission Reasonably Considered Declining AUVs on Export Shipments ..................... 60

IV.  CONCLUSION .......................................................... 61

iii

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Acciai Speciali Terni, S.p.A. v. United States,*
    19 CIT 1051 (1995) ...................................................................... 26, 27

*AK Steel Corp. v. United* States,
    36 CIT 1466, 885 F. Supp. 2d 1321 (2012) ........................................ 44

*Altx, Inv. v. United States,*
    370 F.3d 1108 (Fed. Cir. 2004) .............................................. 19, 21, 24

*Aluminum Extrusions Fair Trade Comm. v. United States,*
    36 CIT 1370 (2012) ............................................................................ 30

*Calabrian Corp. v. United States,*
    16 CIT 342, 794 F. Supp. 377 (1992) ................................................ 57

*Celanese Chems. Ltd. v. United States,*
    31 CIT 279 (2007) ................................................................. 31, 32, 57

*Cemex, S.A. v. United States,*
    16 CIT 251, 790 F. Supp. 290 (1992) ........................................... 34, 58

*Cleo Inc. v. United States,*
    30 CIT 1380 (2006) ........................................................................... 57

*Coal. of Gulf Shrimp Indus. v. United States,*
    71 F. Supp. 3d 1356 (Ct. Int'l Trade 2015)............................ 28, 29, 59

*Comm. for Fair Beam Imps. v. United States,*
    27 CIT 932 (2003) ............................................................................. 32

*Comm. for Fair Coke Trade v. United States, et al.,*
    28 CIT 1140 (2004) ........................................................................... 57

*Consol. Edison Co. v. NLRB,*
    305 U.S. 197 (1938)........................................................................... 18

*Consolo v. Fed. Mar. Comm'n,*
    383 U.S. 607 (1966)........................................................................... 18

iv

## **TABLE OF AUTHORITIES (cont'd)**

**Cases (cont'd)**                                                **Page(s)**

*Copperweld Corp. v. United States,*
    12 CIT 148, 682 F. Supp. 552 (1988) .................................................. 31

*Encon Indus., Inc. v. United States,*
    16 CIT 840 (1992) ....................................................................... 58

*Grupo Indus. Camesa v. United States,*
    85 F.3d 1577 (Fed. Cir. 1996) ............................................... 34

*Hitachi Metals, Ltd. v. United States,*
    949 F.3d 710 (Fed. Cir. 2020) ........................................ 19, 30

*Hynix Semiconductor, Inc. v. United States,*
    30 CIT 1208, 431 F. Supp. 2d 1302 (2006) ......................... 30

*ITG Voma Corp. v. U.S. Int'l Trade Comm'n,*
    253 F. Supp. 3d 1339 (Ct. Int'l Trade 2017), *aff'd,*
    753 F. App'x 913 (Fed. Cir. 2019) .................................... 18, 21

*Iwatsu Elec. Co. v. United States,*
    15 CIT 44, 758 F. Supp. 1506 (1991) .................................. 32

*JMC Steel Grp. v. United States,*
    24 F. Supp. 3d 1290 (Ct. Int'l Trade 2014) ................... 28, 29

*Lone Star Steel Co. v. United States,*
    10 CIT 731, 650 F. Supp. 183 (1986) .................................. 32

*Nucor Corp. v. United States,*
    414 F.3d 1331 (Fed. Cir. 2005) .......................... 23, 24, 30, 57

*OCTAL Inc. v. United States,*
    539 F. Supp. 3d 1291 (Ct. Int'l Trade 2021) ...................... 5, 20, 21, 34

*Rhone Poulenc S.A. v. United States,*
    8 CIT 47, 592 F. Supp. 1318 (1984) .................................... 24

## TABLE OF AUTHORITIES (cont'd)

**Cases (cont'd)**                                                    **Page(s)**

*Siemens Energy, Inc. v. United States,*
   992 F. Supp. 2d 1315 (Ct. Int'l Trade 2014).......................................34

*Universal Camera Corp. v. NLRB,*
   340 U.S. 474 (1951)...........................................................................18, 19

*U.S. Steel Grp. v. United States,*
   96 F.3d 1352 (Fed. Cir. 1996) .........................................................28, 29

*Zhejiang Native Produce & Animal By-Prods. Imp. & Exp.*
   *Corp. v. United States,*
   217 F. Supp. 3d 1363 (Ct. Int'l Trade 2017).......................................18

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ...................................................................17, 18

19 U.S.C. § 1677(4)(A) ....................................................................................56

19 U.S.C. § 1677(7)(B) .....................................................................................20

19 U.S.C. § 1677(7)(C)(i)...................................................................2, 19, 20, 21

19 U.S.C. § 1677(7)(C)(ii) ............................................................................5, 20

19 U.S.C. § 1677(7)(C)(ii)(I) .....................................................................3, 4, 23

19 U.S.C. § 1677(7)(C)(ii)(II) ..................................................................4, 33, 34

19 U.S.C. § 1677(7)(G)(i) ..................................................................................9

19 U.S.C. § 1677(7)(J)........................................................................................61

28 U.S.C. § 2639(a)(1)........................................................................................18

## TABLE OF AUTHORITIES (cont'd)

**Federal Regulations**                                                                    **Page(s)**

19 C.F.R. § 207.3(a) ................................................................ 45


## USITC Publications

*Acetone from Singapore and Spain*,
    Inv. Nos. 731-TA-1438 and 731-TA-1440 (Final), USITC
    Pub. 4997 (Dec. 2019) ......................................................... 29

*Certain Steel Nails from China*,
    Inv. No. 731-TA-1114 (Final), USITC Pub. 4022 (July
    2008) ....................................................................................... 31

*Common Alloy Aluminum Sheet from Bahrain, Brazil,
    Croatia, Egypt, Germany, India, Indonesia, Italy, Oman,
    Romania, Serbia, Slovenia, South Africa, Spain, Taiwan,
    and Turkey*, Inv. Nos. 701-TA-639 and 701-TA-641-642
    and 731-TA-1475-1479, 731-TA-1491-1483, and 731-TA-
    1485-1492 (Final), USITC Pub. 5182 (Apr. 2021) ............................. 29

*Forged Steel Fittings from India and Korea*,
    Inv. Nos. 701-TA-631 and 731-TA-1463-1464 (Final),
    USITC Pub. 5137 (Nov. 2020) ............................................. 31

*Metal Lockers from China*,
    Inv. Nos. 701-TA-656 and 731-TA-1533 (Final), USITC
    Pub. 5218 (Aug. 2021)................................................... 30, 31

*Strontium Chromate from Austria and France*,
    Inv. Nos. 731-TA-1422 and 731-TA-1423, USITC Pub.
    4992 (Nov. 2019) .............................................................. 31

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

# GLOSSARY

| Term | Definition |
|------|------------|
| Adisseo | Adisseo Espana S.A. and Adisseo USA Inc. (Plaintiffs) |
| Novus | Novus International, Inc. |
| [███████] | [████████████████] |
| [██████] | [██████████] |
| [███████████] | [██████████] |
| [████] | [████████████████] |
| Evonik | Evonik Corporation |
| Sumitomo | Sumitomo Chemical Co., Ltd. |
| Commission or ITC | U.S. International Trade Commission |
| Commerce | The U.S. Department of Commerce |
| LTFV | less than fair value |
| DLM | DL-methionine |
| MHA | hydroxy analogue of DL-methionine |
| POI | period of investigation |
| CCO | Chief Commercial Officer |
| STEAW | short ton 100-percent equivalent activity weight |
| Views | *Methionine from France*, Inv. No. 731-TA-1534 (Final), USITC Pub. 5206 (June 2021). |

Defendant U.S. International Trade Commission hereby opposes the motion for judgment upon the agency record filed by Plaintiffs Adisseo Espana S.A. and Adisseo USA Inc.  As discussed below, the Commission's final affirmative determinations regarding methionine from Spain and Japan are supported by substantial evidence and otherwise in accordance with law.

## I.    STATEMENT PURSUANT TO RULE 56.2

### A.    Administrative Determination Under Review

Plaintiffs seek review of the Commission's final affirmative determinations that an industry in the United States was materially injured by reason of methionine from Japan and Spain.  Notice of the Commission's determinations were published at *Methionine from Japan and Spain*, 86 Fed. Reg. 50,743 (Sept. 10, 2021), Appx02457.  The public version of Commission's Views for these determinations are contained in *Methionine from Japan and Spain*, Inv. Nos. 731-TA-1535-1536 (Final), USITC Pub. 5230 (Sept. 2021), Appx11362, incorporating the reasoning of the Commission's Views, and the Staff Report, in *Methionine from France*, Inv. No. 731-TA-1534 (Final), USITC Pub. 5206 (June 2021) ("Views"), Appx02125.  The confidential version of the

1

Commission's Views in the leading investigation appear at Appx02074–

02124; and the confidential version of the Commission's Views in the

trailing investigations appear at Appx02447–02456.[1]

### B.    Question Presented and Summary of Argument

> *1.    Was the Commission's Finding that the Volume and the*
> *Increase in the Volume of Subject Imports was*
> *Significant Supported by Substantial Evidence and in*
> *Accordance with Law?*

Yes.  In accordance with the statute, the Commission "consider{ed}

whether the volume of imports of the merchandise, or any increase in

that volume, either in absolute terms or relative to production or

consumption in the United States, {was} significant."  19 U.S.C.

