<u>**PUBLIC VERSION**</u>

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE**

|  |  |
|---|---|
| ADISSEO ESPANA S.A. AND ADISSEO USA INC. <br>                 Plaintiffs, <br>      v. <br> UNITED STATES, <br>                 Defendant, <br>      and <br> NOVUS INTERNATIONAL INC., <br>                 Defendant-Intervenor. | **Court No. 21-00562** <br><br> **Business Proprietary Information Removed from Pages 6, 9-12, 24, 30, 32, 33, and 35** |

<u>**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**</u>

# Table of Contents

**Page**

I.   INTRODUCTION ................................................................................ 1

II.   ARGUMENT ................................................................................... 2

   A.   The Commission's Determination that Subject Imports Adversely Affected the Price for the Domestic Like Product Was Not in Accordance with Law and Was Not Supported by Substantial Evidence ............................................................................... 2

     1.   The Commission Failed to Consider Non-Price Factors in its Price Effects Determination .................................................... 2

     2.   The Commission's Finding that Subject Imports Caused Price Depression Through Allegedly Below-Market Bids Is Nonsensical and Unsupported by Record Evidence ................................. 6

     3.   The Commission's Decision to Elevate Anecdotal Data Over Actual, Verified Pricing Information for Purposes of Making Its Price Effects Determination Remains Unjustified and Unexplained ......................................................................... 13

     4.   The Commission Failed to Make a Finding of Underselling .... 25

   B.   The Commission's Determination that Subject Imports Adversely Impacted the Condition of the Domestic Industry Was Not in Accordance with Law and Was Not Supported by Substantial Evidence ............................................................................. 29

     1.   The Commission Failed to Consider the Importance of Supplier Diversity in Assessing the Impact of Subject Imports on the Domestic Industry ............................................................... 30

     2.   The Commission Failed to Consider the Limited Substitutability Between Different Chemical Compositions of Methionine in Assessing the Impact of Subject Imports on the Domestic Industry ............................................................... 33

# Table of Authorities

**Pages**

## Cases

Acciai Speciali Terni, S.p.A. v. United States, 19 C.I.T. 1051 (1995) ...... 4

AK Steel Corp. v. United States, 36 C.I.T. 1466 (2012) ......................... 15

Altx, Inc. v. United States, 25 C.I.T. 1100 (2001)............................... 1, 28

Altx, Inc. v. United States, 370 F.3d 1108 (Fed. Cir. 2004) ................... 27

Asociacion Colombiana de Exportadores de Flores v. United States,
   12 C.I.T. 1174  (1988) .............................................................. 24

Asociacion Colombiana de Exportadores de Flores v. United States,
   26 F.3d 139 (Fed. Cir. 1994)..................................................... 24

Burlington Truck Lines, Inc. v. United States, 371 U.S. 156 (1962) ..... 22

Camau Frozen Seafood Processing Imp. Exp. Corp. v. United States,
   37 C.I.T. 1116 (2013) .............................................................. 13

Celanese Chems. Ltd. v. United States, 31 C.I.T. 279 (2007)............... 18

China Nat'l Arts & Crafts Imp. & Exp. Corp. v. United States,
   15 C.I.T. 417 (1991) ................................................................. 7

China Nat'l Mach. Imp. & Exp. Corp. v. United States,
   27 C.I.T. 255 (2003) ................................................................. 7

Comm. for Fair Beam Imps. v. United States, 27 C.I.T. 932 (2003)...... 18

Consol. Edison Co. v. NLRB, 305 U.S. 197 (1938)................................ 12

Hitachi Metals v. United States, 949 F.3d 710 (Fed. Circ. 2020) .......... 14

Iwatsu Elec. Co., Ltd. v. United States, 15 C.I.T. 44 (1991) ................. 19

Lone Star Steel Co. v. United States, 10 C.I.T. 731 (1986) ................... 18

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,
    463 U.S. 29 (1983) ....................................................... 22, 25

New Am. Keg v. United States, No. 20-00008, 2021 Ct. Intl. Trade
    LEXIS 34 (2021) ......................................................... 12, 25

Nippon Steel Corp. v. United States, 25 C.I.T. 1415 (2001) ................... 5

Nucor Corp. v. United States, 414 F.3d 1331 (Fed. Cir. 2005) ........ 26, 27

Rhone Poulenc S.A. v. United States, 8 C.I.T. 47 (1984) ...................... 28

SSIH Equipment SA v. United States ITC, 718 F.2d 365
    (Fed. Cir. 1983) ............................................................ 8

U.H.F.C. Co. v. United States, 916 F.2d 689 (Fed. Cir. 1990) .............. 10

USX Corp. v. United States, 11 C.I.T. 82 (1987) ...................................... 9

**Statutes**

19 U.S.C. § 1677(7)(B)(i) .............................................................. 29

19 U.S.C. § 1677(7)(C)(i) .............................................................. 29

**Administrative Determinations**

Certain Steel Nails from China, Inv. No. 731-TA-1114 (Final),
    USITC Pub. 4022 (July 2008) ............................................. 17

Forged Steel Fittings from India and Korea, Inv. Nos. 701-TA-631 and
    731-TA-1463-1464 (Final), USITC Pub. 5137 (Nov. 2020) ................. 17

Metal Lockers from China, Inv. Nos. 701-TA-656 and 731-TA-1533
    (Final), USITC Pub. 5218 (Aug. 2021) .................................... 17

Strontium Chromate from Austria and France, Inv. Nos. 731-TA-1422
    and 731-TA-1423 (Final), USITC Pub. 4992 (Nov. 2019) .................... 17

