PUBLIC VERSION

Slip Op. 23-178

UNITED STATES
COURT OF INTERNATIONAL TRADE

Court No. 21-00562

ADISSEO ESPANA S.A. and
ADISSEO USA INC.,

*Plaintiffs*,

v.

UNITED STATES,

*Defendant*,

and

NOVUS INTERNATIONAL INC.,

*Defendant-Intervenor.*

Before: M. Miller Baker, Judge

OPINION

[Granting Plaintiffs' motion for judgment on the agency record in part and remanding for further administrative proceedings.]

Dated: December 18, 2023

*Eric C. Emerson*, Steptoe & Johnson LLP of Washington, DC, argued for Plaintiffs. With him on the briefs was *Christopher Forsgren*.

**PUBLIC VERSION**

*Noah A. Meyer*, Attorney Advisor, Office of the General Counsel, U.S. International Trade Commission of Washington, DC, argued for Defendant. With him on the brief were *Andrea C. Casson*, Assistant General Counsel for Litigation, and *Karl Von Schriltz*, Assistant General Counsel for Import Injury.

*Benjamin J. Bay*, Schagrin Associates of Washington, DC, argued for Defendant-Intervenor. With him on the brief was *Christopher T. Cloutier*.

*Baker*, Judge: A Spanish chemical producer challenges the International Trade Commission's conclusion that methionine dumped in the U.S. market materially injures domestic producers. As to certain issues, the court remands to the agency for reconsideration.

I

The Tariff Act of 1930, as amended, establishes a dual-track process for antidumping investigations. An interested party simultaneously petitions the Department of Commerce and the Commission alleging that imported goods being sold at less than normal value materially injure domestic producers. *Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1334 (CIT 2020) (citing 19 U.S.C. § 1673(1)). As relevant here, Commerce investigates whether dumping is occurring, while the ITC investigates whether the domestic industry is materially injured. 19 U.S.C. § 1673(1), (2). Both agencies must reach affirmative determinations before the Department may impose

**PUBLIC VERSION**

antidumping duties on the relevant imported merchandise. *Hung Vuong*, 483 F. Supp. 3d at 1334 (citing § 1673).

In determining whether material injury exists, the Commission must consider the volume of imports of subject merchandise; the effect those imports have on U.S. pricing for domestic like products; and the impact of such imports on U.S. producers of domestic like products, "but only in the context of production operations within the United States." 19 U.S.C. § 1677(7)(B)(i)(I)–(III). As to each of these factors, the statute further directs the Commission to consider various criteria. *See* 19 U.S.C. § 1677(7)(C).

II

Novus International Inc., a domestic methionine producer, petitioned Commerce and the Commission in 2020 to investigate imports of that chemical from France, Japan, and Spain. *See Methionine from France, Japan, and Spain; Institution of Anti-Dumping Duty Investigations and Scheduling of Preliminary Phase Investigations*, 85 Fed. Reg. 47,243 (ITC Aug. 4, 2020), Appx01004. The Commission preliminarily determined that there was "a reasonable indication" that such imports materially injured domestic industry. *Methionine from France, Japan, and Spain; Determinations*, 85 Fed. Reg. 58,385, 58,385 (ITC Sept. 18, 2020).

Commerce first determined that imports from France were dumped and later reached the same con-

Case 1:21-cv-00562-MMB Document 73 Filed 12/22/23 Page 4 of 19

Ct. No. 21-00562 Page 4
**PUBLIC VERSION**

clusion as to imports from Japan and Spain, which in turn required the Commission to stagger its analyses in the same way. Appx02075–02076. The ITC therefore made its final determinations as to all three countries based on the record from the investigation as to France. *See* 19 U.S.C. § 1677(7)(G)(iii).

In that investigation, the Commission explained that in assessing material injury, it considers the volume of subject imports, their effect on prices for the domestic like product, and their impact on domestic producers. Appx02155 (citing 19 U.S.C. § 1677(7)(B)). It further explained that no single factor is dispositive and that it requires "a sufficient causal, not merely a temporal, nexus between subject imports and material injury." Appx02156 (citing *Nippon Steel Corp. v. U.S. ITC*, 345 F.3d 1379, 1384 (Fed. Cir. 2003)).

As to import volume, the Commission noted that while both U.S. methionine demand and imports' market share increased, domestic industry's market share and capacity utilization rate declined. Appx02159–02161. In absolute terms, the volume of imports increased by 137.4 percent. Appx02164–02165.

