**PUBLIC VERSION**

**Views of the Commission on Remand**

By decision and order dated December 18, 2023, the U.S. Court of International Trade remanded the Commission's determinations regarding Spain in the final Methionine investigations, as set out in *Methionine from France*, Inv. No. 731-TA-1534 (Final), USITC Pub. 5206 (June 2021) (the "Leading Views") and *Methionine from Japan and Spain*, Inv. Nos. 731-TA-1535-1536 (Final), USITC Pub. 5230 (Sept. 2021), (the "Trailing Views").[1] Upon consideration of the remand order and based on the evidence in the record of these investigations, the Commission determines again that an industry in the United States is materially injured by reason of imports of methionine from Spain that are sold in the United States at less than fair value ("LTFV").

**I.    BACKGROUND**

In June 2021, the Commission unanimously determined that a domestic industry was materially injured by reason of the subject imports from France found by Commerce to be sold in the United States at LTFV.[2] Subsequently, in September 2021, the Commission unanimously

---

[1] *Adisseo Espana S.A. et al v. United States*, Court No. 21-00562, Slip Op. 23-178 (Ct. Int'l Trade Dec. 18, 2023).  Although the petitions for the antidumping investigations with respect to methionine from France, Japan, and Spain were filed on the same day (July 29, 2020), the investigation schedules became staggered in March 2021, when Commerce postponed its final antidumping duty determinations regarding the trailing investigations (methionine from Japan and Spain), but not its final antidumping duty determination regarding the leading investigation (methionine from France), thereby necessitating an earlier final determination in the leading investigation.  The trailing investigations were based on the same record, as supplemented by inclusion of Commerce's final antidumping duty determinations for subject imports from Japan and Spain, as well as the parties' final comments concerning those determinations.  In the trailing investigations, the Commission adopted its findings and analyses from its leading investigation with respect to issues concerning the domestic like product, domestic industry, cumulation, conditions of competition, and material injury.  *Trailing views*, USITC Pub. 5230 at 4–5.  We continue to adopt those findings and analyses from the original leading investigation, as modified by these Remand Views.

[2] *Leading Views*, USITC Pub. 5206 at 3, 52.

1

**PUBLIC VERSION**

determined that the domestic industry was materially injured by reason of subject imports of methionine from Japan and Spain found by Commerce to be sold in the United States at LTFV.[3]

Respondents Adisseo Espana S.A., a foreign producer and exporter of methionine from Spain, and Adisseo USA Inc., its affiliated U.S. importer of methionine (collectively "Adisseo"), appealed the Commission's final affirmative injury determinations concerning methionine from Spain.[4] As relevant to this remand determination, Adisseo challenged the Commission's finding that the volume of confirmed lost sales due to subject imports' lower price was substantial, as well as the Commission's contextualization of the volume of lost sales.[5] Adisseo also challenged various other aspects of the Commission's original determination, including: (1) the Commission's conclusion that the volume of cumulated subject imports and the increase in the volume of cumulated submit imports was significant; (2) the Commission's finding of significant price effects; and (3) the Commission's finding of significant adverse impact by reason of subject imports.[6]

On December 18, 2023, the court issued an opinion and order, affirming in part and remanding in part the Commission's determinations. In particular, the court sustained the Commission's determinations on all issues but one; the court remanded for the Commission "to reconsider the probative value and factual accuracy of the volume of alleged lost sales used to

---

[3] *Trailing Views*, USITC Pub. 5230 at 3, 9.
[4] Slip Op. 23-178 at 6; *see* Summons and Complaint filed in United States Court of International Trade by Plaintiff (Oct. 13, 2021, and Nov. 12, 2021, respectively). ECF Doc. Nos. 8 & 10.
[5] Plaintiffs' Memorandum in Support of {Court of International Trade} Rule 56.2 Motion for Judgement on the Agency Record (Apr. 1, 2022) at 32–37 ("Adisseo Rule 56.2 Brief"), ECF Doc Nos. 30 & 31.
[6] Adisseo Rule 56.2 Brief at 10–64.