§ 1677(7)(C)(i).  As the Commission explained, the volume of cumulated

---

[1] Although the petitions for the antidumping investigations on methionine from France, Japan, and Spain were filed on the same day (July 29, 2020), the investigation schedules became staggered in March 2021 when Commerce postponed its final antidumping duty determinations regarding methionine from Japan and Spain (the "trailing investigations"), but not its final antidumping duty determination regarding methionine from France (the "leading investigation"), thereby necessitating an earlier final determination in the investigation involving methionine from France.  The trailing investigations were based on the same record, as supplemented by inclusion of Commerce's final trailing antidumping duty determinations for subject imports from Japan and Spain, as well as the parties' final comments concerning those determinations.  In the trailing investigations, the Commission adopted its findings and analyses from *Methionine from France* with respect to issues concerning the domestic like product, domestic industry, cumulation, conditions of competition, and material injury.  Trailing Views at Appx02448–02450.  Accordingly, references in this brief to the Commission's Views are to the confidential Views in the leading investigation.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

subject imports increased by 137.4 percent in absolute terms, and [ ███ ] as a share of apparent U.S. consumption, from 2018 to 2020.  Appx02102 (citing Appx01691; Appx01708; Appx01796).  Based on this evidence, the Commission reasonably found that the volume of cumulated subject imports, and the increase in that volume, was significant in absolute terms and relative to consumption in the United States.

Adisseo acknowledges that subject import volume and market share increased, but asserts that the statute somehow obligated the Commission to make a finding concerning "volume effects" in determining whether cumulated subject import volumes were significant.  PlBr49–62.  Because the statute requires no such analysis, the Court should reject Plaintiffs' argument and affirm the Commission's volume finding.

      2.  *Was the Commission's Finding that Subject Imports Caused Significant Price Effects Supported by Substantial Evidence and in Accordance with Law?*

Yes.  The Commission first considered "whether there ha{d} been significant price underselling" by subject imports using the quarterly

3

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

price comparison data, in accordance with 19 U.S.C. § 1677(7)(C)(ii)(I).

Appx02104.

The Commission then found that responding purchasers reported

shifting a substantial volume of sales from domestic producers to

subject imports due to price, consistent with the [█] percentage point

shift in market share from domestic producers to subject imports and

contemporaneous documentation.  Appx02104–02106 (citing

Appx01708; Appx01730–01731; Appx01796).

The Commission also considered whether subject imports "otherwise

depresse{d} prices to a significant degree."  19 U.S.C. § 1677(7)(C)(ii)(II).

It found that, in light of the prevalence of price renegotiation during the

term of annual or long-term contracts, low-priced offers for subject

imports had exerted downward pressure on prices for the domestic like

product as the domestic industry reduced prices to maintain sales

volume.  Appx02108–02109 (citing Appx01711–01712; Appx01732).  As

support, the Commission relied on testimony, contemporaneous

documentation, purchaser questionnaire responses, and its analysis of

price trends.  Appx02108–02109 (citing Appx10715; Appx10738–10739;

Appx07824–07885; Appx01732; Appx01717–01718).  Noting that other

factors could not explain the magnitude of domestic price declines, the Commission reasonably found that cumulated subject import depressed prices for the domestic like product to a significant degree.  Appx02109–02111 (citing Appx07824–07885; Appx10733; Appx10735–10737; Appx10851; Appx01713).  Accordingly, the Commission reasonably found that cumulated subject imports had significant price effects. Appx02113.

Contrary to Plaintiffs' argument that the Commission was somehow required to make an express finding on whether there was significant underselling, PlBr39–41, the statute only requires the Commission to "consider" the issue, which it did.  19 U.S.C. § 1677(7)(C)(ii).  Moreover, a finding of significant underselling is not a precondition for finding significant price effects.  *See OCTAL Inc. v. United States*, 539 F. Supp. 3d 1291, 1302 (Ct. Int'l Trade 2021).

Adisseo also mischaracterizes the Commission's analysis of the importance of price and the significance of underselling.  The Commission did not find that "purchasers will always buy the lowest price product," as Plaintiffs mistakenly claim, but that "price is an important factor in purchasing decisions," among others, consistent

with the record evidence.  PlBr11–14.  Nor did the Commission rely on

any theory of "phantom underselling" to find price depression, as

Plaintiff maintains.  PlBr14–26.  The Commission considered whether

its pricing data showed significant underselling, as required under the

statute, but reasonably attached weight to other evidence showing that

subject imports otherwise depressed domestic prices.  Appx02103–

02104.

    Plaintiffs also ask the Court to reweigh evidence relating to the effect

of global overcapacity on domestic prices and the lost sales confirmed by

purchasers, reprising arguments reasonably rejected by the

Commission.  PlBr27–39.  Because the Commission's analysis of both

issues was reasonable, the Court should reject Plaintiffs' invitation to

reweigh this evidence.

> ### 3. *Was the Commission's Finding that Subject Imports Had a Significant Impact on the Domestic Industry Supported by Substantial Evidence?*

Yes.  The record supports the Commission's finding that subject

imports had a significant impact on the domestic industry, contributing

to the domestic industry's declining performance over the POI.

Appx02115–02116.  The Commission reasonably found that increasing

6

volumes of subject imports depressed domestic prices, thereby reducing

the domestic industry's revenues and financial performance, and

captured sales and market share from the industry, reducing the

industry's output.  Appx02114–02116 (citing Appx01683; Appx01685;

Appx01687–01688; Appx01708; Appx01736–01737; Appx01739–01741;

Appx01751–01752).  The Commission also considered the role of other

factors so as not to attribute injury from other factors to subject

imports.  Appx02117.

In challenging the Commission's impact analysis, Plaintiffs ask the

Court to reweigh evidence properly considered by the Commission.  The

Commission recognized the importance of supplier diversity, but

reasonably attached weight to other evidence showing that domestic

producers could have used their excess capacity to gain market share

but for low-priced subject imports.  Appx02101; Appx02117 (citing

Appx01708).  The Commission explained that the record did not support

a segmented analysis given that different forms of methionine were

interchangeable to some degree and supplied by subject imports and the

domestic industry.  Appx02084 (citing Appx01669–01670); Appx02090–

02091; Appx01676; Appx01701; Appx02100; Appx01668–01669;

7

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

Appx01674–01676; Appx01806–01812.  Noting that U.S. shipments

constituted [          ] of the industry's total shipments, the

Commission reasonably rejected Adisseo's argument that the declining

unit value of the domestic industry's exports severed the causal nexus

between cumulated subject imports and the domestic industry's

declining performance.  Appx02118 (citing Appx01685).  Likewise

supported by substantial evidence are the Commission's findings that

few purchasers reported an inability to obtain supply from domestic

producers and that the largest domestic producer had increasing

amounts of excess capacity during the POI.  Appx02117–02118 (citing

Appx01665; Appx01683).  We submit that the Court should decline

Plaintiff's invitation to reweigh the evidence, particularly given that the

Commission's findings are supported by substantial evidence.

## II.   STATEMENT OF FACTS

In June 2021, the Commission determined that an industry in the

United States was materially injured by reason of methionine from

France found by Commerce to be sold in the United States at LTFV.

Appx02075.  In September 2021, in the trailing investigations, the

Commission likewise reached affirmative determinations with respect

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

to imports of methionine from Japan and Spain found by Commerce to be sold in the United States at LTFV.  Appx02448.

In reaching its affirmative determinations, the Commission defined a single domestic like product coextensive with the scope, defined the domestic industry as both domestic producers of methionine, and cumulated imports from France, Japan, and Spain for purposes of assessing volume, price effects, and impact in the material injury analysis.[2]  Appx02081–02092.  Plaintiffs do not challenge these aspects of the Commission's determinations.

Addressing the conditions of competition, the Commission explained that all forms of methionine are primarily used as an additive in animal feed and in aquaculture, such that demand for methionine reflects demand in the meat industries.  Appx02097 (citing Appx01653–01654).  The Commission noted that apparent U.S. consumption increased each year from 2018 to 2020, for an overall increase of [ ▮ ] percent during the POI.  Appx02097 (citing Appx01708; Appx01796).

---

[2] *See* 19 U.S.C. § 1677(7)(G)(i).  Throughout this brief, we use the term "cumulated subject imports" and "subject imports" interchangeably.  The Commission also determined that critical circumstances did not exist with respect to subject imports from Adisseo France SAS.  Appx02123.

Case 1:21-cv-00562-MMB   Document 34   Filed 06/30/22   Page 18 of 71

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

With respect to supply, the Commission found that six of nine known global producers of methionine accounted for [▮▮▮▮] global capacity in 2018, and that the capital-intensive nature of methionine production provided an incentive for producers to operate at a high rate of capacity utilization to absorb high fixed costs and provide adequate financial returns.  Appx02097–02098 (citing Appx01656; Appx01745–01746).[3]

The Commission found that the domestic industry was the largest supplier of methionine to the U.S. market during each year of the POI, although its share of apparent U.S. consumption and rate of capacity utilization declined during the period.  Appx02098 (citing Appx01708; Appx01796–01798).  Subject imports, the second largest source of supply, increased their share of apparent U.S. consumption over the POI, while nonsubject imports declined as a share of apparent U.S. consumption.  Appx02098–02099 (citing Appx01708; Appx01796).  The Commission explained that this decline was driven by declines in nonsubject imports from China, which became subject to additional duties under Section 301 of the Trade Act of 1974 in September 2018.