**Glossary**

| Abbreviation | Term |
|---|---|
| Adisseo | Adisseo Espana S.A. and Adisseo USA Inc. (Plaintiffs) |
| DfBr. | Defendant's Response Brief (ECF 33) |
| DLM | DL-Methionine |
| Evonik | Evonik Corporation |
| Final Determination | Methionine from Spain and Japan, 86 Fed Reg. 50743 (Sept. 10, 2021) |
| ITC/Commission | United States International Trade Commission (Defendant) |
| LTFV | Less than Fair Value |
| MHA | Methionine Hydroxy Analog |
| Novus | Novus International, Inc. (Petitioner) |
| PlBr. | Plaintiff's Case Brief (ECF 30) |
| POI | Period of Investigation |
| Tr. | Transcript |
| Views | Methionine from France, Inv. No. 731-TA-1534 (Final), USITC Pub. 5206 (June 2021). |

## I.    INTRODUCTION

The crux of this case is the Commission's failure to live up to its obligation to reach a determination that is logical and based on the entirety of the record evidence.  Specifically, the Commission's Final Determination suffers from two pervasive issues: its failure to deal with contrary record evidence and arguments, and its failure to adequately explain its choices.  Plaintiffs thoroughly documented these errors in its Case Brief, yet in its Rebuttal Brief the Commission failed to address them in any meaningful way.  While some of these failures are more or less glaring than others, cumulatively they fatally undermine the Commission's determination as a whole.[1]

Had the Commission upheld its responsibility to consider *all* the record evidence and undertaken a logical and coherent analysis of that evidence, it necessarily would have reached the opposite conclusion. Consequently, this Court should conclude that the Commission's Final

---

[1] See Altx, Inc. v. United States, 25 C.I.T. 1100, 1118 (2001) ("When considered individually every discrepancy discussed here might not rise to the level of requiring reconsideration of the overall disposition, but taken as a whole, the court finds that the ITC decision is not substantially supported and explained.").

1

Determination was unsupported by substantial evidence and not in accordance with law.

## II.   ARGUMENT

### A.   The Commission's Determination that Subject Imports Adversely Affected the Price for the Domestic Like Product Was Not in Accordance with Law and Was Not Supported by Substantial Evidence

#### 1.   The Commission Failed to Consider Non-Price Factors in its Price Effects Determination

As documented in Plaintiffs' Case Brief, the Commission's price effects analysis significantly understates if not outright ignores the importance of non-price factors in methionine purchasers' decision-making.  PlBr.11-14.  In its Rebuttal Brief, Defendant attempted to rebut Plaintiffs' arguments in two ways.

First, Defendant overstates the degree to which the Commission actually considered non-price factors in its analysis.  See, e.g., DfBr.27 ("In this case, the Commission recognized that non-price factors were important, but nevertheless found price to be an important factor as well."); Id. at 53 (stating that the Commission "recognized" the importance of supplier diversity).

2

In reality, however, discussion of non-price factors in the Commission's Views was almost non-existent.  The Commission mentioned the importance of reliability/availability and diversity of supply only once, in the "Conditions of Competition" section of its Views.  Views at Appx2101.  However, this represents a mere recitation of market conditions, not an evaluation of these non-price factors as part of the Commission's substantive price effects analysis.  Defendant also cites to footnote 185 of its Views as supporting the proposition that the Commission "recognized" the importance of supplier diversity.  Yet this footnote does not discuss how the importance of supplier diversity affected purchasing decisions. Views at Appx2117, n. 185.  And as if to prove this point further, Defendant's Rebuttal Brief itself continues to emphasize the "importance of price" in justifying the Final Determination.  See DfBr.35, 54, 56.

Moreover, the implicit premise of the Commission's entire pricing analysis is that whichever producer offers the lower-priced bid will necessarily win the sale.  This assumption is reflected most clearly in the Commission's finding that, were it not for supposedly "low-priced

subject imports,"[2] "{d}omestic producers could reasonably have expected to gain market share" during the POI.  Views at Appx02117.  Such an expectation would only be reasonable if non-price factors such as availability and substitutability played no role in purchaser decision-making.

Second, Defendant contends in its Rebuttal Brief that "{n}one of the evidence highlighted by Adisseo indicating that non-price factors were important detracts from the Commission's finding that price was also an important factor."  DfBr.26.  To support this assertion, the Commission cites to Acciai Speciali Terni, S.p.A. v. United States, 19 C.I.T. 1051, 1059–60 (1995).

The situation in the instant case, however, is distinguishable from that in Acciai Speciali, since Plaintiffs do not argue (as the Plaintiff did in that case) that the Commission was precluded from finding price sensitivity simply because purchasers did not consistently rate price as the *most* important factor.  Indeed, the situation here is more akin to

_____

[2] Plaintiffs note that the Commission, both in its Views (at Appx02116) and in its Rebuttal Brief (at 37 & 39), references "low-priced subject imports."  As reflected by the uncontested pricing data, subject imports were on balance *higher* priced than the domestic like product throughout the POI.

the one in <u>Nippon Steel Corp. v. United States</u>, 25 C.I.T. 1415 (2001). In <u>Nippon</u>, "{i}n making its price sensitivity finding, rather than evaluate purchasers' assessments of non-price factors such as on-time delivery or product quality, or whether these other factors actually drove their decision to switch suppliers, the Commission simply noted that other non-price factors were also considered 'important.'" <u>Id</u>. at 1430.  The Court disagreed, and held that

> if the Commission chooses to rely on price sensitivity to support its price effects determination, it must assess other aspects of the {relevant} industry that would tend to reduce if not entirely vitiate, the importance of price in purchaser decision-making....*{I}t is insufficient merely to acknowledge that non-price factors are considered 'very important' without discussing the nature of these factors in the industry or relating them to its overall determination, as such factors may eclipse the importance of price in purchaser decision-making.*

<u>Id</u>. at 1430-31 (emphasis added).