As for price effects, the Commission found a "moderately high degree of substitutability" between domestic and imported methionine because most purchasers found them to be comparable. Appx02162. It further determined that "[p]urchasers most frequently cited price after reliability/availability of supply as among the three top factors in purchasing decisions." Appx02163.

**PUBLIC VERSION**

Examining pricing data, the agency concluded that it showed "predominant overselling by cumulated subject imports," Appx02166, meaning that imports were priced *higher* than domestic products. Nevertheless, "the record indicates that purchasers were offered lower-priced . . . imports in particular transactions and that cumulated subject imports were able to take substantial quantities of sales from the domestic industry due to their pricing." Appx02167–02168. "As a result, the domestic industry lost a substantial volume of sales to subject imports due to price." Appx02168. Domestic product prices also declined during the relevant time, and "factors other than . . . imports cannot explain the magnitude of the price declines for the domestic like product." Appx02171.

As to the imports' economic effects, the Commission found that domestic industry's output, employment, and revenue declined due to the imports gaining market share based on pricing. Appx02178. The agency further concluded that domestic industry could reasonably have expected to have gained market share in view of Chinese companies leaving the U.S. market in response to Section 301 tariffs, but instead the subject imports gained market share. Appx02179. While the importers objected that the domestic producers would not have been able to ship more product in any event because they were operating at high capacity, the agency found that the argument failed for two reasons—first, the record did not support it, and second, even if the record did support it, "this circumstance would not explain the revenues that the domestic

industry lost due to the significant price-depressing effects of the subject imports." Appx02179–02180. The Commission emphasized that imports were an independent cause of the decline in domestic industry's financial performance. Appx02180.

Based on these findings, the agency determined that French methionine dumped in the U.S. market materially injured domestic industry. Appx02075. In its later trailing investigations as to Japanese and Spanish imports, the Commission stated that "we adopt the findings and analyses from our determination and views regarding subject imports from the leading investigation [France] with respect to the issues of domestic like product, domestic industry, cumulation, conditions of competition, and material injury by reason of cumulated subject imports." Appx02417–02418. "Accordingly, we determine that an industry in the United States is materially injured by reason of subject imports of methionine from Japan and Spain found by Commerce to be sold in the United States at [less than fair value]." Appx02418.

### III

Adisseo Espana S.A., a Spanish methionine producer, and its affiliated U.S. importer, Adisseo USA Inc. (collectively, Adisseo), brought this suit under 19 U.S.C. §§ 1516a(a)(2)(A)(i)(I) and 1516a(a)(2)(B)(iii) challenging the Commission's final determination. ECF 1 (summons); ECF 10 ¶¶ 1 and 4 (complaint). The court has subject-matter jurisdiction over such actions under 28 U.S.C. § 1581(c).

**PUBLIC VERSION**

Novus intervened as a defendant supporting the government. ECF 18. Adisseo then moved for judgment on the agency record. ECF 30 (confidential); ECF 31 (public). The government, ECF 49 (confidential); ECF 50 (public), and Novus, ECF 36 (confidential); ECF 37 (public), opposed the motion and Adisseo replied, ECF 39 (confidential); ECF 40 (public). The court heard oral argument.

In § 1516a(a)(2) actions such as this, "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). That is, the question is not whether the court would have reached the same decision on the same record—rather, it is whether the administrative record as a whole permits the Commission's conclusion.

> Substantial evidence has been defined as more than a mere scintilla, as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. To determine if substantial evidence exists, we review the record as a whole, including evidence that supports as well as evidence that fairly detracts from the substantiality of the evidence.

*Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (cleaned up).

In addition, the ITC's exercise of discretion in § 1516a(a)(2) cases is subject to the default standard

of the Administrative Procedure Act, which authorizes a reviewing court to "set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Solar World Americas, Inc. v. United States*, 962 F.3d 1351, 1359 n.2 (Fed. Cir. 2020) (explaining that in § 1516a cases brought under section 516A of the Tariff Act of 1930, APA "section 706 review applies since no law provides otherwise") (citing 28 U.S.C. § 2640(b)).

## IV

Adisseo challenges the Commission's determinations (1) that methionine imports depressed domestic market prices, ECF 31, at 10–48; (2) that such imports caused adverse volume effects, *id.* at 49–62; and (3) that such imports injured domestic industry, *id.* at 62–65. The court considers these points in turn.