2

support a finding of adverse price effects in view of the competing methodology proffered by Adisseo in its posthearing brief."[7]

On January 11, 2024, the Commission issued a notice of remand proceedings, and published that notice in the Federal Register on January 17, 2024.[8] In the notice, the Commission stated that it was not reopening the record, but invited parties to file comments concerning how the Commission could best comply with the court's remand instructions.[9] On February 16, 2024, Adisseo filed remand comments, as did Novus International, Inc. ("Novus"), a domestic producer of methionine.[10]

## II. ADOPTION OF FINDINGS FROM THE LEADING VIEWS

We have considered the record as a whole in light of the court's remand instructions. The Commission adopts its original findings, analysis, and conclusions in their entirety with respect to those issues either affirmed by the court or not subject to appeal, including domestic like product,[11] domestic industry,[12] cumulation,[13] legal standards,[14] conditions of competition,[15] volume,[16] and impact.[17] The Commission also adopts its analysis concerning significant price

---

[7] Remand Order accompanying Slip Op. 23-178 at para. 2 (Dec. 18, 2023).
[8] *Methionine From Spain*, Notice of Remand Proceedings, EDIS Doc. 812210 (Feb. 2, 2024); 89 Fed. Reg. 2979 (Jan. 17, 2024).
[9] *Methionine From Spain*, Notice of Remand Proceedings, 89 Fed. Reg. 2979, 2980 (Jan. 17, 2024).
[10] *See* Adisseo Confidential Remand Comments, EDIS Doc. 814352 (Feb. 16, 2024) ("Adisseo Comments"); *see also* Novus Confidential Remand Comments, EDIS Doc. 814326 (Feb. 16, 2024) ("Novus Comments").
[11] *Leading Views*, USITC Pub. 5206 at 5–15.
[12] *Leading Views*, USITC Pub. 5206 at 16.
[13] *Leading Views*, USITC Pub. 5206 at 16–21.
[14] *Leading Views*, USITC Pub. 5206 at 21–25.
[15] *Leading Views*, USITC Pub. 5206 at 25–30.
[16] *Leading Views*, USITC Pub. 5206 at 30–31.
[17] *Leading Views*, USITC Pub. 5206 at 41–47.

effects,[18] as modified by the discussion below of the probative value and factual accuracy of the volume of confirmed lost sales in light of Adisseo's proffered alternate approaches for contextualizing these sales.

In accordance with the court's instructions, we reconsider the probative value and factual accuracy of the volume of alleged lost sales and continue to find that these data support a finding of adverse price effects. We also address Adisseo's proposed approach towards contextualizing the lost sales information.

### III.  THE VOLUME AND PROBATIVE VALUE OF CONFIRMED LOST SALES

#### A.   The Court's Instructions

Addressing the Commission's consideration of the volume of confirmed lost sales, the court stated:

> According to Adisseo, when properly calculated the lost sales were "a far lower amount than identified by the commission, and one that can hardly be considered 'significant.'" Neither the government nor Novus disputes that the agency failed to address Adisseo's proffered methodology. Because the Commission had a duty to address the company's proffer . . . the court must remand.[19]

Accordingly, the court ordered the Commission "to reconsider the probative value and factual accuracy of the volume of alleged lost sales used to support a finding of adverse price effects in view of the competing methodology proffered by Adisseo in its posthearing brief."[20]

#### B.   Parties' Arguments

##### 1.   Petitioner Novus

---

[18] *See Leading Views*, USITC Pub. 5206 at 31–41.
[19] Slip Op. 23-178 at 14 (internal citation omitted).
[20] Remand Order accompanying Slip Op. 23-178 at para. 2.

Novus argues that to comply with the court's remand instructions, the Commission should address the alternative methodology suggested by Adisseo as the evidence underlying the Commission's assessment of lost sales is not in dispute and that the court did not indicate any flaw in the Commission's calculations.[21]  Specifically, Novus highlights that the finding that eight purchasers confirmed purchasing [     ] short ton 100-percent equivalent activity weight ("STEAW") of subject imports in lieu of the domestic like product remains factually accurate regardless of how this volume is contextualized.[22]  Moreover, Novus maintains that the Commission's findings that confirmed lost sales accounted for [   ] percent of the total volume of subject imports that all of the responding purchasers bought during the period of investigation ("POI") and also equates to [    ] percent of the increase in subject import volume over the POI are also indisputably accurate.[23]  In Novus's view, the reasonableness of the Commission's comparisons is further buttressed by its prior comparison of lost sales volumes to total reported purchases of subject imports in *Acetone from Singapore and Spain*, Inv. Nos. 731-TA-1438 and 731-TA-1440 (Final), USITC Pub. 4997 at 34 (Dec. 2019).[24]