---

[3] The Views (Appx02098 (n.104)) contain a typographical error, citing to V-12–V-13 instead of VI-12–VI-13 (Appx01745–01746).

10

Appx02099 (citing Appx01709 (n.15)).  The Commission also found that

responding purchasers had reported supply constraints for both

importers and domestic producers.  Appx02099 (citing Appx01665).

The Commission found a moderately high degree of substitutability

between domestically produced methionine and subject imports of the

same type and form.  Appx02100 (citing Appx01668).  While recognizing

that the substitutability of methionine of different types and forms

could be limited by availability, application, the cost of shifting between

methionine types, and consumer preference, the Commission found that

most responding purchasers indicated they could switch between

different types and forms of methionine.  Appx02100 (citing

Appx01668–01669).  The Commission also found that all major types of

methionine – DLM (solid, 99 activity level), MHA (solid, 84 activity

level), and MHA (liquid, 88 activity level) – were supplied by both

subject imports and the domestic industry.  Appx02100 (citing

Appx01806–01812).

The Commission found that price was an important factor in

purchasing decisions, with purchasers most frequently citing price as

among the top three factors influencing their purchasing decisions,

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

behind only reliability/availability of supply.  Appx02101 (citing

Appx01671).  Moreover, as the Commission explained, most responding

purchasers reported usually purchasing the lowest priced product and a

large majority rated price as a very important purchasing factor.

Appx02101 (citing Appx01671–01672).

The Commission further found that most U.S. methionine sales in

2020 were made pursuant to contracts.  Appx02101–02102 (citing

Appx01711).  As the Commission explained, the domestic industry

reported that their annual and long-term contracts, which accounted for

a majority of their U.S. shipments in 2020, often provided for price

renegotiation during the contract term but did not index prices to raw

material costs.  Appx02101–02102 (citing Appx01712).

The Commission found that nine of 28 purchasers reported that

maintaining multiple sources of supply was very important, and that a

majority of purchasers reported doing so during the POI.  Appx02101

(citing Appx01671).

Addressing volume, the Commission found that subject import

volume increased by 137.4 percent, and that subject imports as a share

of apparent U.S. consumption increased by [███] percentage points,

12

from 2018 to 2020.  Appx02102 (citing Appx01691; Appx01708; Appx01796–01797).  Accordingly, the Commission found that the volume of cumulated subject imports, and the increase in that volume, was significant in both absolute terms and relative to apparent U.S. consumption.  Appx02103.

The Commission analyzed price effects in the context of its findings that there was a moderately high degree of substitutability between the domestic like product and subject imports of the same type and form, and that price was an important factor in purchasing decisions. Appx02103.

The Commission found that, although the quarterly price comparison data indicated predominant overselling by cumulated subject imports, the record also indicated that purchasers were offered lower-priced subject imports in particular transactions and that cumulated subject imports were able to take substantial quantities of sales from the domestic industry due to their pricing.  Appx02105–02106.  This in turn resulted in the domestic industry losing a substantial volume of sales to subject imports due to price.  Appx02106.

13

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

In particular, the Commission observed that 20 of 28 responding purchasers reported purchasing subject imports instead of the domestic like product, 11 reported that subject imports were lower-priced, and eight reported collectively purchasing [　　] short tons STEAW of subject imports in lieu of domestic methionine primarily due to price.[4] Appx02104–02106 (citing Appx01730–01731).  Based on this evidence, the Commission found that the domestic industry lost a substantial volume of sales to subject imports due to price, as the industry lost market share to subject imports from 2018 to 2020.  Appx02106 (citing Appx01708; 01796).

Considering price trends, the Commission found that both domestic and subject import prices declined for products [　　], which accounted for [　　] percent of the industry's commercial shipments. Appx02107 (citing Appx01722; Appx01806).  By contrast, domestic prices for product [ ], which faced less subject import competition and accounted for the smallest share of the domestic industry's U.S.

---

[4] Lost sales, like pricing data, were reported on a STEAW basis to facilitate meaningful comparisons between methionine types.  Appx02104.

14

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

shipments, had increased.  Appx02107–02108 (citing Appx01716; Appx01722; Appx01806).

The Commission found that subject imports had depressed domestic prices to a significant degree.  Appx02111.  As an initial matter, the Commission observed that [          ] of U.S. producers' sales were made pursuant to annual and long-term contracts, including some with price renegotiation or meet-or-release clauses that allow purchasers to inform suppliers of lower-priced offers and purchase the lower-priced product unless the supplier matches the competing offer.  Appx02108 (citing Appx01711–01712).  Based on contemporaneous business documents submitted by Novus, including purchaser e-mails and Novus's internal communications, the Commission found that purchasers had leveraged low-priced offers for subject imports to obtain price concessions from domestic producers, which were forced to cut prices to maintain sales volume and the high capacity utilization levels necessary to cover fixed costs.  Appx02108–02109 (citing Appx07825–07904).  As the Commission explained, such a pricing strategy was consistent with pricing data showing declining domestic prices, despite strong demand, and hearing testimony that Novus repeatedly cut its

floor price to retain sales volume.  Appx02109 (citing Appx10715; Appx01717–01718).  The Commission also noted that low-priced offers for subject imports that did not result in a sale would not be reflected in the quarterly price comparisons.  Appx02105 (n.143).  As further support, the Commission explained that other factors, including demand, declining costs, global overcapacity, and the declining price of soybean meal, could not explain the magnitude of the domestic price declines.  Appx02109–02111.

The Commission concluded that subject imports had significant price effects.  Appx02113.

In evaluating the impact of the subject imports on the domestic industry, the Commission found that, while certain measures of the domestic output increased during the POI, these increases were not commensurate with concurrent increases is apparent U.S. consumption. Appx02114.  Moreover, most of the domestic industry's employment and financial indicators declined, including its net sales revenues, gross profits, and operating income.  Appx02114–02116 (citing Appx01688; Appx01736–01737; Appx01739–01741; Appx01796–01798).

16

The Commission found that the significant volume of low-priced subject imports depressed domestic prices to a significant degree and took sales and market share from the domestic industry on the basis of price. Appx02116. This resulted in the domestic industry's output and revenues being lower than they otherwise would have been, and the domestic industry's financial performance declining. Appx02116.

The Commission rejected Plaintiff's argument that the domestic industry was capacity constrained, necessitating increased subject imports. As the Commission explained, few purchasers reported they could not obtain supply from domestic producers, Novus's declining capacity utilization yielded increasing amounts of excess capacity, and capacity constraints could not explain the revenues lost by the industry as subject imports depressed domestic prices. Appx02117–02118 (citing Appx01665; Appx01682–01683).

## III. ARGUMENT

### A. Standard of Review

Under the Tariff Act of 1930, this Court must review the Commission's final antidumping and countervailing duty determinations by assessing whether they are "unsupported by

17

substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).  The Commission's determinations are presumed to be correct and the burden is on the party challenging the determination to demonstrate otherwise.  28 U.S.C. § 2639(a)(1).

The Supreme Court has defined "substantial evidence" as being "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Substantial evidence is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (quotation omitted); *ITG Voma Corp. v. U.S. Int'l Trade Comm'n*, 253 F. Supp. 3d 1339 (Ct. Int'l Trade 2017), *aff'd*, 753 F. App'x 913 (Fed. Cir. 2019); *Zhejiang Native Produce & Animal By-Prods. Imp. & Exp. Corp. v. United States*, 217 F. Supp. 3d 1363 (Ct. Int'l Trade 2017).  Thus, under the substantial evidence standard, a court may not, "even as to matters not requiring expertise . . . displace the {agency's} choice between two fairly conflicting views,

18

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

even though the court would justifiably have made a different choice

had the matter been before it *de novo*." *Universal Camera*, 340 U.S. at

488.  Rather, a court "'must affirm a Commission determination if it is

reasonable and supported by the record as a whole, even if some

evidence detracts from the Commission's conclusion.'" *Hitachi Metals,*

*Ltd. v. United States*, 949 F.3d 710, 716 (Fed. Cir. 2020) (quoting *Altx,*

*Inc. v. United States*, 370 F.3d 1108, 1121 (Fed. Cir. 2004)).

## B.    The Commission's Volume Finding is Supported by Substantial Evidence and in Accordance with Law

### 1.   The Commission's Volume Finding is in Accordance with Law

The statute instructs the Commission to "consider whether the

volume of imports of the merchandise, or any increase in that volume,

either in absolute terms or relative to production or consumption in the

United States, is significant."  19 U.S.C. § 1677(7)(C)(i).  In accordance

with the statute, the Commission found, and the evidence shows, that

subject import volume increased in absolute terms, by 137.4 percent,

and relative to apparent U.S. consumption, by [     ] percentage points,

between 2018 and 2020.  Appx02102; Appx01691–01692; Appx01708;

Appx01796–01798.  Based on these data, the Commission reasonably

found that the volume of subject imports and the increase in that

19

volume was significant in absolute terms and relative to apparent U.S. consumption.  Appx02103.