In the instant case, the Commission did precisely what the Court proscribed in <u>Nippon</u> – namely, it simply acknowledged that non-price factors are important while failing to explain how non-price factors affected its determination.  The Commission's failure to consider these well-established non-price factors undermines its entire price effects determination.

2.   The Commission's Finding that Subject Imports
Caused Price Depression Through Allegedly Below-
Market Bids Is Nonsensical and Unsupported by
Record Evidence

a.   The Commission Has Failed to Address Plaintiffs'
Argument That Its "Phantom Underselling"
Theory Is Nonsensical and Illogical

Plaintiffs explained in their Case Brief the essential contradiction at the heart of the Commission's "phantom underselling" theory. PlBr.16.  The Commission places great weight – unreasonable weight, as explained below – on email correspondence and testimony that purports to prove that Respondents were making offers at below-market prices that the domestic industry was then obligated to meet, or lose the sale, thus causing price depression.  **But why were Respondents making bids at below-market prices at the same time that they were making *actual sales* at above-market prices, as evidenced by the price comparison data?  Furthermore, if price is such an important factor in the purchasing decision, why were purchasers making *actual purchases* from these Respondents at above-market prices, and [**

**     ], when below-market offers from these same Respondents were also available?**

6

Neither the Commission's Views nor Defendant's Rebuttal Brief offer any answer to these critical questions.  The best Defendant can muster is to speculate, without actual data, that the quarters with smaller margins of overselling might mask sales by Respondents at prices below those of the domestic industry.  Views at Appx02105, n.143.  But as this Court has held, "{g}uesswork is no substitute for substantial evidence in justifying decisions." China Nat'l Arts & Crafts Imp. & Exp. Corp. v. United States, 15 C.I.T. 417, 424 (1991); see also China Nat'l Mach. Imp. & Exp. Corp. v. United States, 27 C.I.T. 255, 268 (2003) ("Conjectures are not facts and cannot constitute substantial evidence.")

The failure to offer a reasonable answer to these basic yet critical questions is fatal to the Commission's finding of "phantom underselling."  If no reasonable answer can be provided to explain how these seemingly contradictory facts can be reconciled, then it should have been impossible for the Commission to reach its determination of price depression, and it should be equally impossible for this Court to sustain it.  As the Federal Circuit has held, "substantial evidence…can be translated to roughly mean 'is {the determination} unreasonable?'"

<u>Nippon Steel Corp. v. United States</u>, 458 F.3d 1345, 1352 (Fed. Cir.

2006) (citing <u>SSIH Equipment SA v. United States ITC</u>, 718 F.2d 365,

381 (Fed. Cir. 1983)) (alteration in original).  A fundamentally illogical

determination is necessarily unreasonable, and cannot be sustained.

> b.   The Record Lacks the Evidence that Would Be
> Consistent with a Finding of "Phantom
> Underselling"

The Commission relied heavily on email communication of

dubious probative value to support its determination of price

depression, and the flaws in that analysis are discussed in Section

II(A)(3)(b) below.  But even assuming, *arguendo*, that the Commission's

theory of "phantom underselling" were correct, the record should

naturally contain other evidence consistent with this pricing dynamic.

The lack of this evidence, and the Commission's failure to explain why

this evidence does not exist, is equally fatal to the Commission's price

depression determination.[3]

---

[3] Defendant distorts Plaintiffs' position, suggesting that Plaintiffs argue that a price depression determination cannot be made without certain types of information on the record.  DfBr.33-34.  Plaintiffs are not arguing that, as a general matter, a price depression determination cannot be made without such evidence.  Rather, Plaintiffs argue that given the specific finding made by the Commission, certain other evidence would necessarily and logically appear on the record, and its absence undermines the Commission's conclusion in this case.

PUBLIC VERSION

First, the record contains virtually no evidence of lost revenues, which should be rampant if the market dynamics were as the Commission describes them.  Petitioner itself recognized that lost revenues were not present on the record, and had no explanation for their absence.  <u>See</u> PlBr.17, n.5.  Throughout its Rebuttal Brief, Defendant points to the fact that two purchasers reported that the domestic industry was required to reduce its prices in the face of import competition.  DfBr.37-38, 45.  But in so doing, the Commission fails to mention that 25 purchasers reported either that the domestic industry did not reduce its prices, or had no knowledge of such a reduction.[4] Why the Commission relies so heavily on the views of these two purchasers without crediting the far larger number of purchasers who reported to the contrary is wholly unexplained.  <u>USX Corp. v. United States</u>, 11 C.I.T. 82, 84 (1987) (The "ITC may not rely upon isolated tidbits of data which suggest a result contrary to the clear weight of the evidence.")

---

[4] PlBr.17.  Plaintiffs also noted for the Commission that these two purchasers accounted for only a trivial [          ] of total reported purchases of methionine during the POI.  Plaintiffs' Post-Hearing Brief, Annex III at Appx07685.

Second, Petitioner alleged that it had lost sales volumes to respondents under "meet-or-release" clauses under long-term contracts. In order to invoke these "meet-or-release" clauses, [

]

PlBr.18.  Petitioner agreed that it would submit such evidence on the record, yet failed to do so, leading the Commission to state both in its Views and in the Rebuttal Brief that it had no "direct" evidence that these meet-or-release clauses had ever been exercised.  Views at Appx02108; DfBr.36.

The best that Defendant could muster in its Rebuttal Brief is to speculate that because competing bids were typically shown in person, the COVID pandemic may have changed the process to a phone call, thus apparently reducing the likelihood of documentation.  DfBr.40, n.9. Even allowing this *post hoc* rationalization to stand,[5] this does not explain why Petitioner was unable to provide any documentation of bids reviewed in person under "meet-or-release" clauses from the beginning

---

[5] See U.H.F.C. Co. v. United States, 916 F.2d 689, 700 (Fed. Cir. 1990) ("Post hoc rationalizations of agency actions first advocated by counsel in court may not serve as the basis for sustaining the agency's determination.")