## A

### 1

Regarding price effects, Adisseo first asserts that the Commission's determination assumes that "methionine purchasers [are] driven principally if not exclusively by price" and contends that "this assumption . . . is contradicted by the factual record." ECF 31, at 11. The company posits that while the record shows that price is important, other factors such as reliability of supply are more important. *Id.* at 11–12 (citing Appx01672). It fails, however, to cite any part of the record to support its contention that the agency

assumed that purchasers were driven principally if not exclusively by price.

To the contrary, Adisseo acknowledges the Commission stated, three times, that "price is an important factor." *Id.* at 11 (citing Appx02101, Appx02103, Appx02106 n.147). The word "an" is critical because "*an* important factor" is a very different matter from "*the* most important factor." Adisseo does not dispute that the record shows that price was, in fact, *an* important factor for domestic purchasers. *See* Appx01672 (showing that 23 of 28 purchasers described price as "very important" while the remaining five characterized price as "somewhat important."); *see also* Appx02163 (the agency explaining that "[p]urchasers most frequently cited price after reliability/availability of supply as among the three top factors in purchasing decisions"). The Commission's weighing of the relative importance of price is thus supported by substantial evidence.

2

Adisseo asserts that the agency's determination that imports depressed domestic prices is not supported by substantial evidence. ECF 31, at 14–32. In so doing, the company presses a host of arguments.

Adisseo initially contends that the Commission adopted a theory of "phantom underselling" proffered by the petitioner whereby foreign producers made low-price offers to which the domestic industry responded by lowering prices, even though the foreign sellers

"were making *actual sales* at higher prices, thus largely overselling the domestic like market." *Id.* at 14 (emphasis in original). The company asserts that this theory is illogical because the record evidence "shows that subject imports consistently and overwhelmingly oversold the domestic like product." *Id.* at 15.

The government responds that "the Commission's recognition that the pricing data indicated predominant overselling did not preclude the [agency] from relying on other evidence to find that subject imports depressed domestic prices." ECF 45, at 33. The government points to the statute, which requires the Commission to consider—in addition to whether there has been "significant price underselling"—whether "the effect of imports . . . *otherwise* depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree." 19 U.S.C. § 1677(7)(C)(ii)(II) (emphasis added). In view of this language, "the Commission may rely on evidence *either* of significant underselling *or* significant price suppression or depression to support a finding for adverse price effects." *OCTAL Inc. v. United States*, 539 F. Supp. 3d 1291, 1302 (CIT 2021) (emphasis in original) (citing *Grupo Indus. Camesa v. United States*, 85 F.3d 1577, 1582 (Fed. Cir. 1996)). Thus, a finding of import overselling does not necessarily preclude a concomitant determination that such imports suppressed domestic product prices.

Adisseo next argues that the record lacks key evidence to support the Commission's determination of price suppression. ECF 31, at 16–19. It contends that

**PUBLIC VERSION**

only a "trivial" number of U.S. methionine purchasers reported that domestic producers reduced their prices to respond to import competition, "while the vast majority of U.S. purchasers" reported either no such reductions or no knowledge of any such reductions. *Id.* at 17. According to the company, a "no knowledge" response undermines the ITC's decision, since purchasers "would surely know" if domestic sellers underbid imports "to win or maintain a sale." *Id.* at 18.

The Commission, however, noted that most responding purchasers reported no knowledge of domestic producers lowering prices in response to import competition. Appx02109 n.154. The problem for Adisseo is that the agency read this evidence differently than the company would prefer. It's not the court's role to second-guess that weighing.

Similarly, Adisseo emphasizes that the record is bereft of any examples of purchasers exercising meet-or-release clauses, which allow them "to inform suppliers of a lower-priced offer and purchase the lower-priced product from another supplier if the supplier it is negotiating with is unable or unwilling to offer a lower price." ECF 31, at 18 (quoting Appx02108). Such clauses can only be exercised where a purchaser provides the seller with written proof of a lower price. *Id.*

The Commission, however, acknowledged the absence of any such "direct evidence of purchasers formally exercising meet-or-release clauses." Appx02108. Nevertheless, the agency found that "evidence in the record, including purchaser emails and Novus's inter-

**PUBLIC VERSION**

nal communications, demonstrate[d] instances where customers notified Novus of offers of lower prices for subject imports and either requested a price reduction or purchased subject imports in lieu of domestic product." *Id*. Adisseo's quarrel is with the weight the agency attached to the absence of direct evidence of purchasers formally exercising meet-or-release clauses, which again is a matter outside the judicial province.