Novus also argues that, even if the Commission adopts either of Adisseo's preferred metrics – comparing the volume of lost sales to apparent U.S. consumption or to the total reported volume of reported purchases and imports of all methionine over the POI – these comparisons do not compel a negative material injury determination.[25]  Novus emphasizes that, although Plaintiff's preferred approaches would yield lower percentage figures, that does not

---

[21] Novus Comments at 3.
[22] Novus Comments at 3–4, 6.
[23] Novus Comments at 4.
[24] Novus Comments at 4 & n.13.
[25] Novus Comments at 4.

change the volume of lost sales in absolute terms or otherwise undermine the Commission's finding that the domestic industry was forced to either lower its prices or lose sales to subject imports.[26] Moreover, Novus argues that the volume of confirmed lost sales is approximately valued at $[     ], even without accounting for the price depressing effects of subject imports – a value that Novus contends is not immaterial.[27]

    **2.    Adisseo**

Adisseo reiterates its arguments from the original investigations that "it is not appropriate to compare the absolute quantity of reported lost sales to the change in subject import volume, {but} it is appropriate to compare the quantity of reported lost sales to the quantity of U.S. purchasers' purchases and imports over the POI and to the total quantity of apparent consumption over the POI."[28] It argues that, in order to comply with the court's remand instructions, the Commission must address its proposed approaches to considering lost sales which calculate that "lost sales accounted for only [ ] percent of total purchases and imports over the POI, and only [ ] percent of total apparent U.S. consumption over the POI."[29] Adisseo contends that the Commission must also address its prior "precedent" in which the Commission utilized the same analysis proffered in Adisseo's posthearing brief.[30]

---

[26] Novus Comments at 6. Novus reiterates that methionine production is capital-intensive and that high capacity utilization rates are essential to maintaining profitability. *Id*.
[27] Novus Comments at 6–7.
[28] Adisseo Comments at 3–4; Respondents' PostHr'g Br. EDIS Doc. 742712 (May 17, 2021) at Annex VII (Response to Question on Lost Sales).
[29] Adisseo Comments at 4.
[30] Adisseo Comments at 5, n.10.

Adisseo also argues that the Commission must explain the comparisons utilized in its leading views.[31] Specifically, Adisseo argues that the Commission must explain why comparing the total volume of lost sales only to the total volume of subject import purchases during the POI and the change in subject import volume over the POI is reasonable in light of its proposed alternative approaches.[32]

Finally, Adisseo argues that, in order to comply with the court's instruction to "reconsider the probative value and factual accuracy of the volume of alleged lost sales used to support a finding of adverse price effects," the Commission must explain why lost sales are of greater probative value than the quarterly price comparison data in assessing price effects.[33] It claims that, if its proffered comparisons demonstrate that the volume of lost sales is substantially reduced, "the Commission should specify why the evidence of alleged lost sales is so probative that it is able to overcome the contrary evidence of the quarterly pricing data."[34]

It is important to note that Adisseo did not challenge the accuracy of the Commission's computation of the volume of lost sales as a percentage of the increase in subject import volumes or the total reported purchases of subject imports during the POI.[35] Instead, as summarized above, Adisseo asks the Commission to view the volume of confirmed lost sales in

---

[31] Adisseo Comments at 5–6.
[32] Adisseo Comments at 5–6.
[33] Adisseo Comments at 6 (quoting Remand Order accompanying Slip Op. 23-178 at para. 2).
[34] Adisseo Comments at 6–7. This argument, however, goes beyond the scope of the court's remand instructions. Specifically, the court affirmed that predominant overselling does not preclude a significant price effect finding on other grounds. Slip Op. 23-178 at 9–10. The court also explained that the Commission did not solely rely on evidence of lost sales to support its price effects finding but also relied on "'price trends for the domestic like product and subject imports,' and evidence of domestic product price reductions." Slip Op. 23-178 at 13–14.
[35] *See* Remand Order accompanying Slip Op. 23-178 at para. 2; Adisseo Comments at 6.

a different context. Thus, Adisseo's issue is not actually with the methodology used to calculate lost sales, but rather with the context in which the Commission viewed the uncontroverted volumes of lost sales.