Plaintiffs' argument that the Commission was required to consider factors other than the significance of subject import volume, such as "supplier diversity" and "volume effects," has no basis in the statute. PlBr49–62.  The plain language of the statutory volume provision contains no mention of effects, unlike the price and impact provisions. *Compare* 19 U.S.C. § 1677(7)(C)(i) *with id.* at § 1677(7)(C)(ii) ("In evaluating the effect of imports of such merchandise on prices . . . ."); *see also id.* at § 1677(7)(B) (bifurcating the Commission's injury assessment between an analysis of subject import "volume," on the one hand, and its "consequent impact" (*i.e.*, its effects), on the other).  Moreover, the Commission is not required to consider the reasons for increased subject import volumes in assessing whether the volume or increase in the volume of subject imports is significant.  The statute explicitly permits a finding that subject import volumes are "significant" in "absolute terms," based upon volume alone.  *See OCTAL Inc.,* 539 F. Supp. 3d at 1299–1300 (citing 19 U.S.C. § 1677(7)(C)(i)).

20

Nor do Plaintiffs cite any legal authority for their assertion that the Commission was legally required to consider the reasons for and effects of increased subject imports in rendering a volume finding. Indeed, this Court has rejected similar arguments in previous cases. *See OCTAL Inc.*, 539 F. Supp. 3d at 1299–1300 (citing 19 U.S.C. § 1677(7)(C)(i) and *ITG Voma*, 253 F. Supp. 3d at 1357) (upholding the Commission's volume finding and rejecting arguments that the statute requires the Commission to consider the effects of subjects imports in its volume analysis or why subject import market share increased).

Consistent with the statute, the Commission considered whether the volume and the increase in volume of subject imports was significant, and reasonably concluded that it was. The Court should decline to "ask more of the Commission than required by the statute." *Altx,* 370 F.3d at 1123.

### 2. The Commission's Volume Finding is Supported by Substantial Evidence

Plaintiffs do not challenge the data on which the Commission based its analysis of subject import volume and acknowledge that "subject import volume did increase both absolutely and relatively over the POI." PlBr49. Indeed, as the Commission found that the absolute

21

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

volume of subject imports steadily increased, more than doubling over the POI, from 33,722 short tons in 2018, to 61,278 short tons in 2019, and 80,075 short tons in 2020, while subject import market share also increased each year, from [     ] percent in 2018 to [     ] percent in 2019 and [     ] percent in 2020.  Appx02102; Appx01691–01692; Appx01708; Appx01796–01797.  Based on these data, the Commission reasonably concluded that the volume of subject imports and the increase in that volume was significant.  Appx02103.

Adisseo's arguments concerning "supplier diversity" and "volume effects" in no way detract from the Commission's finding that subject import volume was significant based on the analysis set out in the statute.  Rather, such arguments pertain to the impact analysis, in which the Commission found a causal link between the significant and increasing volumes of subject imports and the domestic industry's declining performance.  Accordingly, we address those arguments in the impact section below.[5]

---

[5] Likewise, we address in the impact section Plaintiffs' argument that, had the Commission considered the increase in subject import volume on a disaggregated basis (*i.e.*, separately assessing the increases in DLM and MHA), "the Commission necessarily would have concluded that this increase in subject import volume was not significant or injurious."  PlBr54.

### C.   The Commission's Price Effects Finding is Supported by Substantial Evidence and in Accordance with Law

#### 1. The Commission Considered Underselling in Accordance with the Statute

The Commission "consider{ed} whether . . . there ha{d} been

significant price underselling by the imported merchandise" in

accordance with the statute, 19 U.S.C. § 1677(7)(C)(ii)(I), contrary to

Plaintiffs' claim that the Commission's analysis was somehow legally

deficient.  PlBr39–40.  Based on a thorough analysis of the pricing data,

the Commission observed that these "data indicat{ed} predominant

overselling by cumulated subject imports."  Appx02104; Appx01724.

Thus, the Commission considered whether there had been subject

import underselling, in accordance with the statute.

The Commission was not required to make an express finding

concerning the significance of underselling, contrary to Plaintiffs'

argument.  PlBr39–40.  In *Nucor*, the Federal Circuit rejected the

argument that "the Commission did not properly assess the significance

of underselling because it failed to provide … a concrete conclusion

regarding the significance of underselling."  *Nucor Corp. v. United

States*, 414 F.3d 1331, 1339 (Fed. Cir. 2005) (quotation omitted).  The

court held that "{t}he Commission complied with the statutory

requirement that it *consider* whether there had been underselling." *Id.*

(emphasis added); *see also Rhone Poulenc S.A. v. United States*, 8 CIT

47, 55, 592 F. Supp. 1318, 1326 (1984) (declining to find a requirement

for the Commission to make a categorical statement on underselling).

Indeed, as the Federal Circuit explained in *Altx*, the Commission's

"consideration" of a statutory factor does not encompass an obligation to

come to any conclusion regarding that factor.  *Altx*, 370 F.3d at 1123

(discussing "consideration" of the magnitude of the margin of dumping).

Having considered whether there had been significant price

underselling, the Commission complied with the statute, and the Court

should affirm this aspect of the Commission's analysis.

### 2. *The Commission Reasonably Found that Price Was an Important Factor in Purchasing Decisions*

The Commission reasonably found that price was an important

factor, among other important factors, contrary to Plaintiffs' claim that

the Commission somehow "overstated" the importance of price by

overlooking the importance of quality/consistency and

availability/supply continuity.  PlBr12–13.  Indeed, as the Commission

explained, more responding purchasers cited price as among their top

three purchasing factors (22) than any other factor but

24

reliability/availability of supply (23).  Appx02101; Appx01671–01672.

As further support, the Commission noted that 18 of 28 responding

purchasers reported usually purchasing the lowest priced product, and

that 23 of 28 responding purchasers rated price as a very important

factor.  Appx02101; Appx01671–01672.  Consistent with this evidence,

Plaintiffs' own representative testified at the hearing that price had

influenced his company's sourcing decisions:

> {W}e used to import liquid methionine from China,
> and when the … Administration imposed the
> duties, initially 10 percent, and then 25 percent,
> on imports from China, we switched imports from
> China to Spain.

Appx10860; *see* Appx02117; Appx01772 (n.23).  Thus, substantial

evidence supported the Commission's finding that price was an

important purchasing factor.

The Commission's finding that price was an important factor was

also consistent with its finding of a moderate to high degree of

substitutability between subject and domestic methionine.  As support

for its substitutability finding, the Commission found that a majority of

responding purchasers reported that subject and domestic methionine

always met minimum quality specifications and were comparable across

15 purchasing factors, including quality, availability, and all other
purchasing factors identified as very important by majorities of
responding purchasers.  Appx02100; Appx01674–01676.  Furthermore,
as the Commission found, majorities of purchasers reported that
domestically produced methionine was always interchangeable with
methionine from France (14 of 16), Japan (15 of 19), and Spain (10 of
13).  Appx02090–02091; Appx02100–02101; Appx01676.  Having found
that subject and domestic methionine were comparable in terms of non-
price factors, including those highlighted by Plaintiffs, the Commission
reasonably found that price was an important factor in purchasing
decisions.

   None of the evidence highlighted by Adisseo indicating that non-price
factors were important detracts from the Commission's finding that
price was also an important factor.  Indeed, this Court has held that
price need not be the *most* important factor in purchasing decisions to
be *an* important factor in purchasing decisions.  *See Acciai Speciali
Terni, S.p.A. v. United States*, 19 CIT 1051, 1059–60 (1995) (sustaining
the Commission's finding as to the importance of price where
purchasers did not list it as the most important purchasing factor, but

26

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

listed price as "a very important factor").  In this case, the Commission

recognized that non-price factors were important, but nevertheless

found price to be an important factor as well.

>    3. *The Commission Reasonably Found that the Domestic
>       Industry Lost a Substantial Volume of Sales to Subject
>       Imports Due to Price*

The Commission reasonably found that the domestic industry lost

substantial sales to subject imports due to price, notwithstanding

Plaintiffs' arguments to the contrary.  Appx02105–02106.  As the

Commission explained, 20 of 28 responding purchasers reported they

had purchased subject imports in lieu of the domestic like product, 11 of

16 indicated that subject imports were lower-priced, and eight reported

collectively purchasing [███] STEAW of subject imports instead of

domestically produced methionine primarily due to price.  Appx02104–

02105; Appx01729–01731.  The Commission observed that these lost

sales, equivalent to [██] percent of total reported purchases and [██]

percent of the increase in subject import volume during the POI,

occurred while the domestic industry lost [█] percentage points of

market share to subject imports.  Appx02105–02106; Appx01708;

Appx01726–01728; Appx01796.

27

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

None of Plaintiffs' challenges to the Commission's analysis of purchaser responses regarding lost sales withstand scrutiny.  As an initial matter, it is worth noting that Plaintiffs do not contest that 11 responding purchasers reported that subject imports were priced lower than domestic methionine, and that eight of these purchasers reported purchasing [ █████ ] STEAW of subject imports instead of domestic methionine due to price.  *See* PlBr33–34; Appx02104–02105; Appx01731–01732.  Based on this objectively large volume of confirmed lost sales, the Commission reasonably concluded that the domestic industry lost "substantial" sales to subject import due to price. Appx02106.