10

of the POI in January 2018 to the beginning of the COVID pandemic in March 2020, or why Petitioner was unable to produce internal documentation noting the results of such telephone calls after March 2020.  While Petitioner submitted documentation regarding its normal commercial negotiations (including those after March 2020), it was unable to provide any evidence that these specific "meet-or-release" clauses had been activated, notwithstanding its promise to do so. Again, given the market dynamics upon which the Commission's price depression determination rests, this documentation should have been easy to provide, and its absence further undermines the Commission's "phantom underselling" claim.

And finally, if this theory were true, the margins of overselling would naturally narrow over the POI as the gap between the bids for subject imports and the price for subject imports also narrowed.  But in fact, [                                                      ].[6] Under the Commission's holding, this necessarily means that [

---

[6] Plaintiffs' Post-Hearing Brief, Annex III at Appx07689-07690.

11

].  Like the entirety of the Commission's "phantom underselling" argument, this makes no sense, and is equally unaddressed by the Commission.

The unavoidable conclusion is that this core holding simply does not satisfy the standard of review this Court must apply.  The substantial evidence standard requires more than the presence of *some* record evidence supporting the Commission's determination.  Rather, the substantial evidence standard requires "{a} reviewing court {to} consider the *record as a whole*, including that which 'fairly detracts from its weight', to determine whether there exists 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Nippon Steel Corp. v. United States</u>, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (quoting <u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)) (emphasis added).  In other words, "{n}ot addressing the conflicting evidence on the record fails the substantial evidence test because it does not consider record evidence contrary to Commerce's determination." <u>New Am. Keg v. United States</u>, No. 20-00008, 2021 Ct. Intl. Trade LEXIS 34, at *34 (2021) (quoting <u>Camau Frozen Seafood Processing Imp. Exp. Corp. v. United States</u>, 37 C.I.T. 1116, 1121,

(2013)).  In reviewing the Commission's price depression finding, this Court should assess whether the finding is reasonable and factually supported in light of the record evidence as a whole, including the fact that evidence that should appear simply does not.[7]  If not, the Commission's finding is not supported by substantial evidence.

      3.      The Commission's Decision to Elevate Anecdotal Data Over Actual, Verified Pricing Information for Purposes of Making Its Price Effects Determination Remains Unjustified and Unexplained

In reaching its conclusion that subject imports had depressed prices for the domestic like product, the Commission relied heavily if not exclusively on circumstantial and anecdotal[8] evidence of these supposed price effects.  The Commission's main sources of evidence were correspondence between Petitioner and its customers, hearing

---

[7] Additionally, the Court should assess whether the Commission equally failed to consider the alternative causes of price declines, including the global decline in methionine prices and declines in raw material costs.  See PlBr.27-32 (discussing the impact of global price declines); id. at 27, n. 10 (highlighting decline in input costs).

[8] By referring to evidence such as lost sales and email correspondence as "anecdotal," Plaintiffs mean that this information is less probative than quarterly pricing information which was subject to verification by Commission staff.  See Verification Report at Appx01626-01636.  Contrary to Defendant's suggestion, DfBr.45, Plaintiffs are not suggesting that this evidence was fraudulent or inauthentic.

testimony from Petitioner's witnesses, survey responses from the Commission's questionnaires, and allegations of lost sales.  In relying on this evidence, the Commission inexplicably rejected price comparison evidence that demonstrated overwhelming overselling by subject imports during the POI.

The Commission predictably justifies its decision to rely on this evidence on the grounds that each investigation is "*sui generis*," and that the Commission has "broad discretion" in selecting its pricing methodology.  DfBr.30 (citing Hitachi Metals v. United States, 949 F.3d 710, 718 (Fed. Circ. 2020)).  Defendant further mischaracterizes Plaintiffs' arguments on this point as an "invitation {for the court} to reweigh the evidence."  DfBr.33.  In so doing, Defendant misses the mark.  This is not an issue left wholly to agency discretion, nor is it a question of reweighing the evidence.  The issue before the Court is whether the Commission acted contrary to precedent in rejecting more probative price comparison data, and whether the Commission failed to provide a reasoned basis for its decision to do so.

     a.    Both This Court and the Commission Have Consistently Expressed A Preference for the Use

14

of Price Comparison Data for Determining
Adverse Price Effects

In <u>AK Steel</u>, which was cited extensively in Plaintiffs' Case Brief –

but was almost unmentioned by Defendant – the Court upheld the

Commission's decision to reject information that was less probative

than the price comparison data, and concluded that "the Commission

acted reasonably in deciding to weigh verifiable transaction prices from

the period of review more heavily than evidence of offer prices with

limited source citations compiled by an interested party."  PlBr.25-26

(citing <u>AK Steel Corp. v. United States</u>, 36 C.I.T. 1466 (2012)).  In

addition to <u>AK Steel</u>, Plaintiffs cited to numerous determinations in

which the agency expressed a preference for the use of quarterly pricing

data in making a price effects determination;[9] precisely *none* of these

precedents were addressed in Defendant's Rebuttal Brief.

Neither in its Views or its Rebuttal Brief does Defendant provide

any reason for ignoring these specific quarterly pricing data.  There has

never been any suggestion that the pricing data were flawed or

---

[9] PlBr.43-45.

inaccurate;[10] the domestic industry's pricing data were subject to

verification by the Commission staff;[11] and the volume of sales reported

for price comparison purposes [

                              ][12]  Nevertheless, in response to Plaintiffs'

repeated arguments that the Commission rely on these price

comparison data in making its determination of price effects, the

Commission concluded that "while the pricing product data show{}

predominant overselling, these data are not the only information in the

record concerning relative prices of the domestic like product and the

subject imports," Views at Appx02112, without providing a reasoned

basis for its decision to place greater weight on one type of information

than the other.