Along the same lines, the company takes aim at what it characterizes as "informal, anecdotal email" evidence that the Commission cited in finding that Novus "was forced to lower its prices to meet import competition." ECF 31, at 20; *see also id*. at 21–25. Adisseo contends that this material does not support the agency's conclusion of price depression. *Id*. at 25. Yet again, the problem is that the agency read the material differently, and it's not the court's role to reweigh that evidence. It suffices that the Commission explained at length the basis for its conclusion that Novus reduced prices in response to Adisseo's imports and reasonably tethered that finding to the record. *See* Appx02108 n.153.

Finally, Adisseo argues that the Commission improperly declined to address an alternative cause of price depression suggested by the company, global overcapacity. ECF 31, at 27–31. That's not true—the agency squarely addressed this contention and rejected it for several reasons, including that record evidence "reflects that competing offers to purchasers in the U.S. are used as benchmarks for U.S. price

negotiation, not global or non-U.S. price lists." Appx02110. Once again, the company invites the court to undertake de novo review of the record, which the statutory standard of review does not allow. Even if Adisseo's reading is the better one, that's not enough to carry the day when, as here, the agency's rejection of the company's argument is reasonably tethered to the record.

3

Adisseo further challenges the Commission's determination that lost sales indicated import-driven price suppression. ECF 31, at 32–39. It contends that "anecdotal lost sales allegations are insufficient to undermine other more empirical price effects information, such as evidence from the Commission's traditional price comparison analysis." *Id*. at 37. Based on statements in various CIT decisions, *see id*. at 37–38, the company asserts that "[i]n the absence of other record evidence of underselling, the existence of lost sales is insufficient *per se* to establish that subject imports caused adverse price effects." *Id*. at 39.

Adisseo's argument fails. There is no such *per se* rule articulated in the CIT's cases, much less the governing statute. Moreover, the company again overstates the importance of overselling—as discussed above, the statute expressly recognizes that imports might depress domestic prices even in the absence of overselling. *See* 19 U.S.C. § 1677(7)(C)(ii)(II). Finally, the Commission did not rely exclusively on anecdotal evidence of lost sales to find price depression—it also

relied on "price trends for the domestic like product and subject imports," Appx02107, and evidence of domestic product price reductions, Appx02108–02109.

But Adisseo is on firmer ground when it argues that the Commission needs to reconsider its reliance on lost sales in view of the agency's failure to address the company's proffered methodology for calculating those sales. *See* ECF 31, at 32–37. According to Adisseo, when properly calculated the lost sales were "a far lower amount than identified by the Commission, and one that can hardly be considered 'significant.' " *Id.* at 36. Neither the government nor Novus disputes that the agency failed to address Adisseo's proffered methodology. Because the Commission had a duty to address the company's proffer, *see Altx, Inc. v. United States*, 167 F. Supp. 2d 1353, 1359 (CIT 2001) ("The statute directs the Commission to . . . *'address*[ ] *relevant arguments that are made by interested parties . . .* concerning volume, price effects, and impact on the industry of imports of the subject merchandise.") (emphasis in original) (quoting 19 U.S.C. § 1677f(i)(3)(B)), the court must remand. *See also Asociacion Colombiana de Exportadores de Flores v. United States*, 704 F. Supp. 1068, 1071 (CIT 1988) ("In order to ascertain whether action is arbitrary, or otherwise not in accordance with law, reasons for the choices made among various potentially acceptable alternatives usually need to be explained.") (citing *Bowman Transp. v. Ark.–Best Freight Sys.*, 419 U.S. 281, 285–86 (1974)).

**PUBLIC VERSION**

### 4

In evaluating price effects, the statute directs the agency to "consider whether there had been underselling during the investigation period and whether that underselling was significant." *Nucor Corp. v. United States*, 414 F.3d 1331, 1339 (Fed. Cir. 2005); *see also* 19 U.S.C. § 1677(7)(C)(ii)(I). According to Adisseo, "not only did the Commission not make this required statutory determination explicitly, the [agency's] conclusion on underselling is not clear by implication as it discusses both evidence in favor of and against a finding of overselling." ECF 31, at 40–41.

The court disagrees. As the government notes, the Commission plainly found "predominant *overselling*" by imports. ECF 45, at 23 (emphasis added) (quoting Appx02104). That necessarily implies an *absence* of underselling, which in turn means that the underselling was *not* significant. "In this case, the agency's path is clear, even though it did not set forth its conclusion as to the issue of underselling explicitly." *Nucor*, 414 F.3d at 1339. Thus, contrary to the company's argument, the Commission complied with its obligation to "consider" whether underselling occurred and, if so, its significance.