### C. Analysis

The Commission's finding of significant price effects in its original investigations, and again in this remand investigation, relies on record evidence showing that the domestic industry was forced to lower its prices in response to competing offers for subject imports.[36] That is, we found and continue to find that significant price depression occurred as a result of the domestic producers' efforts to maintain sales volume and keep their production lines running at a high rate of capacity utilization.[37] Specifically, we continue to find that price is an important factor in purchasing decisions.[38] We also continue to find that the domestic industry sought to maintain high levels of capacity utilization to offset the high fixed costs associated with methionine production and, thus, chose to compete on price in an effort to maintain sales volume.[39] Indeed, confirmed reports of lost sales showed that the domestic industry lost sales to subject imports primarily due to price in instances where it was unable or unwilling to lower its prices.[40] At the same time, the domestic industry was afforded opportunities to respond to low-priced offers for subject imports, including through meet or release clauses contained in

---

[36] *Leading Views*, USTIC Pub. 5206 at 36–37.
[37] *Leading Views*, USITC Pub. 5206 at 36–37.
[38] *Leading Views*, USITC Pub. 5206 at 29, 31. The Commission's finding that price was an important factor in purchasing decisions was affirmed by the court. *See* Slip Op. 23-178 at 8–9.
[39] *Leading Views*, USITC Pub. 5206 at 26, 36–37.
[40] *Leading Views*, USITC Pub. 5206 at 32–34, 36–37.

some of its annual and long-term contracts.[41] As the Commission observed in the Leading Views, price trend data,[42] hearing testimony,[43] and contemporaneous communications provided by petitioner[44] were consistent with the domestic industry's reported strategy of responding to low-priced offers for subject imports to maintain sales volume and a high rate of capacity utilization.[45]

Turning to the court's instruction to consider the factual accuracy of the volume of lost sales, the confirmed volume of lost sales primarily due to price totaled [    ] STEAW, as reported by U.S. purchasers, and was accurately described in the Commission's Leading Views.[46] Adisseo has not challenged the factual accuracy of the total lost sales figure. Instead, Plaintiff's disagreement is with how the Commission contextualized and weighed this evidence

---

[41] *Leading Views*, USITC Pub. 5206 at 36–37. These contract negotiations allow purchasers to inform suppliers of a lower-priced offer and purchase the lower-priced product from another source if the supplier it is negotiating with is unable or unwilling to offer a lower price. *Id*. at 36.

[42] *Leading Views*, USITC Pub. 5206 at 35 (citing Confidential Report ("CR"), Memorandum INV-TT-072 at Tables V-3, V-6 & E-1; *Methionine from France*, Inv. No. 731-TA-1534 (Final), USITC Pub. 5206 (June 2021), Public Report ("PR") at Tables V-3, V-6 & E-1). Specifically, domestic producers' prices for pricing products [    ], which accounted for the vast majority of their U.S. commercial shipments in 2020, declined during the POI. CR/PR at Table V-6 & E-1. In contrast, U.S. producers' prices for pricing product [ ], which accounted for a small minority of their U.S. commercial shipments in 2020 and which faced only two quarters of competition from subject imports, increased during the POI. CR/PR at Tables V-3, V-6, & E-1.

[43] *Leading Views*, USITC Pub. 5206 at 37 (citing Hearing Transcript at 22 (Galo), 45–46 (Drake)).

[44] *Leading Views*, USITC Pub. 5206 at 36–37 (citing Novus Posthearing Brief at Exh. 2). Moreover, the Commission had explained that its finding of price depression was consistent with the quarterly price comparison data on the record. *See Leading Views*, USTIC Pub. 5206 at 32–34, 36–37.

[45] *Leading Views*, USITC Pub. 5206 at 36–37.

[46] *Leading Views*, USITC Pub. 5206 at 33 (citing CR/PR at Table V-9). Contrary to what Adisseo may suggest, this volume does not change regardless of how it is contextualized. *See* Adisseo Comments at 6 (contending that "evaluating the volume of lost sales {using its preferred approaches} demonstrates that the volume of lost sales was in fact substantially lower than that found by the Commission . . .").

by calculating a ratio that compares this volume to the increase in the volume of subject imports.