Plaintiffs object to the Commission's methodology in finding the volume of confirmed lost sales "substantial," offering their own alternative methodology calculated to minimize the same lost sales by comparing them to all purchases and imports over the POI.  PlBr32–36. As this Court has held, however, "{t}he Court examines 'not what methodology {Plaintiff} would prefer, but … whether the methodology actually used by the Commission was reasonable'" and "will affirm the {Commission's} chosen methodology as long as it is reasonable." *Coal. of*

28

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

*Gulf Shrimp Indus. v. United States*, 71 F. Supp. 3d 1356, 1367 (Ct. Int'l Trade 2015) (quoting *JMC Steel Grp. v. United States*, 24 F. Supp. 3d 1290, 1300 (Ct. Int'l Trade 2014) and citing *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1361–62 (Fed. Cir. 1996)).  Here, the Commission found the volume of lost sales substantial relative to both total reported purchases of subject imports ([ ] percent) and the total increase in subject import volume over the POI ([ ] percent).  Appx02105; Appx01728–01731; Appx01796–01797.  The Commission's comparison of lost sales to total reported purchases over the POI was reasonable, given that confirmed lost sales are a subset of reported purchases.  The Commission took a similar approach in *Acetone from Singapore and Spain*, which Plaintiffs cite with approval.  PlBr34 (n.13) (citing *Acetone from Singapore and Spain,* Inv. Nos. 731-TA-1438 and 731-TA-1440 (Final), USITC Pub. 4997, at 34 (Dec. 2019)).[6]  The Commission's comparison of lost sales to the increase in subject import volume over the POI was also reasonable because it shows that the volume of lost

---

[6] *See also Common Alloy Aluminum Sheet from Bahrain, Brazil, Croatia, Egypt, Germany, India, Indonesia, Italy, Oman, Romania, Serbia, Slovenia, South Africa, Spain, Taiwan, and Turkey,* Inv. Nos. 701-TA-639 and 701-TA-641-642 and 731-TA-1475-1479, 731-TA-1481-1483, and 731-TA-1485-1492 (Final), USITC Pub. 5182, at 38 (Apr. 2021).

29

sales was large relative to the increase in subject import volume, which the Commission had found significant.  Appx02103.

Similarly unavailing is Plaintiffs' argument that the Commission improperly attached weight to confirmed lost sales when quarterly price comparisons showed overselling.  PlBr37–39, 42–43.  Contrary to Plaintiffs' suggestion that the Commission must focus on its "traditional price comparison analysis" because it has done so in past cases, the Commission's analysis of price effects in this case was not bound by its analyses in previous investigations, as each investigation is *sui generis*. *See Hitachi Metals,* 949 F.3d at 718 (quoting *Nucor Corp.*, 414 F.3d at 1340).  Indeed, this Court has held that "'the ITC has broad discretion in selecting the appropriate analysis or methodology to apply in its review of subject import price effects.'"  *Aluminum Extrusions Fair Trade Comm. v. United States*, 36 CIT 1370, 1387 (2012) (quoting *Hynix Semiconductor, Inc. v. United States*, 30 CIT 1208, 1215, 431 F. Supp. 2d 1302, 1310–11 (2006)).[7]  Here, the Commission recognized that the

---

[7] Consistent with the broad discretion afforded by the statute, the Commission has likewise relied on other record evidence to find significant price effects in past cases where pricing data showed overselling in a majority of quarterly comparisons. *See Metal Lockers from China*, Inv. Nos. 701-TA-656 and 731-TA-1533 (Final), USITC Pub. 5218, at 27–33 (Aug. 2021) (relying on confirmed lost sales and revenues, the lower AUVs of subject imports, and contemporaneous documentation

pricing data indicated predominant overselling, but reasonably attached weight to other evidence, including confirmed lost sales, showing that subject imports had adverse price effects.

The Commission's analysis of lost sales information was fully consistent with the case law cited by Plaintiffs.  The Commission did not regard the lost sales information as singularly "determinative or persuasive on the question of a causal link between LTFV imports and material injury," which was the Court's concern in *Copperweld Corp. v. United States*, 12 CIT 148, 170, 682 F. Supp. 552, 572 (1988) (quotation omitted), but also relied on a wide range of other evidence showing that subject imports depressed domestic prices, as discussed below.  The Commission did not find that lost sales "per se" established adverse price effects, as Plaintiffs mistakenly argue.  PlBr39.  In each of the other cases cited by Plaintiffs, the court reaffirmed that the Commission may rely on lost sales as evidence of adverse price effects.  *See Celanese*

---

and supporting affidavits); *Forged Steel Fittings from India and Korea*, Inv. Nos. 701-TA-631 and 731-TA-1463-1464 (Final), USITC Pub. 5137, at 28–31 (Nov. 2020) (relying on confirmed lost sales and market share data); *Strontium Chromate from Austria and France*, Inv. Nos. 731-TA-1422 and 731-TA-1423 (Final), USITC Pub. 4992, at 25–28  (Nov. 2019) (relying on purchase cost data and confirmed lost sales); *Certain Steel Nails from China*, Inv. No. 731-TA-1114 (Final), USITC Pub. 4022, at 17–20 (July 2008) (relying on price trends and confirmed lost sales and revenues).

*Chems. Ltd. v. United States*, 31 CIT 279, 300 (2007) ("{I}t was precisely such evidence of lost sales and revenue that the Commission relied on in 2003 as evidence of direct head-to-head price competition.") (quotations omitted); *Comm. for Fair Beam Imps. v. United States*, 27 CIT 932, 955 (2003) (holding "the fact that the ITC decided to de-emphasize confirmed lost sales and revenues data does not detract from its finding of no impact because assigning different weights to different pieces of evidence is fully within the ITC's discretion"); *Lone Star Steel Co. v. United States*, 10 CIT 731, 734, 650 F. Supp. 183, 186 (1986) (holding that it is for the Commission, "to determine whether lost sales, together with other factors, indicate a causal nexus between … imports and material injury to the domestic industry"); *Iwatsu Elec. Co., Ltd.  v. United States*, 15 CIT 44, 53, 758 F. Supp. 1506, 1514 (1991) (holding that the Commission appropriately considered lost sales information along with "other data which indicated that the purchasing decision was price sensitive" in examining whether domestic prices were depressed).

Because the Commission's analysis of lost sales was reasonable and in accordance with law, the Court should affirm it.

32

### 4. The Commission Reasonably Found Price Depression by Reason of Subject Imports

Contrary to Plaintiffs' argument, the Commission did not rely on any theory of "phantom underselling" to support its price depression finding, a term which appears nowhere in the Commission's Views. PlBr14–27. Rather, the Commission reasonably found that low-priced offers for subject imports depressed domestic prices based on a thorough analysis of pricing data, contemporaneous business documents, sworn testimony, and purchaser questionnaire responses. Appx02104–02109. Plaintiffs' various challenges to the Commission's analysis amount to an invitation for the Court to reweigh evidence reasonably considered by the Commission.

First, the Commission's recognition that the pricing data indicated predominant overselling did not preclude the Commission from relying on other evidence to find that subject imports depressed domestic prices, as Plaintiffs mistakenly argue. PlBr14–16. After considering whether there has been significant underselling, the Commission is required to consider whether subject imports "otherwise" depressed or suppressed domestic prices, meaning whether price depression or suppression occurred apart from any underselling. 19 U.S.C. §

33

1677(7)(C)(ii)(II).  As this Court has emphasized, "the Federal Circuit …
and this Court have made clear that the Commission may rely on
evidence *either* of significant underselling *or* significant price
suppression or depression to support a finding for adverse price effects."
*OCTAL Inc.*, 539 F. Supp. 3d at 1302 (citing *Grupo Indus. Camesa v.
United States*, 85 F.3d 1577, 1582 (Fed. Cir. 1996)); *see also Siemens
Energy, Inc. v. United States*, 992 F. Supp. 2d 1315, 1334–35 (Ct. Int'l
Trade 2014) (sustaining the Commission's significant price effects
finding based solely on price suppression and holding that the
Commission "did not need to find" underselling under the
circumstances); *Cemex, S.A. v. United States*, 16 CIT 251, 261, 790 F.
Supp. 290, 299 (1992).  As this Court held in *Cemex*, "{t}o require
findings of underselling would be inconsistent with the proposition that
price suppression or depression is sufficient."  *Id.* at 261, 790 F. Supp.
at 299.

In this case, the Commission found that subject imports otherwise
depressed domestic prices because low-priced subject import offers had
forced domestic producers to reduce their prices, based on a wide range
of evidence.  Analyzing pricing data, the Commission observed that

domestic prices for pricing products [ ███ ], which accounted for the vast majority of the domestic industry's U.S. shipments in 2020, had declined by [ ██ ] to [ ██ ] percent during the POI, as subject import prices for the same products declined by [ ██ ] to [ ██ ] percent. Appx02107; Appx01722; Appx01806.  By contrast, domestic prices for product [█], which faced less competition from subject imports and accounted for a small minority of the domestic industry's U.S. shipments ([ ██ ] percent in 2020), had increased by [ ██ ] percent. Appx02107–02108; Appx01716; Appx01722; Appx01806.