    Defendant attempts to justify this decision by citing to four

determinations in which the agency allegedly used similar types of

evidence to make a finding of price effects where, as here, the price

comparison data reflected overselling.  DfBr.30-31, n.7.  But in two of

the determinations cited by Defendant, the price comparison data in

_____

[10] PlBr.15, n.4.
[11] See Verification Report at Appx01626-01636.
[12] Final Staff Report at Appx01715.

fact showed significant <u>underselling</u>, not overselling (meaning that the anecdotal evidence was supportive of and consistent with the price comparison data),[13] and in the other two, anecdotal evidence was relied upon because the price comparison data were flawed or incomplete.[14] These cases do not undermine in any way the basic principle that the type of evidence upon which the Commission exclusively relied to make its price depression determination has been consistently disfavored where, as here, accurate and complete price comparison data were available.

The same is true, and perhaps to an even greater degree, with respect to the lost sales information upon which the Commission

---

[13] <u>Forged Steel Fittings from India and Korea</u>, Inv. Nos. 701-TA-631 and 731-TA-1463-1464 (Final), USITC Pub. 5137, at 28–31 (Nov. 2020) (There was increasing and substantial underselling in the latter part of the POI, and this price comparison data was consistent with other evidence such as responses to purchaser questionnaires.); <u>Certain Steel Nails from China</u>, Inv. No. 731-TA-1114 (Final), USITC Pub. 4022, at 17–20 (July 2008) (Price comparison data showed underselling in 41 of 84 quarterly comparisons).

[14] <u>Metal Lockers from China</u>, Inv. Nos. 701-TA-656 and 731-TA-1533 (Final), USITC Pub. 5218, at 27–33 (Aug. 2021) (The Commission "determine{d} that the quarterly price comparisons based on the pricing product data collected in the final phase of these investigations are not a reliable measure of the relative prices of subject imports and domestic product."); <u>Strontium Chromate from Austria and France</u>, Inv. Nos. 731-TA-1422 and 731-TA-1423 (Final), USITC Pub. 4992, at 25–28 (Nov. 2019) (Although redactions for BPI make it difficult to discern clearly, the language of the public report suggests that the quarterly price comparison data did not receive sufficient coverage to warrant its usual evidentiary weight.).

extensively relies.  Plaintiffs provided ample judicial precedent

supporting the basic principle that the Commission uses lost sales

allegations to corroborate other pricing data on the record, or where

other pricing data (such as quarterly pricing data) are flawed or

unavailable, and not as the basis for a price effects determination on its

own or in conflict with the quarterly pricing data.  PlBr.37-38.

Defendant attempts to distinguish this precedent to no avail, as

Plaintiffs have accurately and fairly characterized the court's holdings

in these cases:

- Defendant cherry-picks a quote from Celanese Chems. Ltd. v. United States, 31 C.I.T. 279, 300 (2007) that actually refers to the Commission's holding in a determination not under review.  In the determination underlying the appeal, the Commission found that the price comparison data showed mixed underselling and overselling, with overselling occurring in the more recent portion of the POI, and rejected lost sales evidence that contradicted the price comparison data.

- In Comm. for Fair Beam Imps. v. United States, 27 C.I.T. 932, 955 (2003), the Court affirmed the Commission's decision to reject lost sales evidence because it was contrary to the price comparison data showing predominant overselling, which is the point for which Plaintiffs cited the case.

- Defendant selectively quotes from Lone Star Steel Co. v. United States, 10 C.I.T. 731, 734 (1986), suggesting that the

Commission has the discretion "to determine whether lost sales, together with other factors, indicate a causal nexus between … imports and material injury to the domestic industry". DfBr.32. The full quotes states as follows: "*The court has indicated on other occasions that instances of lost sales alone do not mandate a finding of injury*; rather it is for ITC to determine whether lost sales, together with other factors, indicate a causal nexus between LTFV imports and material injury to the domestic industry." Lone Star Steel Co., 10 C.I.T. at 734 (emphasis added). Furthermore, this case provides an example where the Commission did not accord weight to evidence of lost sales that was incongruent with the price comparison data. In the determination underlying this appeal, the Commission found that the underselling margins were decreasing later in the POI, and the lost sales evidence was not sufficient to overcome this evidence. Id. at 733.

- In Iwatsu Elec. Co., Ltd. v. United States, 15 C.I.T. 44, 53-55 (1991), the Commission found that the price comparison data were not reliable because price comparisons between subject imports and domestic product were "problematic." Id. Thus, consistent with Plaintiffs' point, the Commission had leeway to place greater weight on lost sales evidence as a basis for adverse price effects. In the instant case, no such defect was found with respect to the pricing data.

The instant case provides a perfect example of why the agency and its reviewing courts have taken this position. Plaintiffs' Case Brief closely analyzes the correspondence submitted by Petitioner with its post-hearing brief, and demonstrates that it is missing key elements, such as direct evidence of foreign producer price quotations and the

19

identity of suppliers making price offers, and further demonstrates that many of the Commission's characterizations of this correspondence were unsupportable. PlBr.20-25. Defendant attempts to rehabilitate the Commission's conclusion by offering its own more detailed *post hoc* analysis of the same documentation. DfBr.39-44. While Plaintiffs believe that Defendant's analysis is wrong in several respects, this conflict is precisely the point: informal commercial communication that is capable of conflicting subjective interpretations is inherently less reliable than verified and objective quarterly price comparison data. This is why the both the Commission and its reviewing courts have consistently held that quarterly price comparison data, provided that it is accurate and complete, is a preferred basis for making a price effects determination.

    b.  The Commission Failed to Explain Why It Relied upon Anecdotal Data Over the Verified Pricing Data on the Record

Even if the Commission had the discretion to use anecdotal evidence over quarterly pricing data in making its price effects determination, the Commission failed to explain why it made the choice it did. In its Views, the Commission states that "while the pricing

product data show{} predominant overselling, these data are not the only information in the record concerning relative prices of the domestic like product and the subject imports," Views at Appx02112, but offered no further explanation for its choice of one over the other.  The Commission similarly concedes that "the pricing data indicate predominant overselling by cumulated subject imports," but instead relies without justification or explanation on the fact that "the record indicates that purchasers were offered lower-priced imports in particular transactions . . ."  Views at Appx02106.