### B

Adisseo ostensibly takes aim at the Commission's determination that subject imports caused adverse *volume* effects, a factor specified by 19 U.S.C. § 1677(7)(B)(i)(I). ECF 49–58. But the company admits

that "subject volume did increase both absolutely and relatively over the" period of investigation. *Id.* at 49. Instead of challenging the agency's volume findings on their own terms, Adisseo takes issue with the Commission's measure of the *impact* of those imports on domestic producers[1]—an issue the court considers below in connection with 19 U.S.C. § 1677(7)(B)(i)(III).

The company thus does not challenge the Commission's finding that a 137.4-percent increase in the volume of subject imports is "significant both in absolute terms and relative to apparent U.S. consumption." Appx02103. The court therefore sustains that determination.

C

Finally, Adisseo argues that the Commission overstated the impact of subject imports on domestic producers. *See above* note 1; *see also* 19 U.S.C. § 1677(7)(B)(i)(III).

First, the company asserts that the Commission's determination that domestic producers should have

---

[1] *See* ECF 31, at 50–53 (arguing the Commission failed to consider the importance of supply diversity when assessing the significance of the increase in subject imports); *id.* at 53–58 (asserting that the increase in subject imports was not significant because of the lack of substitutability between the different chemical compositions of methionine). Adisseo's reply implicitly acknowledges that these points bear on the "impact" factor of § 1677(7)(B)(i)(III) rather than the "volume" factor of § 1677(7)(B)(i)(I). *See* ECF 40, at 29–36.

gained market share following the exit of Chinese imports is undermined by record evidence showing that purchasers valued having multiple suppliers. *See* ECF 31, at 50–53. But the agency acknowledged that evidence, Appx02101, and explained that "imports captured market share from both the domestic industry and [Chinese] imports. This undercuts Respondents' assertions that cumulated subject imports merely replaced volumes of nonsubject imports as they receded from the U.S. market." Appx02117 n.185. Although it's possible to read the record differently, substantial evidence supports the Commission's rejection of the company's theory that subject imports eroded the market share of domestic producers.

Second, Adisseo argues that in evaluating the impact of the increase in subject import volume, the agency should have "consider[ed] this increase on a disaggregated [basis]," ECF 31, at 54, meaning that it should have separately analyzed imports of the two different compositions of methionine.[2] According to the company's reading of the record, "because these chemical configurations are not fully interchangeable, an increase in supply of one configuration has a more attenuated effect on producers of the other." *Id*. at 55.

---

[2] "[M]ethionine is produced and sold in two distinctly different chemical configurations," *id.*, DLM and MHA. The former is sold only in dry form, while the latter is sold predominantly, but not exclusively, in liquid form. *Id*.

**PUBLIC VERSION**

The Commission, however, did consider substitutability of methionine's two compositions. Specifically, the agency noted three types of product substitution: "between liquid and dry methionine using currently installed equipment" (14 of 26 responding purchasers could switch), "between methionine of different activity levels" (12 of 18 could switch), and "between MHA and DLM" (13 of 22 could switch). Appx02100. It further observed that "in some instances, . . . substitutability may be limited by," inter alia, "the cost of shifting between methionine types[ ] and customer preference." *Id*. The Commission just gave less weight to these considerations than Adisseo would prefer.

Moreover, the statute directs the agency to define the domestic industry as the "producers as a whole of a domestic like product." 19 U.S.C. § 1677(4)(A). Under this provision, "[t]he Commission is not required to focus on one portion of the industry by making a disaggregated analysis of material injury." *Celanese Chems., Ltd. v. United States*, 31 CIT 279, 298 (2007). As the government points out, the agency "relied on the interchangeability of DLM and MHA as a factor supporting the definition of a single domestic like product, and thus a single domestic industry." ECF 45, at 58 n.15. Adisseo does not challenge that definition, so it can hardly complain of the Commission's failure to disaggregate DLM and MHA in considering the impact of the subject imports.

**Ct. No. 21-00562**                                                  **Page 19**
**PUBLIC VERSION**

\* \* \*

For the foregoing reasons, the court grants Adisseo's motion for judgment on the agency record in part. A separate remand order will issue.

Dated: December 18, 2023     /s/ *M. Miller Baker*
          New York, NY           Judge