In its Leading Views, the Commission provided context for the volume of confirmed lost sales, [     ] STEAW, by comparing it with two metrics of subject import volume. First, the Commission compared the volume of lost sales to the increase in subject import volumes. Second, the Commission also addressed Adisseo's concern about comparing the "absolute quantity of reported lost sales to the change in subject import volume," by comparing the volume of lost sales to the total reported purchases of subject imports in its Leading Views. Both metrics provided context to the volume of lost sales, illustrating the importance of price in purchasing decisions and, consequently, how sales lost to lower-priced subject imports put pressure on domestic producers to lower prices.[47]

The Commission's calculations for both comparisons are factually accurate. That is, the volume of lost sales do account for [   ] percent of the total volume of subject imports that all of the responding purchasers bought during the POI; and the volume of lost sales do equate to [    ] percent of the increase in subject import volume over the POI.[48] In these investigations, we continue to find that the lost sales volume is probative as reflecting, in a price sensitive market where producers seek to utilize their production capacity to offset high fixed costs, the extent to which lower-priced offers by importers can and did result in the domestic industry losing sales to subject imports. The comparison of the volume of lost sales to the total of subject import purchases reported by purchasers allowed the Commission to gauge

---

[47] *See Leading Views*, USITC Pub. 5206 at 33–34; Respondents' PostHr'g Br. EDIS Doc. 742712 (May 17, 2021) at Annex VII (Response to Question on Lost Sales).
[48] *Leading Views*, USITC Pub. 5206 at 33 (calculated from CR/PR at Tables IV-12, V-8, & V-9).

the frequency at which subject imports were purchased primarily because of their lower price rather than domestic products. The comparison of lost sales volumes to the increase in subject import volumes was also probative in the circumstances of the underlying investigations because subject imports had gained [ ▮ ] percentage points of market share from the domestic industry during the POI.[49]

Turning to the ratios Adisseo proposes the Commission consider in evaluating the volume of lost sales, we again note that there is no disagreement with the accuracy of the calculations used by the Commission, or those described by Adisseo. Rather, Adisseo simply prefers a different metric, noting that the volume of confirmed lost sales accounted for [ ▮ ] percent of total purchases and imports across all sources reported by purchasers over the POI, and [ ▮ ] percent of total apparent U.S. consumption over the POI. Even though the volume of lost sales accounts for a lesser percentage of these larger data sets relied upon by Adisseo, we continue to find that their volume is significant in these contexts. Given the importance of price and the need to maintain high-capacity utilization levels, confirmed lost sales totaling [ ▮ ] percent of total purchases and imports, or [ ▮ ] percent of apparent U.S. consumption, are consistent with and support the Commission's finding that domestic producers faced reducing prices or losing sales to subject imports.[50]

---

[49] *Leading Views*, USITC Pub. 5206 at 34.
[50] Adisseo Comments at 4. Plaintiff argues that the "Commission must also address its prior precedent in which the Commission used the same analysis suggested by Adisseo." Adisseo Comments at 5, n.10. However, each Commission investigation is *sui generis* and based on the specific facts of each record. Thus, the appropriate comparisons are not determined by rigid adherence to "precedent," but rather what comparisons may be appropriate in the circumstances of each investigation. *See, e.g., Nucor Corp. v. United States*, 414 F.3d 1331, 1336, 1341 (Fed. Cir. 2005).

**PUBLIC VERSION**

Even considering these alternative metrics, we disagree with Adisseo that these metrics warrant an alteration of the Commission's analysis of price effects. Nor do these alternative metrics detract from our finding that the volume of lost sales reflected that domestic producers were forced to lower prices to compete with subject imports and maintain sales volume.

As discussed in the Leading Views, and having considered Adisseo's alternative metrics, we continue to find that subject imports depressed prices for the domestic like product to a significant degree. Accordingly, we find that subject imports had significant price effects on prices for the domestic like product. We adopt and incorporate in their entirety all other aspects and analyses set out in our Leading Views and Trailing Views.

## IV.   CONCLUSION

For the foregoing reasons, we again determine that an industry in the United States is materially injured by reason of subject imports of methionine from Spain found by Commerce to be sold in the United States at LTFV.