Given the importance of price in purchasing decisions and the degree of substitutability between the domestic and subject products, the Commission explained that low-priced subject imports had forced domestic producers to cut their prices to maintain sales volume and the high level of capacity utilization necessary to cover the high fixed costs associated with methionine production.  Appx02108–02109. Specifically, the evidence, including hearing testimony and numerous questionnaire responses, demonstrated that U.S. producers' sales were primarily made pursuant to annual and long-term contracts which often contained meet or release clauses allowing for price renegotiation

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

during the contract term.  Appx02108; Appx01711–01712; Appx07818–07819; Appx10714–10717; Appx10724–10725; Appx10730–10731; Appx10778; Appx10830; Appx10863–10864; Appx05847 ([ ▮ ] Importer Questionnaire); Appx05600 ([ ▮ ] Importer Questionnaire); Appx05713 ([ ▮ ] Producer Questionnaire); Appx05792 ([ ▮ ] Producer Questionnaire); Appx05657 & Appx05665 ([ ▮ ] Importer Questionnaire).  These price renegotiation provisions allow purchasers to inform suppliers of lower-priced offers and purchase product from another supplier if the contracted supplier is unable or unwilling to meet the competing offer.  Appx02108; Appx01711–01712; Appx07818–07819.  While recognizing that the record did not contain direct evidence of purchasers formally exercising meet or release clauses, the Commission found that contemporaneous business documents submitted by Novus, including purchaser emails and Novus's internal communications, showed that purchasers had referenced low-priced offers for subject imports to seek price reductions from Novus.  Appx02108; Appx07811–07885.  In addition, respondent [ ▮ ] reported that meet or release clauses had allowed

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

purchasers to negotiate prices downwards during the POI.  Appx01712;

Appx05665 ([          ] Importer Questionnaire).

The Commission also found that the domestic industry's strategy of

competing with low-priced subject imports to maintain sales volume

was supported by pricing data showing that domestic prices had

declined, despite strong demand, and sworn hearing testimony.

Appx02108–02109; Appx01717–01718; Appx10715; Appx10738–10739;

Appx07812–07928; Appx10707–10708.  Moreover, both domestic

producers reported, and two purchasers confirmed, that U.S. producers

had reduced their prices to compete with low-priced subject imports.

Appx02109 (n.154); Appx01732.

Contrary to Plaintiffs' argument, the Commission explained that the

substantial volume of confirmed lost sales was not inconsistent with

pricing data showing a smaller volume of subject imports in quarters of

underselling.  Appx02105 (n.143).  As the Commission explained, the

two data sets concerned different comparisons, and the smaller volume

of subject imports in quarters of underselling did not negate or

contradict information from purchasers that they had shifted sales from

domestic producers to subject imports due to price.  Appx02105 (n.143).

The Commission also noted that subject import overselling may reflect domestic producer price cuts to maintain sales volume in the face of lower-price offers for subject imports.  Appx02105 (n.143).  Finally, the Commission noted that its quarterly comparisons were based on average prices aggregating multiple sales, such that quarters of overselling at low margins likely included additional volumes of subject imports that undersold the domestic like product.  Appx02105 (n.143).  Thus, far from embracing any theory of "phantom underselling," the Commission reasonably explained how its pricing data were fully consistent with the substantial volume of confirmed lost sales from purchasers.

Similarly misplaced is Plaintiffs' suggestion that the Commission could not find price depression without evidence of lost revenues or examples of purchasers exercising meet-or-release clauses.  PlBr16–19.  Indeed, the Commission expressly addressed the lost revenue evidence, noting that two purchasers reported that domestic producers had reduced their prices to compete with subject imports, and recognized the absence of direct evidence of purchasers formally exercising meet-

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

or-release clauses.[8]  Appx02109 (n.154); Appx01732.  Yet, the
Commission reasonably attached weight to other evidence, including
contemporaneous business documents, pricing data, and hearing
testimony, showing that low-priced subject import offers had forced
domestic producers to cut their prices to maintain their sales volume
and an economical rate of capacity utilization.  Appx02108–02109.  As
further support, the Commission noted the absence of any other
explanation for the magnitude of the domestic price declines.
Appx02109–02111.  The Court should reject Plaintiffs' invitation to
reweigh this evidence.

The Commission also reasonably relied on ample documentary
evidence showing intense price competition from subject imports,
notwithstanding Plaintiffs' self-interested reinterpretation of this same

[8] The Commission reasonably noted for context that most responding purchasers
had reported not knowing whether domestic producers had reduced their prices to
compete with subject imports, Appx02109 (n.154), contrary to Plaintiffs' suggestion
that these responses somehow conflicted with the Commission's price depression
finding.  PlBr17–18.  Responding purchasers would have responded "no" to the
question if, in their experience, domestic producers had not reduced their prices or
had reduced them for reasons other than subject imports, as did 10 purchasers with
respect to subject imports from France and 11 with respect to subject imports from
Japan.  Appx01732.  Furthermore, the fact that [████] changed its response from
"yes" in the preliminary phase, Appx01092, to "don't know" in the final phase,
Appx05387 ([████] Purchaser Questionnaire), contradicts Plaintiffs' contention
that "don't know" could only mean "no."  PlBr17–18.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

evidence.[9]  PlBr20–27.  As an initial matter, the contemporaneous

purchaser and internal emails submitted by Novus, reflecting Novus's

experience of low-priced subject import competition and the need to

lower its own prices to maintain sales volume, were explained by an

affidavit submitted by Novus's CCO and corroborated by sworn hearing

testimony that Novus had to repeatedly lower prices to compete with

subject imports.  Appx02108–02109; Appx07811–07885; Appx10715;

Appx10738–10739; Appx10718; Appx10726–10727; Appx10745.  In his

affidavit, Novus's CCO stated that "[███████████████████████

████████████████████████████████████████]" and that

[████████████████████████████████████████████████

████████████████████]"  Appx07812.  He also attested to

several similar price negotiation experiences including that "[███████

███████████████████████████████████████████████

███████████████████████████████████████████████

---

[9] Plaintiffs claim that the email documentation submitted by Novus are not
probative of pricing pressure from subject imports because they do not contain the
competing prices being offered for subject imports, as meet or release clauses
require [████████████████] of the competing offer.  PlBr20–21.  The CCO of
Novus stated that, prior to Covid, competing bids were usually reviewed at the
customer's place of business, though they are now often conveyed *orally* or by email.
Appx07812.  It is clear, based on the internal correspondences discussed below, that
Novus was aware of the quoted prices of competing offers.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

████████████ ]"  Appx07813.  Similarly, at the hearing, the same official

testified under oath that "{w}e had to repeatedly lower our floor price in

order to allow our team to compete and retain as much volume as we

could."  Appx10715.

Based on the record as a whole, the Commission reasonably

understood the submitted correspondence as showing that purchasers

used low-priced subject import offers to seek lower prices from Novus.

Specifically, [ ███████████ ] notified Novus [ ███████████████

███████████████████████████████████████

███████████████████████████████████

███████████████████████████████████ ].[10]

Appx07825–07845 (cited at Appx02108 (n.153)).  Contrary to Adisseo's

argument, these competing offers in 2020 could have only been for

subject imports, given the marginal presence of nonsubject imports in

the U.S. market that year and a sworn affidavit of Novus's CCO

---

[10] [ ██████ ] CCO attested that [ █████████████████████████

█████████ ] and nonsubject imports accounted for only [ ███ ] percent of apparent U.S.
consumption in 2020.  Appx07812; Appx01708.  Moreover, [ ████████████ ] reported
only being supplied by [ █████████████████ ] in 2020.  Appx01803;
Appx05535 ([ ████████████ ] Purchaser Questionnaire).  Accordingly, it was
reasonable for the Commission to infer that [ ██████ ] was the source of the
competition referenced in this email.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

identifying [████] as its principal competition for these sales.
Appx01708; Appx07812.

Similarly, [██████████████████████████████████████████
██████████████████████████████████████████████████████
███████████████████████████████████████████████████].
Appx07863–07867 (cited at Appx02108 (n.153)).  In this exchange,
[████████████████████] confirmed the pressure [████████████]
had on [████████████████████████████████], indicating that
[████████████████████████████████████████], that
[████████████████████] and that the [████████████████████
████████████████████].  Appx07865 (cited at Appx02108 (n.153)).
Again, the limited presence of nonsubject imports, Novus's earlier loss
of this business to Adisseo, and Novus's internal e-mails confirm that
the competing quotes were for subject imports.  Appx07862–07863.

Moreover, the Commission reasonably relied on internal
communications indicating that Novus was aware of price competition
from subject imports, implemented price reductions, and, at times, lost
business to lower-priced subject imports.  *See* Appx02108 (n.153);
Appx07870 (discussing [████████████████████████████████████

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

██████████████████████ ]); Appx07880–07881 (discussing [██████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████ ]);

Appx07871 (discussing [██████████████████████████

█████████████████████████████████████████████

██████ ]); Appx07873 (discussing a [████████████████████

████████████████ ], which [████████████████████████ ], and a

need to [████████████████████ ] the following year);[11]

Appx07874–07876 (discussing that [███████████████████████

█████████████████████████████████████████

████████████████████████████████████████████

██████████ ]); Appx07882 (discussing the need to [███████████████

████████████████████████████████████████ ]);

Appx07883 (discussing that [██████████████████████████

████████████████████████████ ]); Appx07888 (discussing

that [████████████████████████████████████████████████

---

[11] The fact that this email reflects [████████████████████ ] does not undermine
that ████████████████████████ .

43

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

███████████████████████████████████████ ]);

Appx07890–07891 (discussing that [ ██████████████████████

████████████████████████████████████████

████████████████████████████ ]); Appx07899–07900

(discussing concerns of [ ███████████████████████████

████████████████████████████████████████

███ ]); Appx07902 (discussing [ ██████████████████████

████████████████████████████ ]; Appx07903–07904

(discussing [ █████████████████████████████████████

████████████████ ]).  Plaintiffs' alternative interpretation of Novus's

internal e-mails is not only an impermissible invitation for the Court to

reweigh the evidence, but also unpersuasive.  These e-mails,

maintained in the ordinary course of business, explicitly show that

Novus was forced to lower its prices in the face of low-priced subject

import competition, consistent with the affidavit and hearing testimony

of Novus officials.