Defendant's Rebuttal Brief offers no support to the Commission's decision to select certain information for purposes of its decision.  In defending the use of this evidence, the Commission states that it "recognized that the pricing data indicated predominant overselling, but reasonably attached weight to other evidence, including confirmed lost sales, showing that subject imports had adverse price effects."[15]  The paragraph in Defendant's Rebuttal brief ends there, with no further

---

[15] DfBr.31.  Defendant's Rebuttal Brief uses this same phase, "reasonably attached weight", to justify the use of other anecdotal data such as business documents and hearing testimony, also without explaining why this information was preferred. DfBr.39.

21

explanation why the agency's decision to "attach{} weight" to one type of information over the other was reasonable.  Even if the Commission has the authority to select one type of information over the other, its Views fail to explain why that choice was made in a manner that would allow this court to understand the path of the agency's reasoning.  See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) ("{T}he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'") (quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962)).

<div style="margin-left:2em">

c.      The Commission Failed to Explain Why Its Analysis of Lost Sales Volumes Was Reasonable

</div>

Just as the Commission failed to explain why it selected one type of evidence over another in making its price effects determination, so too did the Commission fail to explain its conclusion that the volume of lost sales was substantial.

First, the Commission failed to explain its determination that the volume of lost sales was "substantial."  PlBr.32-37.  During the investigation, Plaintiffs offered several approaches to assessing the

significance of the alleged lost sales volume, including by reference to total U.S. consumption. The Commission ignored all of these approaches and instead measured the volume of lost sales relative to the increase in annual subject imports from 2018 to 2020. In its Case Brief, Plaintiffs illustrated why this approach was unreasonable, and concluded by noting that the Commission had failed to explain "why it chose this comparison over one of the more appropriate comparisons raised by Plaintiffs during the investigation." PlBr.36.

In its Rebuttal Brief, rather than explain the reasons for selecting the reasons for its particular analysis, Defendant instead defended its methodology as "reasonable," but again offered no basis for selecting this particular approach as opposed to other available approaches. See DfBr.29. The best that Defendant could offer was to say that "{t}he Commission's comparison of lost sales to the increase in subject import volume over the POI was also reasonable because it shows that the volume of lost sales was large relative to the increase in subject import volume," DfBr.30, which is a meaningless tautology. Particularly since the Commission has used other measures in past cases to assess the significance of the lost sales volume, the Commission's failure to explain

why it analyzed the volume of lost sales in this case in this manner

undermines its determination.  See Asociacion Colombiana de

Exportadores de Flores v. United States, 12 C.I.T. 1174, 1177 (1988),

aff'd, 26 F.3d 139 (Fed. Cir. 1994) ("In order to ascertain whether action

is arbitrary, or otherwise not in accordance with law, reasons for the

choices made among various potentially acceptable alternatives usually

need to be explained.").

Second, Plaintiffs identified two main flaws with the volume of

lost sales upon which the Commission relied, the second of which was

that the purchaser accounting for the vast majority of this lost sales

volume in fact [

], from [                      ] in 2018 to [

] in 2020.  PlBr.34, n.13.  Plaintiffs raised this issue before the

agency and also in their Case Brief, but to date, the Commission has

failed to explain how the domestic industry could have "lost" sales when

[

] Here too, the Commission's failure to

explain its determination, and its continued ignoring of contrary record

24

evidence, undermines an important basis for its conclusion.  <u>See</u> <u>New</u> <u>Am. Keg v. United States</u>, No. 20-00008, 2021 Ct. Intl. Trade LEXIS 34, at *48 (2021) ("The agency must offer an explanation of the decision that is clear enough to enable judicial review, and cannot leave vital questions, raised by comments which are of cogent materiality, completely unanswered.") (quoting <u>Motor Veh. Mfrs. Ass'n</u>, 463 U.S. 43 (1983)).

> 4.    The Commission Failed to Make a Finding of Underselling

The Commission is required by statute and by judicial precedent to make a finding whether there was significant underselling by subject imports during the POI, which a majority of Commissioners failed to do. PlBr.39-41.  In its Rebuttal Brief, Defendant asserted that "{t}he Commission was not required to make an express finding concerning the significance of underselling," arguing that the agency need only "consider" whether underselling had occurred.  DfBr.23.  However, the cases that the Commission cites to support this proposition are inapposite.

First, the Commission mischaracterized the Federal Circuit's holding in <u>Nucor Corp. v. United States</u>, 414 F.3d 1331 (Fed. Cir. 2005). In that case, the Court found that the Commission had upheld its legal obligation to make a finding on the significance of underselling because, although it did not make an explicit statement as to its finding, it unmistakably made an *implicit* finding of insignificant underselling. <u>See</u> PlBr.41, n. 16.  Specifically, the Court in <u>Nucor</u> explained that

> {i}t is true, as Nucor contends, that the Commission did not state in so many words that the volume of underselling was an insignificant factor in evaluating whether the effect of imports on prices had led to present material injury to the domestic industry.  Nonetheless, the trial court found that to be the plain import of the Commission's analysis, and we agree.