These documents were not, as Plaintiff asserts, simply "anecdotal"

evidence. PlBr25–27 (citing *AK Steel Corp. v. United States*, 36 CIT

1466, 885 F. Supp. 2d 1321 (2012)).  Rather, the Commission reasonably

44

relied on the contemporaneous purchaser e-mails and internal communications submitted by Novus, as reflective of business documents that were maintained in the ordinary course of business. Moreover, a Novus official had attested to their authenticity in a sworn affidavit, and counsel to Novus had certified that they were accurate, as required by the Commission's regulations (19 C.F.R. § 207.3(a)). Appx07743; Appx07812–07816.  Given these certifications, Plaintiff can hardly challenge the authenticity or credibility of these documents, and in fact, never did so before the Commission.

Furthermore, the Commission found that the documentary evidence showing that low-priced subject import offers forced domestic producers to cut their prices was consistent with other evidence.  As the Commission explained, these documents were consistent with hearing testimony, pricing data showing declining domestic prices despite otherwise strong demand, and reports from two purchasers that domestic producers reduced their prices to compete with subject imports.  Appx02108–02109 (text & n.154); Appx01717–01718; Appx01722; Appx01732; Appx10715; Appx10738–10739.  The Commission also explained that low-priced offers for subject imports

45

would not necessarily be reflected in the underselling data where domestic producers had succeeded in retaining sales by lowering their prices.  Appx02109.  Based on all of this evidence, the Commission reasonably found that subject imports depressed domestic prices to a significant degree.

### 5. The Commission Reasonably Found that Price Depression Was Not Explained by "Global Overcapacity"

The Commission reasonably found that global overcapacity could not explain declining domestic prices, notwithstanding Plaintiffs' mistaken claim that relevant evidence was "unreasonably ignored by the Commission."  PlBr27.[12]  Specifically, the Commission explained that any price pressure created by global overcapacity would have been transmitted to the U.S. market by imports, consisting primarily of subject imports, and that the reason for low subject import prices did not detract from their adverse effects.  Appx02110.  The Commission also found that purchasers used competing offers as benchmarks for price negotiations, not global or non-U.S. price lists, based on a wide range of record evidence.  Appx02110 (text & n.160).  In particular,

---

[12] Plaintiffs do not challenge the Commission's analysis of other factors, including declining costs and declining soybean meal price.  PlBr27 (n.10).

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

contemporaneous e-mail communications showed that price negotiations revolved around competing offers.  Appx02110; Appx07852 (purchaser email where a representative for [█████████████████ ████████████████████████████████████████ ██████████████████████████████]); Appx07859 (indicating that [███████████████████████████████████████ ███████████████████]); Appx07865 (purchaser email where a representative for [█████████████████████████████████████████ ███████████████████████████████████████████████████ ██████████████████████]); Appx07873 (indicating that [███████ ███████████████████████████████████████████████████ ██] which resulted in [███████████████████████████████ █████████████████████████████████]); Appx07878– 07879 (indicating that [████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████████████████ ██████████████]); Appx07890–07891 (indicating that the [████████ ████████████████████████████████████████████████████]); Appx07902 (indicating that [██████████████████████████████

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

█████████]).  Indeed, even documentation submitted by

Plaintiffs show that competing offers, not global prices, drove price

negotiations.  *See* Appx07719–07720 (purchaser email indicating

[████████████████████]); Appx07728

(purchaser email indicating that the [████████████

████████]).

Furthermore, the Commission relied on hearing testimony, including

from a witness for Adisseo, showing that competing offers were used as

benchmarks in price negotiations.  Appx02110 (text & n.160);

Appx10851 (when asked how she determines whether Sanderson Farms

is paying a reasonable price for methionine, Amy Batal of Sanderson

Farms responded "we look at our two suppliers and make sure their

prices are reasonably in line with each other"); *see also* Appx10735

("{W}hen it got down to … what price are we going to agree on, that was

based on the competing offers that the purchaser had actually

received."); Appx10736 ("{T}here's awareness of global prices, but the

price a producer would pay … is driven by the willingness of another

supplier to price at that moment.").  The Commission also considered

that [██████] responding purchasers reported they do not rely on

48

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

published price information when negotiating sales prices with suppliers.  Appx02110 (n.160); Appx01713.[13]  Substantial evidence supported the Commission's finding that any price effects of global overcapacity would have been transmitted to the U.S. market through low-priced subject import competition.

In urging the Court to reweigh the evidence, Adisseo cherry picks other evidence to support its alternative view of the record, but none detracts from the Commission's conclusions.  Although [█] purchasers reported relying on non-U.S. prices during negotiations, the Commission noted that a majority of purchasers, [██], did not rely on published prices.  Appx02110 (n.160); Appx01713.  Similarly, although [██████] purchasers reported being aware of global prices, PlBr28–29, the record showed that competing offers, not global prices, drove price negotiations, as discussed above.  Indeed, both [███████████]

---

[13] In its critical circumstances analysis, the Commission found that there was [████████████████████████████████████████████████ and that [████████████████████████████████], indicating that low-priced offers for and sales of subject imports were the cause of declining domestic prices.  Appx02123; Appx07785; *see also* Appx07761–07762; Appx07815; Appx01673; Appx10724–10725; Appx10750; Appx10760; Appx10820–10821.  This evidence further undermines Adisseo's assertion that global overcapacity caused declining U.S. prices.  PlBr27–32.

██ ], which Plaintiffs highlighted as reportedly relying on non-U.S.
prices in price negotiations, PlBr29–30, negotiated prices based on
competing offers, according to contemporaneous business documents on
the record.  *See* Appx07852; Appx07865.

Similarly unpersuasive is Plaintiffs' claim that Novus's price
concessions to [ ███████ ] were somehow dictated by global prices.
PlBr30–31.  On the contrary, contemporaneous business documents
show the [ ███████ ] representative explicitly referencing "the
offers we received" and "competition … working with capped prices" in
requesting similar concessions from Novus.  Appx02108 (n.153);
Appx07852.  As discussed above, the Commission reasonably
understood this exchange as [ ███████ ] using lower-priced subject
import offers to extract lower prices from [ ████ ].  *See* Appx02108
(n.153).

### D.   The Commission's Impact Finding is Supported by Substantial Evidence and is in Accordance with Law

#### 1. The Commission's Impact Finding Should be Sustained

In conducting its impact analysis, the Commission found that,
despite a [ ███ ] percent increase in apparent U.S. consumption over the
POI, the domestic industry's employment-related indicators and

50

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

financial performance declined, while increases in other factors, such as net sales, were not commensurate with the increase in apparent U.S. consumption.  Appx02114–02116; Appx01659; Appx01683; Appx01685; Appx01688; Appx01708; Appx01736–01737; Appx01739–01741; Appx01796–01798.  The Commission found a causal nexus between these negative trends in the domestic industry's performance and subject imports because the industry lost substantial sales to subject imports on the basis of price, while subject imports gained [█] percentage points of market share from the industry, and subject imports depressed domestic prices to a significant degree.  Appx02116; Appx01708.

As part of its non-attribution analysis, the Commission explained that nonsubject imports declined after imposition of the Section 301 tariffs on nonsubject imports from China.  Appx02117.  Yet, even as these nonsubject imports withdrew from the market, subject imports not only replaced the exiting nonsubject imports, but also took market share from the domestic industry, thereby preventing the domestic industry from gaining market share as would have been expected with the imposition of the Section 301 tariffs.  Appx02117; Appx01708.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

The record also supports the Commission's rejection of Adisseo's argument that increased subject imports were necessitated by alleged domestic industry capacity constraints.  As the Commission explained, relatively few purchasers reported they could not obtain supply from domestic producers, and in fact Novus possessed ample excess capacity, [████] short tons, with which it could have increased production in 2020.  Appx02117–02118 (*calculating from* Appx01683).  The Commission also explained that even assuming *arguendo* that the domestic industry was capacity constrained, such constraints could not explain the declines in the industry's revenues due to the significant price-depressing effects of the of the subject imports.  Appx02118; Appx01732 (confirming lost revenues).

While recognizing that declining AUVs on export shipments may have also contributed to the industry's declining financial performance, the Commission found that subject imports were nonetheless an independent cause of the industry's declining financial performance. Appx02118.  Specifically, throughout the POI the subject imports depressed prices (as measured by AUV) for the U.S. producers' domestic shipments, which accounted for [████] of its total shipments.

52

Appx01685; Appx01797.  Therefore, factors related to export shipments
and global price trends did not detract from the finding that subject
imports' prices played a material role in the domestic industry's overall
financial declines tied to its domestic shipments.

### 2. The Commission Reasonably Considered the Importance of Supplier Diversity

Plaintiffs argue, unpersuasively, that the Commission somehow
"failed to recognize" the importance of supply diversity in finding that
the domestic industry could have reasonably expected to gain market
share as nonsubject import volumes rapidly declined.  PlBr50–53.
Contrary to Adisseo's argument, the Commission recognized that 17 of
28 purchasers reported that they maintained multiple sources of supply
during the POI, that nine reported doing so was very important, and
that eight reported that it was important.  Appx02101 (citing
Appx01671), *see also* Appx02117 (n.185).  Having recognized the
importance of supplier diversity, however, the Commission reasonably
explained that domestic producers had been in a position to gain
market share from nonsubject imports as they receded from the U.S.
market, but were prevented from doing so by subject imports.
Appx02117–02118.