<u>Nucor</u>, 414 F.3d at 1339.  Therefore, contrary to Defendant's assertion, the more accurate characterization of the Court's holding in <u>Nucor</u> is that the Commission has an obligation to make a finding, either explicit or implicit, whether significant underselling had occurred.  In the instant case, the Commission did neither.  The Commission's position in its Rebuttal Brief should also be taken as a concession that, in fact, no conclusion on significant underselling was implicitly reached in its Views.

26

The Commission's characterization of the Federal Circuit's holding in <u>Altx, Inc. v. United States</u>, 370 F.3d 1108 (Fed. Cir. 2004) is also misleading.  <u>See</u> DfBr.24.  The specific portion of the <u>Altx</u> opinion cited by the Commission deals with an entirely different issue – specifically, the obligation for the Commission to consider the magnitude of dumping under 19 U.S.C 1671(7)(C)(iii)(V) – and not the meaning of the Commission's obligation to "consider" whether there has been significant underselling in the context 19 U.S.C. § 1677(7)(C)(ii).

Indeed, the Federal Circuit, in its discussion of 19 U.S.C. § 1677(7)(C)(ii), subsequently stated: "In <u>Altx, Inc. v. United States</u>, 167 F. Supp. 2d 1353, 1365 (Ct. Int'l Trade 2001), <u>aff'd</u>, 370 F.3d 1108 (Fed. Cir. 2004), the {CIT} held that the Commission was required to make two distinct determinations, one for each prong of {19 U.S.C. §} 1677(7)(C)(ii)."  <u>Nucor</u>, 414 F.3d at 1340.  The <u>Nucor</u> Court then went on to make its holding regarding the Commission's statutory obligation to reach a conclusion regarding the significance of underselling, as discussed above.  This demonstrates that the Federal Circuit agreed with the CIT's holding in <u>Altx, Inc. v. United States</u>, 25 C.I.T. 1100

(2001) that the Commission must make a distinct determination both as to significant underselling and as to price depression/suppression.

Third, <u>Rhone Poulenc S.A. v. United States</u>, 8 C.I.T. 47 (1984) should provide no support for the Commission's decision in this case. In the portion of <u>Rhone Poulenc</u> cited by the Commission, the Court's holding was that "{a}lthough the concise expression of such a{n} {underselling} finding is preferable, we are reluctant to require the ITC to state its position with technical exactitude *in this developing area of the law . . .*" <u>Id</u>. at 55 (emphasis added). As <u>Rhone Poulenc</u> was decided in 1983, nearly 40 years ago, Plaintiffs submit that this area of the law can no longer be considered "developing." Instead, more recent case law requiring the Commission to make a finding of underselling is a better guide for this agency's statutory obligations.

Finally, the Commission's reliance on the term "consider" in 19 U.S.C. § 1677(7)(C)(ii) as allowing the agency to avoid making a specific finding of underselling proves too much. Under the structure of this statutory provision, the term "consider" applies both to underselling and price suppression/depression. 19 U.S.C. § 1677(7)(C)(ii). Indeed, 19 U.S.C. § 1677(7)(B)(i) states that in making a material injury

28

determination, the Commission must "consider" volume, price effects and the impact of subject imports on the domestic industry.  19 U.S.C. § 1677(7)(B)(i).  Taken to its extreme, the Commission's interpretation of "consider" would eliminate the agency's obligation to make any specific findings whatsoever as part of its material injury determination.  This clearly cannot be Congress's intent and also has not been the agency's consistent practice.

In sum, the caselaw cited by Defendant in its Rebuttal Brief does not, in fact, support its contention that the Commission was not obliged to make a finding on significant underselling.  Because the Commission failed to satisfy its statutory duty in the instant case, its determination was not in accordance with law.

B.  **The Commission's Determination that Subject Imports Adversely Impacted the Condition of the Domestic Industry Was Not in Accordance with Law and Was Not Supported by Substantial Evidence[16]**

---

[16] Defendant argues that Plaintiffs' arguments that the increase in the volume of subject imports was not "significant" are misplaced, because the Commission is not required to consider contextual factors in making a determination of the "significance" of the volume of subject imports under 19 U.S.C. § 1677(7)(C)(i). DfBr.20.  Accordingly, Defendant addressed the substance of Plaintiffs' volume arguments in the impact section.  Without conceding the point, Plaintiffs respond to Defendant's arguments regarding volume in the context of impact on the domestic industry as well.

1.   The Commission Failed to Consider the Importance of
     Supplier Diversity in Assessing the Impact of Subject
     Imports on the Domestic Industry

The Commission's core conclusion with respect to subject import

volume and market share is that "{d}omestic producers could reasonably

have expected to gain market share following the exit of these {Chinese}

imports from the U.S. market{.}"  Views at Appx02117.  The domestic

industry's failure to gain market share, notwithstanding [

                              ], was critical to its material injury

determination.

But as Plaintiffs explained in their Case Brief, the Commission's

holding relies heavily on an assumption that the domestic industry's

inability to gain market share occurred because it was being

consistently undersold by subject imports.  This aspect of the

Commission's assumption is of course undercut by the consistent [

          ] overselling observed during the POI.  But perhaps more

critically, this conclusion fails to take into account the significance of

non-price considerations – most critically, the importance of supplier

diversity and reliability of supply – in purchasers' decision-making, as

required by <u>Nippon</u>.  As a consequence, the Commission's assumption

regarding the reasonable expectation for the domestic industry's growth in market share is not just unsupported, it is contradicted by record evidence.