In particular, the Commission found that price was an important purchasing factor, identified by many more purchasers than supplier diversity as very important (23 to 9) and as among their top three purchasing factors (22 to 1). Appx02101; Appx01671–01672. The importance of price to purchasers, as well as the moderately high degree of substitutability between subject and domestic methionine, supported the Commission's finding that subject imports captured market share from both nonsubject imports and the domestic industry. Indeed, purchasers confirmed that domestic producers lost a substantial volume of sales to lower-priced subject imports and domestic producers likewise documented that subject imports competed directly with their products on the basis of price. Appx02116–02117; Appx02112; Appx01730–01731: Appx07811–07934 (documentation of price competition from Novus); Appx07718–07729 (documentation of price competition from Adisseo).

In contrast, there was no evidence on the record that the importance of supplier diversity had increased over the period of investigation so as to motivate purchasers to increase their purchases of subject imports at the domestic industry's expense. After replacing nonsubject imports

from China between 2018 and 2020, subject imports increased by an additional [          ] short tons over the POI, equivalent to [     ] percent of apparent U.S. consumption in 2020.  *Calculated from* Appx01796–01797; *see also* Appx02117 (n.185); Appx01708.  Thus, the evidence supports that price pressure from cumulated subject imports drove purchasers to buy substantial additional volumes of subject imports at the expense of both nonsubject imports and the domestic industry. Appx02117; Appx01708.  As explained by the Commission, purchasers did not simply replace nonsubject imports from China with subject imports – so as to maintain a constant level of supplier diversity or otherwise – as Plaintiffs contend.  *See* Appx02117 (n.185); Appx01708.

Further, as the domestic industry lost market share to subject imports during the POI, the domestic industry's excess capacity increased, including excess capacity to produce the specific type of methionine, MHA, that accounted for a majority of nonsubject imports from China.[14]  *Compare* Appx01816 with Appx01820.  This fact too, in

---

[14] Plaintiffs recognize that most nonsubject imports from China consisted of MHA but contend that purchasers desiring a diversity of supply would not have turned to [                                   ] to the U.S. market during the POI.  PlBr52–53.  This assumption is undercut by the fact that [          ] to the market in 2018, a share which declined as

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

addition to the importance of price, the substantial volume of confirmed lost sales, and competition from low-priced subject imports that had depressed domestic prices, supports the Commission's finding that low-priced subject imports had prevented the domestic industry from gaining market share relinquished by nonsubject imports from China. Appx02117.

### 3. The Commission Reasonably Considered the Impact of All Cumulated Subject Imports

Plaintiffs argue that the Commission should have considered the impact of increasing volumes of subject imports on the domestic industry on a disaggregated basis because, in their view, competition between subject imports and the domestic industry was attenuated with respect to subject imports of DLM.  PlBr53–62.  This argument does not withstand scrutiny.

First, the Commission is required to define the domestic industry for purposes of its injury analysis as the "producers as a whole of a domestic like product."  19 U.S.C. § 1677(4)(A).  This Court has held that "{t}he Commission is not required to focus on one portion of the

_____

subject imports captured market share.  Appx01821. Novus [■■■■■■■■■■■■■■■■■■■■■■■].  Appx01716 (notes to Tables V-3 and V-4).

industry by making a disaggregated analysis of material injury"
because "Congress intended that the Commission determine whether or
not the domestic industry *as a whole* has experienced material injury
due to the imports." *Celanese Chems. Ltd.*, 31 CIT at 298 (citing *Nucor*,
414 F.3d at 1336, and *Calabrian Corp. v. United States*, 16 CIT 342,
350–51, 794 F. Supp. 377, 385–86 (1992)); *see also Cleo Inc. v. United
States*, 30 CIT 1380, 1400 (2006) ("The ITC's task is to assess whether
the industry as a whole has been injured by the subject imports.")
(citation omitted); *Comm. for Fair Coke Trade v. United States, et al.*, 28
CIT 1140, 1165–67 (2004) (rejecting arguments that the court direct the
Commission to segment the domestic industry and to conduct a
"separate analysis" for each segment of the industry).  Thus, the
Commission's analysis here of the impact of all cumulated subject
imports on the domestic industry as a whole was in accordance with
law.

The aggregate analysis conducted by the Commission is further
supported by its finding that subject imports competed with the
domestic industry with respect to all types of methionine.  The
Commission reasonably found a moderately high degree of

57

substitutability between domestic and subject methionine based in part on the level of interchangeability between different types and forms of methionine.  Appx02100.[15]  Specifically, 14 of 26 responding purchasers reported that they could switch between dry and liquid methionine using currently installed equipment; 12 of 18 reported that they could switch between methionine of different activity levels; and 13 of 22 reported that they could switch between MHA and DLM.  Appx02100; Appx01669.  As the Commission also observed, all types of methionine were supplied by subject imports and the domestic industry.  Appx2100, Appx01806–01812.

This Court has recognized that the "ITC has broad discretion in the choice of its methodology." *Cemex*, 16 CIT at 255, 790 F. Supp. at 294. Having found competition between subject and domestic methionine of all types, the Commission reasonably assessed the impact of cumulated

---

[15] The Commission also relied on the interchangeability of DLM and MHA as a factor supporting the definition of a single domestic like product, and thus a single domestic industry.  Appx02084 (citing Appx01669–01670); Appx02087–02088 (n.62). Notably, Plaintiffs do not challenge the Commission's definition of a single domestic like product. *See Encon Indus., Inc. v. United States,* 16 CIT 840, 841–42 (1992) (rejecting plaintiff's assertion that imports of low-end fans could not injure producers of high-end fans, where plaintiff had not challenged the like product definition.)

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

subject imports in the aggregate, and its methodology should therefore be sustained. *Coal. of Gulf Shrimp Indus.*, 71 F. Supp. 3d at 1365.

For the same reason, Adisseo's proposed disaggregated methodology makes little sense. As discussed above, the record reflects a substantial competitive overlap between DLM and MHA in the U.S. market, as a majority of purchasers reported being capable of switching between the two. Given this, even with domestic DLM producer [█████████ ██████████████████████], Appx02118, most purchasers could have purchased MHA from Novus in lieu of subject imports, particularly given that [████] percent of the increase in subject import volume over the POI consisted of MHA, *calculated from* Appx01810, and that seven of eight confirmed lost sales involved MHA, either alone or in combination with DLM. Appx02105 (text & n.143) (comparing Appx01730–01731 with Appx01802–01803).

Nor does the record support Plaintiffs' contention that [███████ ███████████████] forced purchasers to increase their purchases of subject imports. PlBr56–58. As the Commission explained, few purchasers reported that they could not obtain supply from domestic producers. Appx02118; Appx01665. Only five reported being placed on

59

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

allocation and only one reported being placed on allocation solely by

domestic producers. Appx01665. The Commission also noted that

[ ▮ ] reported only one supply constraint, which occurred after the

POI, and otherwise possessed substantial and growing excess capacity

that could have been used to increase production. Appx02118;

Appx01665; Appx01683. Thus, the Commission reasonably rejected

Plaintiffs' argument that the domestic industry was capacity

constrained, and the Court should reject Plaintiffs' invitation to reweigh

the evidence.

### 4. The Commission Reasonably Considered Declining AUVs on Export Shipments

Plaintiffs reprise their argument that the domestic industry's

declining AUVs on export shipments explained the industry's declining

financial performance, PlBr63 (n.25), even though the Commission

reasonably rejected this argument below. *See* Appx02118. As the

Commission explained, subject imports materially contributed to the

industry's declining financial performance by depressing domestic

prices to a significant degree. Appx02118. Thus, even if the industry

may possibly have been more profitable absent the decline in export

AUVs, as Plaintiffs argue, the Commission found that the industry was

still less profitable than it would have been absent the significant price depression caused by subject imports. *See* 19 U.S.C. § 1677(7)(J) ("The Commission may not determine that there is no material injury … to an industry in the United States merely because that industry is profitable."). The Court should therefore sustain the Commission's analysis of this issue.

## IV.   CONCLUSION

As discussed in this brief, the Commission's determinations are supported by substantial evidence and in accordance with law. We respectfully ask that the Court affirm these determinations in their entirety.

Respectfully submitted,


*/s/ Andrea C. Casson*
Andrea C. Casson
Assistant General Counsel for
Litigation

*/s/ Karl von Schriltz*
Karl von Schriltz
Assistant General Counsel for Import
Injury

*/s/ Noah A. Meyer*
Noah A. Meyer

61

Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 708-1521
Facsimile: (202) 205-3111
Noah.meyer@usitc.gov


*Attorneys for Defendant United States*
*International Trade Commission*

## CERTIFICATE OF COMPLIANCE

Pursuant to Chambers Procedures 2(B)(1) and (2), I hereby certify that the attached **DEFENDANT UNITED STATES INTERNATIONAL TRADE COMMISSION'S PUBLIC MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD** contains 11,334 words, according to the word-count function of the word processing system used to prepare this brief (Microsoft Word 2010).

Dated: June 30, 2022          */s/ Noah A. Meyer*

                                    Noah A. Meyer

                                    Attorney-Advisor
                                    Office of the General Counsel
                                    U.S. International Trade Commission
                                    500 E Street, SW
                                    Washington, DC 20436
                                    Telephone: (202) 708-1521
                                    Facsimile: (202) 205-3111
                                    Noah.Meyer@usitc.gov