Defendant contends that "there was no evidence on the record that the importance of supplier diversity had increased over the period of investigation so as to motivate purchasers to increase their purchases of subject imports at the domestic industry's expense." DfBr.54. Yet the importance of supplier diversity does not need to have changed over the POI to explain the increase in subject import market share, especially when consumption was increasing, and Defendant provides no explanation of why this should be the case. On the contrary, in a market environment where demand is growing and there is only one domestic producer for each type of methionine, one would expect that purchasers would seek to obtain relatively *more* of their supply from subject imports. This is because when consumption is growing, in order for the domestic industry to keep its market share constant (let alone increase it), purchasers must *increase* the volume of methionine they are procuring from the domestic industry. In light of this dynamic and the unquestioned importance of supplier diversity to purchasers, it is no

31

wonder that domestic industry's market share declined somewhat [

],[17] as

purchasers rebalanced their supplier mix to ensure availability of

supply.

Defendant also notes that "as the domestic industry lost market

share to subject imports during the POI, the domestic industry's excess

capacity increased, including excess capacity to produce the specific

type of methionine, MHA, that accounted for a majority of nonsubject

imports from China." DfBr.55. Defendant acknowledged Plaintiffs'

previously-made point that purchasers seeking diversity of supply

would not seek to purchase *more* from Novus, which already supplied

[        ] of the MHA to the U.S. market over the POI. DfBr.55, n. 14.

Yet Defendant dismisses this point as invalid because Novus supplied

[                           ] in 2018 and [

] Id. But the

Commission fails to explain why purchasers seeking diversity of supply

would maintain the exact proportion of purchases from Novus relative

---

[17] See Final Staff Report at Appx01685 (Table III-5).

to imports – particularly when demand for MHA was growing, and where there was evidence that [

].[18]  Such domestic industry supply constraints create an even greater impetus for purchasers to ensure availability by purchasing subject imports.[19]

The critical importance of supplier diversity provides a far simpler and more compelling explanation for the pricing and volume data on the record: purchasers were willing to pay a premium for subject imports throughout the POI because of their well-documented need for a diversity of supply, particularly in the face of an unreliable domestic supplier.

2.    The Commission Failed to Consider the Limited Substitutability Between Different Chemical Compositions of Methionine in Assessing the Impact of Subject Imports on the Domestic Industry

───────────────

[18] See PlBr.57 (noting that "{h}alf of responding purchasers (10 of 20) reported supply constraints" and that "5 of 20 – or 25 percent – of U.S. purchasers reported being placed on allocation from U.S. importers and producers."); id. at 61 (text & n. 24) (noting [                                                                              ] and record evidence of [                                                                      ].).
[19] "{Novus} ha{s} no objection to somebody's preference on having two suppliers of {MHA}, *one of them needing to be imported*."  Tr. at Appx11053 (Galo) (emphasis added).

33

The limited substitutability of the different types of methionine –
MHA and DLM – heightens the importance of supplier diversity for
purchasers and significantly limited the extent to which the domestic
industry could have "reasonably expected" to gain market share during
the POI.  The issues posed by the limited substitutability of MHA and
DLM are further exacerbated by the structure of the domestic
methionine industry – wherein there is only one domestic producer for
each type of methionine.  In its Rebuttal Brief, Defendant attempts to
respond to this argument in two ways.

First, the Commission contended that its analysis was in
accordance with law because the Commission is required to examine
whether the domestic industry "as a whole" has been materially injured
by subject imports.  DfBr.56-57.  This may be true, but this argument
misses the mark.  Plaintiffs' point is not that only a segment of the
domestic industry was materially injured.  Rather, Plaintiffs' argument
is that the two chemical configurations of the subject merchandise (i.e.,
DLM and MHA) have different market dynamics that serve to limit

substitutability, segment the market, and attenuate competition.[20]

Therefore, Plaintiffs submit that it is logical for the Commission to

examine the respective segments of the industry in order to accurately

determine whether the domestic industry as a whole has been injured.

Second, Defendant noted that "13 of 22 {purchasers} reported that

they could switch between MHA and DLM."  DfBr.58.  However, just

because DLM and MHA are interchangeable *in theory* does not

eliminate the fact that there are costs associated with switching

between product forms, and that there is only one domestic supplier of

each form.  Moreover, when purchasers regard supplier diversity as

important (which the Commission acknowledges), it necessarily means

that imports are required.  While the Commission recognized all of

these factors separately, it did not link them together as part of its

impact analysis.  In neither its Views nor its Rebuttal Brief does the

Commission address the contrary evidence and arguments regarding

the limited practical substitutability of MHA and DLM and its effect on

---

[20] See PlBr.56 (noting that net subject import growth was most pronounced for DLM, and that [

].)

injury attribution.  Accordingly, like the Commission's other findings detailed herein, the Commission's determination that subject imports adversely impacted the domestic industry is unsupported by substantial evidence and not in accordance with law.

Respectfully submitted,


   /s/ Eric C. Emerson
Eric C. Emerson
Christopher Forsgren
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 429-8076

*Counsel for Adisseo Espana S.A. and Adisseo USA, Inc.*

Dated: August 12, 2022

# CERTIFICATION PURSUANT TO STANDARD CHAMBER PROCEDURES

Pursuant to Standard Chamber Procedure 2(B)(2), I, Eric C. Emerson, certify the foregoing Reply Brief in Support of Rule 56.2 Motion for Judgment on the Agency Record, filed by Plaintiffs Adisseo Espana S.A. and Adisseo USA Inc., complies with the word count limitations of Standard Chamber Procedure 2(B)(1).  This brief was prepared in Century Schoolbook 14-point type, and contains 6,980 words, excluding the parts of the brief exempted by Standard Chamber Procedure 2(B)(1).  In making this certification I have relied on the word count feature of the word-processing software used to prepare the brief.

>     /s/ Eric C. Emerson
> Eric C. Emerson
> Steptoe & Johnson LLP
> 1330 Connecticut Avenue, N.W.
> Washington, D.C. 20036
> (202) 429-8076
>
> *Counsel for Adisseo Espana S.A. and Adisseo USA, Inc.*

Dated: August 12, 2022